(REDACTED)

FILED UNDER SEAL

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| IN RE: MACBOOK KEYBOARD LITIGATION | ) | Case No.: 5:18-cv-02813-EJD |
| | ) | |
| | ) | **CLASS ACTION** |
| | ) | |
| | ) | |
| | ) | **MERITS EXPERT REPORT OF** |
| | ) | **HAL J. SINGER, PH.D.** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO A PROTECTIVE ORDER

R**EDACTED - FILED UNDER SEAL**

INTRODUCTION AND ASSIGNMENT ........................................................................... 1

QUALIFICATIONS ...................................................................................................... 4

I.    CHOICE-BASED CONJOINT ANALYSIS DEMONSTRATES ECONOMIC INJURY ........................ 5
      A.    CBC Analysis Is a Standard Economic Method ..................................... 5
      B.    CBC Analysis Confirms Consumers Are Highly Averse to the Keyboard
            Defect ..................................................................................................... 7
            1.    Design and Administration of CBC Survey .................................. 7
            2.    Calculating the Net Disutility of the Keyboard Defect ............ 13
      C.    Estimating the Keyboard Defect Risk Using Apple's Attempted Repair Rate
            ............................................................................................................... 15
      D.    Aggregate Damages Using Traditional CBC Framework ..................... 18

II.   INCORPORATING THE SUPPLY SIDE ...................................................................... 21
      A.    Standard Economics Shows How Firms With Market Power Decrease Their
            Prices In Response to Decreased Demand ........................................... 21
      B.    Aggregate Damages Using Linear Demand Approximation ................. 22
      C.    Aggregate Damages Using Nonlinear Demand Systems ...................... 24

CONCLUSIONS ....................................................................................................... 30

APPENDIX 1: CURRICULUM VITAE OF HAL J. SINGER ............................................... 32

APPENDIX 2: MATERIALS RELIED UPON ................................................................ 42

APPENDIX 3: PRE-TEST QUESTIONNAIRE ............................................................... 46

APPENDIX 4: ADDITIONAL ANALYSES .................................................................... 54

APPENDIX 5: PREDICTED REPAIR RATES FOR NEWER MACBOOK MODELS ................... 59

-1-

**INTRODUCTION AND ASSIGNMENT**

1.      Plaintiffs represent a certified class of MacBook purchasers (the "Class"), defined as

follows:

> [A]ll persons who purchased, other than for resale, within California, New York,
> Florida, Illinois, New Jersey, Washington or Michigan, an Apple MacBook from any
> of the model years 2015-2017, an Apple MacBook Pro from any of the model years
> 2016-2019 (excluding the 16 inch MacBook Pro released in November 2019), or an
> Apple MacBook Air from any of the model years 2018-2019.[1]

2.      Plaintiffs allege that the Apple laptops included in the Class definition above (the

"MacBooks") are defective.[2] Specifically, Plaintiffs allege that the MacBook's "butterfly" keyboard

is prone to fail, causing the keys to stick, to register multiple keystrokes when a key is pressed only

once, or to stop registering keystrokes altogether (collectively, the "Keyboard Defect").[3] The web

page for Apple's Keyboard Service Program describes the Keyboard Defect similarly.[4] Plaintiffs

allege that the Keyboard Defect arises from "a physical problem that compromises the MacBook's

central functionality,"[5] and that, when the Keyboard Defect manifests in the MacBook, "the

computer becomes inoperable and unsuitable for its ordinary, intended use."[6]

---

1.  *In Re: MacBook Keyboard Litigation*, Case No.: 5:18-cv-02813-EJD, Order Granting Motion to Certify Class (March 8, 2021) [hereafter, Class Cert Order], at 2.
2.  *In Re: MacBook Keyboard Litigation*, Case No.: 5:18-cv-02813-EJD, Second Amended Consolidated Class Action Complaint (October 11, 2018) [hereafter, Complaint], ¶1. *See also* Class Cert Order at 4.
3.  Complaint ¶1.
4.  *See* Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro - Apple Support, *available at* https://support.apple.com/keyboard-service-program-for-mac-notebooks. ("Apple has determined that a small percentage of the keyboards in certain MacBook, MacBook Air, and MacBook Pro models may exhibit one or more of the following behaviors:
    - Letters or characters repeat unexpectedly
    - Letters or characters do not appear
    - Key(s) feel 'sticky' or do not respond in a consistent manner
Apple or an Apple Authorized Service Provider will service eligible MacBook, MacBook Air, and MacBook Pro keyboards, free of charge. The type of service will be determined after the keyboard is examined and may involve the replacement of one or more keys or the whole keyboard.").
5.  Complaint ¶2.
6.  *Id.*

PRIVILEGED AND CONFIDENTIAL

3.      In my Class Reports, I demonstrated that economic injury and aggregate damages to the Class can be reliably determined using Choice-Based Conjoint ("CBC") analysis.[7] Now that the Class has been certified based in part on my CBC model,[8] I have been asked to complete this analysis at the merits phase. For purposes of my analysis, I have been asked to assume that, as Plaintiffs allege, the MacBook exhibits the Keyboard Defect with a higher probability than what the Class could have reasonably expected at the point of purchase. My methodology employs, as an input, an estimated probability of the Keyboard Defect manifesting within four years of purchase, which corresponds to the economic risk to which all Class Members are exposed at the point of purchase (the "Keyboard Defect Risk"). This economic risk translates into a decrease in the price of the MacBook, had Apple disclosed the Keyboard Defect at the point of purchase.

4.      The Keyboard Defect Risk is applied to the output of the CBC survey, as opposed to being incorporated into the CBC survey. This involves a straightforward application of the standard "expected utility" framework widely used by economists for decades to analyze consumer behavior under uncertainty.[9] Using this expected utility framework, all of my damages calculations conservatively assume that consumers are risk neutral.[10]

_____

7.   Class Certification Report of Hal J. Singer (August 14, 2020) [hereafter, Class Cert Report]; *see also* Class Certification Reply Report of Hal J. Singer (October 28, 2020) [hereafter, Class Cert Reply].

8.   In its Class Cert Order, the Court recognized that "Choice-based conjoint ("CBC") analysis is a well-recognized economic method used to study and quantify consumer preferences." Class Cert Order at 10. Similarly, "[t]he Court f[ound] Dr. Singer's CBC analysis reliable and relevant to Plaintiffs' theory of class-wide damages." *Id* at 12.

9.   In its Class Cert Order, the Court recognized that the expected utility approach "is supported by legitimate economic literature and is reliable." Class Cert Order at 11.

10.  It is also possible to disclose the Keyboard Defect Risk to respondents within the CBC survey. My Class Cert Reply demonstrated that doing so results in greater damages than the expected utility framework I employ here. *See* Class Cert Reply ¶¶32-34. *See also* Class Cert Order at 11-12 ("[I]n his reply report, Dr. Singer provided the results of a modified version of his CBC analysis in which he incorporated the risk of manifestation in the survey itself. According to the results of this modified survey, informing respondents of the probability of failure, as Apple suggested, actually generates a higher damage estimate because consumers are fundamentally risk averse…Plaintiffs rely on Dr. Singer's reports not for the damages figures they produce, but for the conclusion that a CBC analysis offers a workable method to calculate class-wide damages. On this point, the Court finds both the Singer Report and the Singer Reply Report relevant and helpful.").

PRIVILEGED AND CONFIDENTIAL

5.    I have been asked to estimate damages under two alternative methods. *First*, I have been asked to estimate the downward shift in demand for MacBooks that would have resulted from disclosure of the Keyboard Defect at the point of purchase. This is a traditional approach that has been employed by academic economists to estimate damages using CBC analysis in several litigation matters.[11] *Second*, I have been asked to incorporate more complex supply-side considerations by using the output of the CBC analysis as a starting point, and then analyzing the supply side using standard methods that incorporate Apple's cost and price-cost margins for the MacBooks at issue here. It bears emphasis that the first approach does not ignore the supply side, but instead assumes that the supply curve of MacBooks would have remained fixed (vertical) in the but-for world.[12]

6.    As detailed below, I find that economic injury to the Class is statistically and economically significant. Under the traditional conjoint method, I estimate aggregate damages to the Class of consumers in the seven states at issue at approximately ▮▮▮▮▮▮. When accounting for supply-side factors, I estimate aggregate damages to the Class at between ▮▮▮▮▮▮ (using a linear approximation to the demand curve) and ▮▮▮▮▮▮ (using nonlinear demand systems). As

---

11.    *See, e.g.,* Greg Allenby, Jeff Brazell, John R. Howell & Peter Rossi, *Valuation of Patented Product Features*, THE JOURNAL OF LAW AND ECONOMICS 57(3) (2014) [hereafter, Allenby et al. 2014A] at 630-631 (noting use of this traditional approach in *Apple Electronics Co. Ltd. v. Samsung Electronics Co. Ltd.,* No. 11-CV-1846 [N.D. Cal. Dec. 2, 2011] and in *Microsoft Corp. v. Motorola Inc.,* 696 F.3d 872 [9th Cir. 2012]). In *Apple v. Samsung*, Apple's own economist, Professor John Hauser of MIT, employed this traditional approach to determine the price premium for patented features of Samsung devices. *See Expert Report of John R. Hauser* in *Apple v. Samsung* (July 26, 2012). Dr. Hauser conducted conjoint surveys "to determine the price premium, if any, that Samsung consumers are willing to pay for the features associated with the patents at issue." *Id.* ¶7. *See also, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018), *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018); *In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016).

12.    This approach is consistent with a consumer-driven theory of harm, as Apple could have supplied the same quantity of MacBooks in the but-for world that it supplied in the actual world, at the same cost. The supply-side analysis in Part II below addresses Apple's incentives to reduce the supply of MacBooks in the but-for world in order to further increase its but-for profit. Accordingly, the difference between the two methods comes down to whether Apple is assumed to adjust its supply and pricing to maximize its profit in the but-for world, or if Apple is assumed simply to supply the same quantity of MacBooks at the same cost that it did in the actual world. It bears emphasis that Apple would have earned profit on the MacBooks under either scenario.

-4-

explained below, these calculations are based on an estimated Keyboard Defect Risk of ████, derived from the evidence in the case. My aggregate damages models can incorporate alternative estimates of the Keyboard Defect Risk with straightforward ministerial adjustments to the calculations.[13]

## QUALIFICATIONS

7.     I am a Managing Director at Econ One, a Senior Fellow at George Washington University's Institute for Public Policy, and an Adjunct Professor at Georgetown University's McDonough School of Business, where I have taught Advanced Pricing to MBA candidates since 2014.

8.     I am the co-author of the e-book *The Need for Speed* (Brookings Press 2013), and the book *Broadband in Europe* (Springer Press 2005). My articles have appeared in dozens of legal and economic journals, as well as economic textbooks.

9.     I have testified before Congress on the interplay between antitrust and sector-specific regulation. My scholarship and testimony have been widely cited by courts and regulatory agencies. In agency reports and orders, my writings have been cited by the Federal Communications Commission, the Federal Trade Commission, and the Department of Justice. My economic practice has been recognized by the American Antitrust Institute.

10.     I earned M.A. and Ph.D. degrees in economics from the Johns Hopkins University and a B.S. *magna cum laude* in economics from Tulane University.

---

13. As explained below, the estimated Keyboard Defect Risk of ████ is calculated using all MacBooks for which Apple has produced four years of attempted repair rates. *See* Table 3 below. In the alternative, I have also calculated projected repair rates for all of the MacBooks at issue, including those for which only limited data are available, resulting in a more conservative Keyboard Defect Risk estimate of approximately ████. *See* Appendix Tables A7 and A8. If I use this more conservative estimate of the Keyboard Defect Risk, aggregate damages range from ████████████ *See* Appendix Table A1.

PRIVILEGED AND CONFIDENTIAL

11.    My curriculum vitae is provided in Appendix 1, which contains a list of cases in which I have served as a testifying expert since 2012 and a list of publications I have authored in the previous 10 years. I have assessed common impact and performed damages analyses in numerous antitrust and consumer protection cases. While at Navigant Economics, I testified on behalf of Apple in a music-royalty proceeding in Canada that is unrelated to the present matter. I have never testified against Apple in any proceeding before the instant case. I have no financial stake in the outcome of this case. Econ One is being compensated for my work in this case at the rate of $825 per hour. A list of the materials upon which I relied in forming my opinions for this report is provided in Appendix 2.

## I.    CHOICE-BASED CONJOINT ANALYSIS DEMONSTRATES ECONOMIC INJURY

12.    In this section, I demonstrate that Choice-Based Conjoint ("CBC") analysis establishes economic injury to Class Members in the seven states using standard methods. The results of the CBC analysis demonstrate that consumers are highly averse to the Keyboard Defect when it is disclosed to them at the point of purchase.

### A.    CBC Analysis Is a Standard Economic Method

13.    Economists have used CBC analysis for decades to study and to empirically quantify consumer preferences. CBC analysis is grounded in economic modeling techniques pioneered by (among others) the Nobel Prize winning economist Daniel McFadden.[14] The economic modeling frameworks that provide the underpinning for CBC analysis have been widely used by economists

---

14.    *See, e.g.*, Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) MARKETING SCIENCE 275-297 (1986); *see also* Lisa Cameron, Michael Cragg & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," *Law360* (October 16, 2013) [hereafter, McFadden et al. 2013]; Paul Green & V. Srinivasan, *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice,* 54(4) JOURNAL OF MARKETING 3-19 (1990) [hereafter, Green & Srinivasan].

PRIVILEGED AND CONFIDENTIAL

to study markets for differentiated consumer products, in applications ranging from merger analysis to the competitive effects of introducing new products.[15]

14.　　Conjoint analysis has been widely adopted by the private sector. As of the early 1980s, one study estimated that there were hundreds of commercial applications of conjoint analysis each year.[16] More recently, it has been estimated that there are tens of thousands of such applications annually.[17] Applied conjoint analyses frequently focuses on goods and services marketed to consumers.[18]

15.　　CBC can be used to rigorously quantify consumer valuations of product attributes that are not priced separately. CBC uses survey responses to quantify the tradeoffs that consumers reveal they are willing to make when choosing among different products comprised of different combinations of attributes.[19] The economic models underlying CBC analysis express the utility that a consumer derives from a particular product in terms of the salient features of that product. Each product is expressed as a bundle of features, and each feature contributes something to the overall

---

15.　*See, e.g.,* Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 RAND JOURNAL OF ECONOMICS (2000); *see also* Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) JOURNAL OF POLITICAL ECONOMY (2002).

16.　Green & Srinivasan, *supra*, at 3, citing Dick Wittnick & Philippe Cattin, *Commercial Use of Conjoint Analysis: An Update,* 53 JOURNAL OF MARKETING 91-96 (1989).

17.　BRYAN K. ORME, GETTING STARTED WITH CONJOINT ANALYSIS: STRATEGIES FOR PRICING RESEARCH, (2nd ed. Research Publishers 2005) [hereafter, ORME 2005].

18.　Green & Srinivasan, *supra*, at 3-4 ("Conjoint analysis continues to be popular….The large majority of conjoint studies pertain to consumer goods (59%) and industrial goods (18%)….New product/concept evaluation, repositioning, competitive analysis, pricing, and market segmentation are the principal types of applications.") *See also* VITHALA RAO, APPLIED CONJOINT ANALYSIS 133-136, 229-256 (Springer-Verlag 2014).

19.　Conjoint studies sometimes attempt to create "incentive alignment" mechanisms for their respondents by (for example), offering the respondent a positive probability that every stated choice will result in an actual transaction. However, as Professor McFadden has noted, "experimental evidence is that people have difficulty understanding, accepting, and acting on the incentives in these mechanisms. Thus, it can be quite difficult in practice to ensure incentive alignment in a CBC, or to determine in the absence of strong incentives whether subjects are responding truthfully. Fortunately, there is also considerable evidence that while it is important to get subjects to pay attention and answer carefully, they are mostly honest in their responses irrespective of the incentives offered or how well they are understood[.]" *See* Moshe Ben-Akiva, Daniel McFadden, and Kenneth Train, FOUNDATIONS OF STATED PREFERENCE ELICITATION: CONSUMER BEHAVIOR AND CHOICE-BASED CONJOINT ANALYSIS 23-24 (Now Publishers 2019) [hereafter, McFadden et al. 2019].

utility that the consumer derives from the product. By selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes the respondent's utility—respondents indirectly reveal the value they attribute to individual features.[20] In this way, CBC enables the researcher to elicit consumers' valuation of an individual dimension of a multidimensional product. Various researchers have studied consumer preferences using conjoint analysis in the market for laptop (and desktop) computers.[21]

**B.    CBC Analysis Confirms Consumers Are Highly Averse to the Keyboard Defect**

16.    In this section, I describe the CBC analysis conducted to date, based on a survey conducted between March 31 and April 7, 2021.[22] The CBC survey yielded a data set of 10,440 data points compiled from the 1,044 respondents in the target population who completed the online survey, after screening out invalid responses (such as incompletes or click-throughs).[23]

**1.    Design and Administration of CBC Survey**

17.    Before completing the conjoint module, each respondent completed a brief pre-test (shown in the Appendix). First, respondents were asked six population-validation questions, which filtered out individuals not within the target population. The target population was defined to include

---

20. *See, e.g.*, Rao, *supra*, at 16-23.

21. *See, e.g.*, Kamel Jedidi., & Z. John Zhang, *Augmenting Conjoint Analysis to Estimate Consumer Reservation Price* 48(10) MANAGEMENT SCIENCE 1350–1368 (2002) (applying conjoint analysis to evaluate consumer preferences for five key notebook computer attributes: processing speed, hard drive, memory, price, and brand name); *see also* E. O. Oyatoye, Andrew E. Otike-Obaro, & Ezeoke Golda Nkeiruka, *Using Conjoint Analysis to Study the Factors Important to University Students in Nigeria When They Select a Laptop Computer* Richards College of Business, University of West Georgia 1-15 (2016) (applied choice-based conjoint studying laptop features including brand name, microprocessor, screen size/weight, hard drive, RAM and price); Christopher Chapman, James Alford, Chad Johnson, Ron Weidemann, & Michal Lahav *CBC vs. ACBC: Comparing Results with Real Product Selection*, Sawtooth Software Conference Proceedings (2009) (analyzing consumer preferences for computer accessory product line using both a choice-based conjoint and an adaptive choice-based conjoint).

22. The conjoint survey was administered by Qualtrics, which regularly conducts such surveys on behalf of business schools and large corporations. *See* Conjoint Analysis Software Tool, Qualtrics, *available at* https://www.qualtrics.com/core-xm/conjoint-analysis/.

23. [1,044 respondents] x [10 choice tasks] = 10,440. Qualtrics screens out invalid survey responses as a part of their standard service offering.

PRIVILEGED AND CONFIDENTIAL

those who had purchased a MacBook previously, so as to elicit participation by individuals familiar with the products at issue. The target population consisted of individuals aged 18 or over residing in the United States who had purchased an Apple laptop (MacBook, MacBook Air, or MacBook Pro) within the past five years, excluding individuals who had participated in another consumer electronics survey within the past 30 days. The survey questions were phrased so that the respondents were unaware of the topic of the survey until they had been pre-qualified.[24] After agreeing to complete the survey in one sitting and without input from others, respondents then confirmed that they understood that they were being asked to "assume you are shopping for a new Apple Laptop Computer," and that they were to "select the product that you would actually purchase in real life," or to select the no-purchase option.

18.    For the next portion of the pre-test, respondents were asked five questions pertaining to hardware defects to be disclosed at the point of purchase during the conjoint module. Consistent with Apple's Keyboard Service Program,[25] respondents were told that, if they selected a MacBook with a defect, Apple would attempt to repair it at no cost to the consumer:

> Some of the MacBooks shown to you will have a **hardware defect**. The defects will be described to you.
>
> If you select a MacBook with a **defect**, please assume the defect will appear sometime **after** your purchase. Once the defect appears, you will have the following options: (1) ship the laptop to Apple for Apple to attempt a free repair; (2) take the laptop to an Apple store for Apple to attempt a free repair.[26]

---

24. Respondents were asked if they had purchased a "Laptop Computer" among five other common consumer electronics. Conditional on their affirmative reply, they were then asked if that computer had been an "Apple" computer, among four other top laptop brands.

25. *See* Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro - Apple Support, *available at* https://support.apple.com/keyboard-service-program-for-mac-notebooks.

26. *See* Appendix 3 (emphasis in original). Respondents could also review this information during the conjoint module by hovering over the relevant text.

PRIVILEGED AND CONFIDENTIAL

19.     To avoid an exclusive focus on the Keyboard Defect (which might have induced some respondents to focus on the keyboard more than on other hardware), respondents were told that the laptops could exhibit one of five hardware defects—trackpad, speakers, webcam, keyboard, or microphone—and that some laptops would not exhibit any of these hardware defects. By design, respondents were not asked to make any assumptions regarding the likelihood of experiencing a defect.[27] Respondents confirmed in the pre-test that they understood each hardware defect as it was presented to them.[28] The description of the problems that can result from the Keyboard Defect was based on record evidence.[29] The order in which respondents were presented with the hardware defects during the pre-test was randomized. Respondents were also notified during the pre-test that some of the MacBooks would be displayed with the original retail price, while others would display the retail price with a discount applied.

20.     In a CBC survey, the products presented to respondents include different attributes, and the values that each attribute can take on are referred to as levels. Because respondents are limited in their ability to choose among a large number of options, CBC researchers generally limit

_____

27.  Rather than incorporate the Keyboard Defect Risk directly into the CBC survey, which would increase the cognitive burden on respondents, it is incorporated later in the analysis, under the conservative assumption that consumers are risk-neutral.

28.  *See* Appendix 3. Respondents could also review the descriptions of each hardware defect during the conjoint module by hovering over the relevant text.

29.  For the Keyboard Defect, respondents were told, "Some MacBooks will have a defective keyboard. Customers who experience this defect report that the 'keys do not respond,' or the 'keys are sticky,' or that 'letters or characters repeat unexpectedly.'" *See e.g.,* Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro - Apple Support, *available at* https://support.apple.com/keyboard-service-program-for-mac-notebooks. ("Letters or characters repeat unexpectedly; Letters or characters do not appear; Key(s) feel 'sticky' or do not respond in a consistent manner"); APL-MBKeyboard_00228247 at APL-MBKeyboard_00228252 "([T]he top 3 failure modes by comptia ('keys do not respond', 'sticky keys', 'keys repeat'…); APL-MBKeyboard_00637313 at APL-MBKeyboard_00637329 ("Specific Key(s) Do Not Work"… "Key press repeats characters"… "Key press feels abnormal"); *id.* at APL-MBKeyboard_00637338 ("Key does not respond, confirmed issue"); APL-MBKeyboard_00372163 ("Shallow/Key travel and feedback issues… Sticky or stuck keys… Not recognizing keystrokes/Some keys aren't working").

surveys to six or fewer attributes.[30] In this case, I ultimately included three broad attributes in the conjoint survey: (1) the type of Apple laptop (for example, a base model MacBook Pro 13-inch), (2) the presence or absence of a particular defect (disclosed at the point of purchase), and (3) the price.[31] With the exception of the defect attribute, the selection of the attributes and how they were displayed to respondents was based on the way in which the laptops are or have been described, displayed, and priced to prospective customers on Apple's website. For example, each choice set included images of the relevant laptops from Apple's website, including the technical specifications listed on Apple's website.[32]

21.    CBC survey respondents generally perform at most 20 "choice tasks."[33] In this case, I limited each respondent to ten choice tasks. For each choice task, a respondent is asked to select her preferred alternative from among a "choice set" of alternative laptops, with each choice defined by its attributes. In each choice set, the respondent is asked to select the laptop that she would choose to purchase if those were the only options available. Each choice task presented the respondent with three different laptops from which to choose.[34] Importantly, in every choice set, respondents were also given the option not to purchase any of the three laptops. Including such a "no buy" option allows a researcher to identify the willingness-to-pay of the marginal consumer—that is, the price

---

30.  To avoid cognitive fatigue among respondents, conjoint researchers typically limit surveys to no more than six attributes, four to five products, and no more than 20 choice tasks. Even so, "other researchers argue that many more attributes and products can be included, as long as the subjects understand how the attributes affect them[.]" *See* McFadden et al. 2019 at 21. *See also* McFadden et al. 2013 at 2.

31.  Respondents were shown current generation Apple MacBooks and prices as of June 2020.

32.  Specifically, I styled the choices based on the comparison attributes on Apple's "Buy-Mac" page. *See, e.g.*, Buy 13-inch MacBook Air, Apple, *available at* https://www.apple.com/shop/buy-mac/macbook-air. I omitted some product attributes in order to standardize the presentation of attributes between the various MacBook Air and MacBook Pro models. Each choice set displayed the model name, model size, a picture of the model, the processor type, storage capacity, the presence of a Touch Bar or Touch ID (if applicable), and the presence of a discrete graphics card (if applicable).

33.  *See* n. 30, *supra.*

34.  *Id.*

-11-

at which a consumer is indifferent between purchasing the laptop and not purchasing it.[35] Figure 1 below displays a sample choice task.

FIGURE 1: SAMPLE CONJOINT CHOICE TASK



22.     Table 1 below displays attributes and levels used in the CBC survey; eight laptop models, six defect options (including "No Defect"), and nine discount options (including "No Discount"). The choice sets displayed to respondents were selected randomly, such that no respondent was more likely to see a given choice set than any other respondent. For example, as indicated in Table 1 below, respondents were shown randomized prices derived from Apple's actual retail price of the model in question. The random component of the price was a discount from the actual price ranging from $0 to $2,000, in steps of $200 up until $1,200, at which point the steps increased to $400.   The CBC survey in my Class Cert Report offered respondents a maximum discount of $800 off the list price, and found that this was insufficient to compensate the vast majority (75 percent) of respondents for the disutility of the Keyboard Defect.[36] The range of

---

35.  *See, e.g.*, McFadden et al. 2013 at 4.
36.  Class Cert Report ¶43.

discounts in Table 1 below was selected to ensure that the full disutility of the Keyboard Defect is accurately captured.[37]

TABLE 1: ATTRIBUTES AND LEVELS IN CBC SURVEY

| Attribute | Description | Levels |
|---|---|---|
| Model | Apple laptop model (Specifications & graphics from Apple website) | • MacBook Air 13-Inch (1.1 GHz Quad-Core i3 Processor with Turbo Boost up to 3.2 GHz; 256 GB Storage; Touch ID)<br>• MacBook Air 13-Inch (1.1 GHz Quad-Core i5 Processor with Turbo Boost up to 3.5 GHz; 512 GB Storage; Touch ID)<br>• MacBook Pro 13-Inch (1.4 GHz Quad-Core Processor with Turbo Boost up to 3.9 GHz; 256 GB Storage; Touch Bar and Touch ID)<br>• MacBook Pro 13-Inch (1.4 GHz Quad-Core Processor with Turbo Boost up to 3.9 GHz; 512 GB Storage; Touch Bar and Touch ID)<br>• MacBook Pro 13-Inch (2.0 GHz Quad-Core Processor with Turbo Boost up to 3.8 GHz; 512 GB Storage; Touch Bar and Touch ID)<br>• MacBook Pro 13-Inch (2.0 GHz Quad-Core Processor with Turbo Boost up to 3.8 GHz; 1TB Storage; Touch Bar and Touch ID)<br>• MacBook Pro 16-Inch (2.6 GHz 6-Core Processor; 512 GB Storage; AMD Radeon Pro 5300M; Touch Bar and Touch ID)<br>• MacBook Pro 16-Inch (2.3 GHz 8-Core Processor; 1 TB Storage; AMD Radeon Pro 5500M; Touch Bar and Touch ID) |
| Hardware Defect | Defect disclosed at point of purchase | • Trackpad<br>• Speakers<br>• Keyboard<br>• Webcam<br>• Microphone<br>• No Hardware Defect |
| Price | Apple's advertised retail price (less randomized discount) | • Retail Price<br>• Retail Price minus $200<br>• Retail Price minus $400<br>• Retail Price minus $600<br>• Retail Price minus $800<br>• Retail Price minus $1,000<br>• Retail Price minus $1,200<br>• Retail Price minus $1,600<br>• Retail Price minus $2,000 |

---

37. Respondents were informed that they would likely see large discounts from Apple's list prices in the pre-test. ("Q24: Finally, each of the MacBooks shown to you will have a price. Some of these prices will be significantly discounted from Apple's list prices. The prices you see may be much lower than what you would normally expect. These prices are not errors; they are part of the survey.").

PRIVILEGED AND CONFIDENTIAL

23.     To prevent negative pricing, discounts that exceeded the base price of a model were not shown in the survey. Table 2 below shows which discounts were allowed with each laptop. For example, five discounts (No Discount through an $800 discount) were allowed for the $999 base MacBook Air, and all nine discounts (No Discount through a $2,000 discount) were allowed for the $2,799 second-tier MacBook Pro 16". In total, 360 unique products can be defined.[38]

TABLE 2: POSSIBLE MODELS AND DISCOUNTS

| MacBook: | Air Tier 1 | Air Tier 2 | Pro-13 Tier 1 | Pro-13 Tier 2 | Pro-13 Tier 3 | Pro-13 Tier 4 | Pro-16 Tier 1 | Pro-16 Tier 2 |
|---|---|---|---|---|---|---|---|---|
| List Price: | $999 | $1,299 | $1,299 | $1,499 | $1,799 | $1,999 | $2,399 | $2,799 |
| No Discount | x | x | x | x | x | x | x | x |
| $200 Discount | x | x | x | x | x | x | x | x |
| $400 Discount | x | x | x | x | x | x | x | x |
| $600 Discount | x | x | x | x | x | x | x | x |
| $800 Discount | x | x | x | x | x | x | x | x |
| $1,000 Discount | | x | x | x | x | x | x | x |
| $1,200 Discount | | x | x | x | x | x | x | x |
| $1,600 Discount | | | | | x | x | x | x |
| $2,000 Discount | | | | | | | x | x |
| Lowest Price | $199 | $99 | $99 | $299 | $199 | $399 | $399 | $799 |

### 2.     Calculating the Net Disutility of the Keyboard Defect

24.     Using standard statistical methods,[39] I obtained estimates of consumer utility parameters for each respondent. The utility parameters measure the estimated value to each individual of each level of every attribute. This allows me to calculate, for each consumer, the "Net Disutility" of the Keyboard Defect, defined as the difference between (1) the utility that the consumer derives from an Apple laptop with the Keyboard Defect; and (2) the utility she derives

---

38.  Equal to the sum of the product of the defects (always 6) and the discount (5 through 9) for each model. For example, for the MacBook Air tier 1, 30 models are possible, equal to 6 defects * 5 possible discounts.

39.  Qualtrics software uses standard Hierarchical Bayesian Methods to converge on the coefficients that represent the value of each attribute for each individual. *See* Qualtrics, *Conjoint Analysis White Paper*, *available at*: https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/; *see also* Peter Lenk, Wayne DeSarbo, Paul Green, & Martin Young, *Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs* 15(2) MARKETING SCIENCE 173-191 (1996).

-14-

from an otherwise identical Apple laptop without the Keyboard Defect. Similarly, I can also calculate the "Net Utility" that the consumer derives from receiving a price discount of a given amount, defined as the difference between (1) the utility that the consumer derives from an Apple laptop when the price is discounted by a given amount; and (2) the utility she derives from an otherwise identical Apple laptop with a discount of $0.

25.    Given this information, I can solve for the discount that the consumer would require to compensate for the disutility experienced from the Keyboard Defect. To illustrate, suppose that a given consumer derives a Net Disutility of -3.75 from the Keyboard Defect, a Net Utility of 3.50 from a $600 discount, and a Net Utility of 4.50 from an $800 discount. In this example, a $600 discount is not sufficient to compensate the consumer for the disutility experienced from the Keyboard Defect (-3.75 + 3.50 < 0). However, an $800 discount is more than sufficient to compensate the consumer for the disutility experienced from the Keyboard Defect (-3.75 + 4.50 > 0). Accordingly, we can infer that this consumer would require a discount of between $600 and $800 in compensation for the disutility from the Keyboard Defect. A more precise discount can be estimated as the utility-weighted average of $600 and $800, with the $600 discount receiving more weight in the calculation.[40]

26.    I applied standard statistical methods to calculate a 95 percent confidence interval for the average discount that consumers would require to make them indifferent between an Apple laptop with and without the Keyboard Defect. The lower end of this 95 percent confidence interval

---

40.  In this example, the net contribution to the consumer's utility from a laptop with the Keyboard Defect and a $600 discount is equal to -3.75 + 3.5 = -0.25. If the discount is increased to $800, the net utility contribution is equal to -3.75 + 4.5 = 0.75. The weighted average discount can therefore be estimated at 0.25*$800 + 0.75*600 = $650. Note that, in this example, the $600 discount places the consumer closest to the point of indifference. Accordingly, the $600 discount receives more weight in the calculation.

PRIVILEGED AND CONFIDENTIAL

-15-

is $1,174, and the upper end is $1,271; the midpoint is therefore ($1,174 + $1,271)/2 = $1,222.[41] This is the discount that respondents would require to make them indifferent between a MacBook with the Keyboard Defect, compared with an otherwise identical MacBook without the Keyboard Defect.[42]

27.    My analysis does not end here. As explained below, the expected disutility of the Keyboard Defect at the point of purchase is conservatively estimated using standard methods by multiplying the estimated disutility of the Keyboard Defect by the estimated Keyboard Defect Risk, obtained from Apple's repair rate data. This yields the estimated discount that a risk-neutral consumer would require at the point of purchase to make the consumer indifferent between (1) a MacBook without the Keyboard Defect; (2) and an otherwise identical MacBook that comes with a risk of exhibiting the Keyboard Defect.

## C.    Estimating the Keyboard Defect Risk Using Apple's Attempted Repair Rate

28.    Apple has produced internal data reporting the percentage of various models equipped with a "butterfly" keyboard and sold to individual consumers in the United States "that came back for a repair related to (1) letters or characters repeating unexpectedly, (2) letters or characters that do not appear, and/or (3) key(s) feeling 'sticky' or that do not respond in a consistent

---

41.  Rounded figures shown. ($1,270.61 + $1,173.59)/2 = $1,222.10.
42.  This result reinforces the findings of the CBC survey in my Class Cert Report, which offered respondents a maximum discount of $800, and found that, for the vast majority (75 percent) of respondents, $800 was insufficient to compensate them for the disutility of the Keyboard Defect. Class Cert Report ¶43.

PRIVILEGED AND CONFIDENTIAL

manner."[43] Record evidence suggests that Apple's repair rate estimates (the "Attempted Repair Rates") are likely conservative estimates of the true incidence of the Keyboard Defect.[44]

29.      Table 3 below lists each of the MacBook model names and codes, their sales during the Class Period, and the Attempted Repair Rate (if available). As seen below, the Attempted Repair Rates are █████████████████████████ For example, the repair rate for the 2015 12-inch MacBook (code ███ was ███████ in Year 1, but the cumulative repair rate had █████████ ███████ by Year 4. The overall cumulative repair rate across all years for which data are available for this model is ██████████ Using these data, I have also calculated the weighted average cumulative repair rate for models with four years of data, using Apple's direct sales of class MacBook as weights,[45] at ██████████[46] Finally, I have also calculated projected cumulative repair rates for all of the MacBooks at issue, including those for which only limited data are available; the projected weighted average Attempted Repair Rate for all models under this more conservative approach is approximately ██████████[47]

---

43.   Defendant Apple Inc.'s Supplemental Responses To Interrogatory Nos. 4-5 And 9-12 of Plaintiffs' First Set of Interrogatories (June 4, 2020), Response to Interrogatory 9. Updated repair rate data was produced on February 23, 2021.

44.   *See, e.g.*, Deposition of Cheri Gandy at 56:21-58:23 and 105:10-122:8 ███████████ ███████████ Ms. Gandy is a Channel Readiness Program Manager at Apple. *Id.* 42:20-22. Deposition of Jared Williams [hereafter, Williams Dep] at 86:8-87:9; 108:3-21; 117:21-118:7 ███████████████ ███████████████ Mr. Williams is a Manager at Apple. *Id.* 24:7 – 25:21.

45.   Apple produced national sales data of class MacBooks from April 2015 through December 2020. These national sales data are from "APL-MBKeyboard_01179069.xlsx". Apple also produced sales data limited to the class states for the same laptops and time period ("APL-MBKeyboard_01179071.xlsx"). Both sales files include Apple's direct sales to individual customers and excludes institutional sales and third-party sales. The sales channels covered are the Online Store (apple.com) and purchases made or completed at an Apple Retail Store.

46.   Weighting by class state sales yields a comparable defect rate of ██████████ . *See* Appendix Table A5.

47.   *See* Appendix Tables A7 and A8.

TABLE 3: ATTEMPTED REPAIR RATES BY MODEL

| MacBook Model Name | Model Code | Apple Direct National Sales (Class Period) | Year 1 Repair Rate | Year 2 Repair Rate | Year 3 Repair Rate | Year 4 Repair Rate | Weeks of Data* | Overall (Cumulative) Repair Rate |
|---|---|---|---|---|---|---|---|---|
| MacBook (Retina, 12-inch, Early 2015) | █ | █ | █ | █ | █ | █ | | █ |
| MacBook (Retina, 12-inch, Early 2016) | █ | █ | █ | █ | █ | █ | | █ |
| MacBook Pro (13-inch, 2016, Two Thunderbolt 3 ports) | █ | █ | █ | █ | █ | █ | | █ |
| MacBook Pro (13-inch, 2016, Four Thunderbolt 3 ports) | █ | █ | █ | █ | █ | █ | | █ |
| MacBook Pro (15-inch, 2016) | █ | █ | █ | █ | █ | █ | | █ |
| MacBook (Retina, 12-inch, 2017) | █ | █ | | | | | █ | █ |
| MacBook Pro (13-inch, 2017, Two Thunderbolt 3 ports) | █ | █ | █ | █ | █ | | █ | █ |
| MacBook Pro (13-inch, 2017, Four Thunderbolt 3 ports) | █ | █ | █ | █ | █ | | █ | █ |
| MacBook Pro (15-inch, 2017) | █ | █ | █ | █ | █ | | █ | █ |
| MacBook Pro (13-inch, 2018, Four Thunderbolt 3 Ports) | █ | █ | █ | █ | | | █ | █ |
| MacBook Pro (15-inch, 2018) | █ | █ | █ | █ | █ | | | █ |
| MacBook Air (2018) | █ | █ | █ | █ | █ | | | █ |
| MacBook Pro (13-inch, 2019, Four Thunderbolt 3 ports) | █ | █ | █ | | | | █ | █ |
| MacBook Pro (15-inch, 2019) | █ | █ | █ | | | | █ | █ |
| MacBook Air (2019) | █ | █ | █ | | | | █ | █ |
| MacBook Pro (13-inch, 2019, Two Thunderbolt 3 ports) | █ | █ | █ | █ | | | █ | █ |
| **WEIGHTED AVERAGE CUMULATIVE ATTEMPTED REPAIR RATE - MODELS WITH 4 YRS OF DATA** | | | | | | | | █ |

*Sources*: Repair rates from Defendant Apple Inc.'s Supplemental Responses to Interrogatory Nos. 4-5 And 9-12 of Plaintiffs' First Set of Interrogatories (February 23, 2021), Response to Interrogatory 9. Apple Direct National Sales data from "APL-MBKeyboard_01179069.xlsx". *See* Appendix Table A2. Weighting by class state sales yields a comparable defect rate of █. *See* Appendix Table A5. *Weeks of Data: Many of Apple's self-reported repair rates are partial recordings for the final year of data. For example, although Apple reports a Year 4 Repair rate for model █, it is only for half of year 4. (4 years * 52 Weeks = 208 Weeks. 180 Weeks / 52 Weeks = 3.5 years.)

PRIVILEGED AND CONFIDENTIAL

30.     To the extent some Class Members experienced the Keyboard Defect but did not bring their computers into Apple for repair, or did so without Apple having recorded the incident, the estimates in Table 3 are conservative. The estimates also are likely conservative for models for which repair-rate data are available for a relatively short amount of time; data for these models may be insufficient to reflect the true likelihood of failure over the four-year useful life and, hence, the risk to which Class Members were exposed. For example, as seen in Table 3, the repair rate for Model ███████████████████ in Year 1 to a cumulative repair rate of ██████████ in Year 4. But in the case of Model ███████████████████████ Apple has produced only 72 weeks of data, showing a repair rate of █████████ in Table 3. This is a lower bound to the four-year cumulative repair rate for Model ████, whatever it turns out to be.[48] In Table 3, I have also calculated the weighted average cumulative repair rate, using only models with four full years of repair data, which is calculated at ██████████ Finally, even for models for which Apple has produced four full years of repair data, the repair rates in Table 3 are also conservative to the extent that the Keyboard Defect continues to manifest going forward.

**D.    Aggregate Damages Using Traditional CBC Framework**

31.     In this section, I calculate aggregate damages to the Class using the traditional CBC framework.[49] Aggregate damages depend on the economic risk to which all Class Members are exposed at the point of purchase—that is, the Keyboard Defect Risk—which can be estimated using Apple's Attempted Repair Rate. Specifically, aggregate damages can be expressed as the product of (1) MacBook revenue during the Class Period; (2) the diminution in value from the Keyboard Defect,

---

48.  Williams Dep. 160:1-19.
49.  Aggregate Damages could be allocated to Class Members based on the share of class purchases that each Class Member represents. For example, assume hypothetically that aggregate damages are $500 million, and that total Class Member expenditures on MacBooks are $5 billion. If a Class Member spent $5,000 on MacBooks, her damages allocation would come to [($5,000)/($5 billion)]*($500 million) = $500.

as quantified by the CBC analysis; and (3) the Attempted Repair Rate. All of my damages calculations conservatively assume that consumers are risk-neutral.

32.    As seen in Appendix Table A6, given a Keyboard Defect Risk of █████████ ████ the expected disutility of the Keyboard Defect is calculated at approximately ████ *$1,222 ████. The weighted average price for the MacBooks at issue is approximately ████ Therefore, consumer disutility can be expressed in percentage terms as ███████████████ This is the estimated discount that a risk-neutral consumer would require at the point of purchase to make the consumer indifferent between a MacBook without the Keyboard Defect and a MacBook with a ████ risk of suffering from the Keyboard Defect. As seen below, Class Revenue for the MacBooks in the seven states at issue totals ████████████████ Accordingly, my estimate of aggregate damages using the traditional CBC approach is ██████████████████



TABLE 4: AGGREGATE DAMAGES (TRADITIONAL CBC METHOD)

| State | [1] Class MacBook Revenue | [2] Consumer Disutility from Keyboard Defect | [3] = [1]*[2] Aggregate Damages |
|---|---|---|---|
| California | ████ | ████ | ████ |
| New York | ████ | ████ | ████ |
| Florida | ████ | ████ | ████ |
| Illinois | ████ | ████ | ████ |
| New Jersey | ████ | ████ | ████ |
| Washington | ████ | ████ | ████ |
| Michigan | ████ | ████ | ████ |
| **TOTAL** | ████ | ████ | ████ |

*Notes*: Sales data are for model year 2015 through 2017 MacBooks, model year 2016 through 2019 MacBook Pros, and model year 2018 through 2019 MacBook Airs, equipped with a "butterfly" keyboard and sold in CA, FL, IL, MI, NJ, NY, and WA. Sales data include Apple's direct sales and third-party sales to individuals. Third party data missing for some time periods. Missing third party data is extrapolated using the ratio of Apple's direct sales to third-party sales. For example, if Amazon sells 10% as many MacBooks as Apple, Amazon's sales are projected at 10% of Apple sales for missing time periods.

33.    It again bears emphasis that all of my damages calculations throughout this report conservatively assume risk-neutral Class Members. To the extent Class Members are risk averse,

these calculations understate the consumer harm. This conclusion flows directly from the standard "expected utility" framework that economists have used for decades to analyze consumer behavior under uncertainty.[50] In its Class Cert Order, the Court recognized that the expected utility approach "is supported by legitimate economic literature and is reliable."[51] According to the expected-utility framework, a risk-averse consumer would strictly prefer to insure her $500,000 home at a cost of $5,000 rather than risk a one percent chance of losing the home entirely, despite the fact that the cost of the insurance is the same as the expected loss without insurance (equal to $500,000*0.01). In this example, the more risk-averse is the consumer, the more the consumer will be willing to pay for the insurance in excess of $5,000. Indeed, it is common for consumer electronics retailers to sell insurance (or "extended warranties") to their customers at the point of purchase.[52] Apple itself sells insurance to customers through AppleCare+ and the AppleCare Protection Plan.[53] That some of Apple's customers purchase such protection demonstrates a degree of risk aversion, further supporting the conservative nature of my damages estimate (which assumes risk neutrality).

---

50. *See, e.g.,* Frederick Chen, *Expected Utility Illustrated: A Graphical Analysis of Gambles with More than Two Possible Outcomes* 41(1) JOURNAL OF ECONOMIC EDUCATION 63-70 (2010) [hereafter, Chen (2010)], at 63 ("One of the main concepts covered in intermediate microeconomics textbooks is *expected utility*, the central framework used to analyze decision under uncertainty.") (emphasis in original). *See also* Ted O'Donoghue & Jason Somerville, *Modeling Risk Aversion in Economics* 32(2) JOURNAL OF ECONOMIC PERSPECTIVES 91-114 (2018) [hereafter, O'Donoghue et al. (2018)], at 91-92 ("Economists have a shared preconception that, for the most part, people dislike risk…This risk-aversion intuition is a key driver in many prominent economic applications…To capture the risk-aversion intuition, the *standard approach in economics* has been to utilize the *model of expected utility*…The expected utility model is extremely tractable and portable into a wide variety of applications and has been used to derive many important insights.") *See also* GIACOMO BONANNO, UNCERTAINTY, RISK AND INFORMATION: AN ECONOMIC ANALYSIS (2019) ISBN-13: 978-1708284817 [hereafter, BONANNO (2019)], Chapter 2. (Prof. Bonanno reviews fundamental principles of choice under uncertainty using the standard expected utility framework). *Id.* at 19-20 ("For a risk-neutral consumer, the certainty equivalent is the same as the expected value; in contrast, the certainty equivalent is less than the expected value for a risk-averse consumer.").

51. Class Cert Order at 11.

52. *See, e.g.,* BestBuy.com, Geek Squad Protection, *available at* https://www.bestbuy.com/site/geek-squad/geek-squad-protection/pcmcat159800050001.c?id=pcmcat159800050001.

53. *See* AppleCare Products, Apple.com, *available at* https://www.apple.com/support/products/.

PRIVILEGED AND CONFIDENTIAL

## II. INCORPORATING THE SUPPLY SIDE

34.      The traditional CBC method utilized in Part I above is consistent with a consumer-driven theory of harm in which Apple is assumed to supply the same quantity of MacBooks in the but-for world that it did in the actual world, at the same cost it incurred in the actual world. The supply-side analysis performed in this section formally models Apple's incentives to reduce the supply of MacBooks in the but-for world in order to maximize its but-for profit. In the supply-side model, reducing the supply of MacBooks in the but-for world allows Apple to charge a higher price than it otherwise could (albeit still lower than the price of the MacBooks in the actual world).  The supply-side model also allows Apple to incur lower costs by supplying fewer MacBooks.

35.      In this section, I incorporate supply-side factors into the CBC framework developed above. Elementary economic models of supply and demand show how a decrease in demand in a competitive market leads to a decrease in price, via a movement along the market supply curve.[54] As explained below, standard economics also shows how even firms with substantial pricing power, such as Apple, respond to a decrease in demand by lowering their prices. Because the supply-side analysis depends on Apple's own-price elasticity of demand, which depends on outside options for buyers, it takes into account the behavior of rival suppliers.[55]

### A.      Standard Economics Shows How Firms with Market Power Decrease Their Prices In Response to Decreased Demand

36.      According to standard economic principles, firms such as Apple, which sell products differentiated by (among other things) their brand name, are likely to have pricing power beyond

---

54.  *See,* e.g., N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS 80 (8th ed. 2018) ("How an Increase [or Decrease] in Demand Affects the Equilibrium[:] An event that raises [lowers] quantity demanded at any given price shifts the demand curve to the right [left]. The equilibrium price and the equilibrium quantity both rise [fall].").

55.  Singer Class Cert Report ¶¶46-48; *see also* William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 HARVARD LAW REVIEW 937, 944-945 (1981) (showing mathematically that a firm's own-price elasticity of demand is a function of the supply elasticity of competing firms).

what a perfectly competitive firm selling homogeneous output indistinguishable from that of its competitors could charge.[56] To maximize profits, firms with pricing power increase the price of their output until the markup of price over marginal cost is equal to the inverse of the own-price elasticity, a fundamental tenant of pricing theory sometimes referred to as the Lerner Index.[57] A profit-maximizing firm with pricing power chooses the price of its output—and thus the amount of output to supply—using this inverse elasticity rule, which can be written:

$$(P - C) / P = 1 / E_D$$

37.     Above, $P$ is the price, $C$ is the marginal cost, and $E_D$ is the own-price elasticity of demand, defined as the percentage decrease in quantity demanded generated by a one percent increase in price. When $E_D$ is low, demand is said to be inelastic. The more inelastic is demand, the greater will be the markup of price over cost because consumer demand is less affected by price. As explained below, the inverse-elasticity formula allows one to estimate how a profit-maximizing firm with pricing power, such as Apple, would adjust its prices in response to a decrease in demand, including a decrease caused by disclosure of the Keyboard Defect at or prior to the point of purchase.

**B.     Aggregate Damages Using Linear Demand Approximation**

38.     I use output of the CBC analysis in Part I.B.2 above, combined with the Lerner Index, to calculate the decrease in Apple's profit-maximizing price resulting from disclosure of the Keyboard Defect at the point of purchase. Economists commonly employ linear approximations to

---

56. Landes & Posner, *supra.* at 939-940.
57. *Id.*

-23-

the demand curve.[58] Accordingly, I begin with a linear approximation to the demand curve for MacBooks. A linear demand curve is written:

$$Q = \alpha - \beta P,$$

where $\alpha$ is the intercept of the demand curve, $\beta$ is the slope of the demand curve, $Q$ is the quantity demanded of Apple laptops, and $P$ is price of an Apple laptop.

39.     Recall from Part II.B above that consumer distaste for the Keyboard Defects can be estimated at approximately $1,222. Conservatively assuming consumer risk neutrality, and given a Keyboard Defect Risk of ███████ this translates into a downward shift in demand of ███████████ *$1,222 ≈ ████ As seen in Appendix Table A6, the weighted average price for the MacBooks at issue is ███████████ Therefore, if the Keyboard Defect were disclosed at the point of purchase, with a Keyboard Defect Risk of ███████ Apple would have had to drop its price to approximately ██████████ in order to sell the same quantity of laptops that it did in the actual world.

40.     Faced with this decline in demand, Apple's profit-maximizing response is to adjust its price downward, and to reduce its supply of MacBooks. After accounting for these supply-side factors, the estimated decline in market price is one half the prior amount ███████ Expressed as a percentage, the price decline is ████████████ (half the previous value of ███

---

58. *See, e.g.,* Jerry Hausman, Serge Moresi, & Mark Rainey, *Unilateral effects of mergers with general linear demand* 111(2) ECONOMICS LETTERS 119 – 121 (2011), at 119 ("We derive the formula for the unilateral price effects of mergers of two products with linear demand in the general asymmetric situation. The formula uses the same information required to calculate upward pricing pressure in the 2010 Horizontal Merger Guidelines."); Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) PRODUCTION AND OPERATIONS MANAGEMENT 95-113 (2009), at 95 ("We consider two substitutable products and compare two alternative measures of product substitutability for linear demand functions that are commonly used in the literature."); Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) JOURNAL OF ECONOMIC PERSPECTIVES 23-44 (2003), at 26-28 [hereafter, Hausman (2003)] (using a linear approximation to the demand curve to calculate consumer surplus). More generally, linear approximations are standard in economics. *See, e.g.,* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, ECONOMETRIC MODELS & ECONOMIC FORECASTS (McGraw-Hill, Inc. 3rd ed., 1991), at 233 [hereafter, Pindyk & Rubinfeld] ("[A]ny nonlinear function can be expressed as a [linear] Taylor series expansion."). *See also id.* at 510-511.

PRIVILEGED AND CONFIDENTIAL

-24-

percent).  This is not a coincidence—it can be shown mathematically that this is a general property of linear demand curves: When the demand curve is linear, the decrease in the profit-maximizing price resulting from a downward vertical shift in the demand curve is equal to one-half of the distance of the vertical shift. This result holds for any linear demand curve, regardless of its slope or intercept.[59] As seen below, my estimate of aggregate damages accounting for supply-side factors and using a linear approximation to the demand curve is ██████████████████████████ ███████

TABLE 5: AGGREGATE DAMAGES WITH SUPPLY SIDE (LINEAR DEMAND)

| State | [1]<br>Class MacBook Revenue | [2]<br>Price Decrease from Keyboard Defect | [3] = [1]*[2]<br>Aggregate Damages |
|---|---|---|---|
| California | ██████ | ████ | ██████ |
| New York | ██████ | ████ | ██████ |
| Florida | █████ | ████ | █████ |
| Illinois | ████ | ████ | █████ |
| New Jersey | █████ | ████ | █████ |
| Washington | █████ | ████ | ██████ |
| Michigan | █████ | ████ | ██████ |
| **TOTAL** | ██████ | ████ | ██████ |

*Notes*: *See* Table 4, *supra*.

## C.    Aggregate Damages Using Nonlinear Demand Systems

41.    Using standard methods, analogous calculations can be performed using nonlinear multiproduct differentiated product demand systems. These methods can be used to estimate how market prices would change, given a change in market conditions. For example, these models are

---

59.  Note that, for a linear demand curve, $P = \alpha/\beta - Q/\beta$. If the intercept of the demand curve, $\alpha$, shifts downward to $\alpha'$, then the downward vertical shift is $\Delta P = [\alpha/\beta - Q/\beta] - [\alpha'/\beta - Q/\beta] = [\alpha - \alpha']/\beta$. The profit-maximizing price for a firm facing a linear demand curve is $P_{MAX} = 0.5[\alpha/\beta + C]$. Therefore, the decrease in the firm's profit-maximizing price resulting from a downward shift in demand is $\Delta P_{MAX} = 0.5[\alpha/\beta + C] - 0.5[\alpha'/\beta + C] = 0.5[\alpha - \alpha']/\beta = 0.5\Delta P$. *See also* Jerry Hausman & Gregory Leonard, *Efficiencies from the Consumer Viewpoint* 7 GEORGE MASON LAW REVIEW 707 (1999).

commonly applied by antitrust authorities to simulate the effect of prospective mergers on prices, taking into account the costs and profit margins of the merging firms.[60] Economists have used these techniques in a range of applications and industries, such as studying the effects of trade policy and the competitive effects of introducing new products.[61]

42.    As explained above, a profit-maximizing firm such as Apple chooses prices according to the inverse-elasticity rule. The inverse-elasticity rule generalizes to multiproduct firms in nonlinear settings as follows: Suppose that a multi-product firm sells a total of $J$ products, indexed by $j = 1, 2, \ldots, J$. The firms' vector of profit-maximizing prices for all $J$ products is the solution to the following system of $J$ nonlinear equations:

$$q_j + \sum_{k \in J} (p_k - c_k) \frac{\partial q_k}{\partial p_j} = 0 \qquad (1.1)$$

43.    Above, $q_j$ is the quantity demanded of product $j$, and $p_k$ is the price of product $k$. Similarly, $c_k$ is the marginal cost of product $k$. If the firm sells just one product ($J = 1$), then equation (0.1) above collapses to the same inverse-elasticity rule reviewed above. In that case, the firm's profit-maximizing price depends on the own-price elasticity of demand for that product, and no others. But if the firm sells more than one product ($J > 1$), then the profit-maximizing price generally depends upon both on the own-price elasticity of demand for the product in question, and on the cross-price elasticity between that product and all other products sold by the firm. For example, if

60. *See, e.g.,* Gloria Sheu and Charles Taragin, "Calibrating the AIDS and Multinomial Logit Models with Observed Product Margins," US Department of Justice, Economic Analysis Group Discussion Paper EAG 12-7 (October 2012) [hereafter, Sheu and Taragin]. *See also* Nathan Miller, Marc Remer, Conor Ryan & Gloria Sheu, *Upward Pricing Pressure as a Predictor of Merger Price Effects* EAG Discussion Paper 201602, Department of Justice Antitrust Division (2016).

61. Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) JOURNAL OF POLITICAL ECONOMY (2002); *see also* Steven Berry, James Levinsohn, & Ariel Pakes, *Voluntary Export Restraints on Automobiles: Evaluating a Trade Policy* 89(3) AMERICAN ECONOMIC REVIEW (1999); Matt Rysman, *Competition Between Networks: A study of the Market for Yellow Pages* 71 REVIEW OF ECONOMIC STUDIES 483-512 (2004); Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 RAND JOURNAL OF ECONOMICS (2000).

-26-

the firm sells two products, the price of the first product will generally depend on the own-price elasticity of the first product and the cross-price elasticity between the first and second products. Conversely, the price of the second product will generally depend both on the own-price elasticity of the second product and on the cross-price elasticity between the two products.

44.    In different contexts—for example, in merger analysis—pricing equations for Apple's competitors could be incorporated into the demand system above. I do not do so here, for several reasons. *First*, my objective is to analyze Apple's pricing of its own laptops, not those of its competitors. *Second*, my analysis already incorporates the behavior of other suppliers through Apple's own-price elasticity of demand. *Third*, Apple conceded that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[62] *Fourth*, even assuming that Apple did take the prices of other manufacturers into account, my model is conservative to the extent that Apple's competitors would, in the but-for world, lower their own prices in response to Apple's lower prices for MacBooks. This could result in a "second order" effect, placing still more downward pressure on Apple's prices.

45.    I use standard nonlinear (logit and nested logit) demand systems to predict the effect of the challenged conduct on Apple's prices, taking the supply side into account.[63] As shown in Part I.C above, I first use the output of the CBC model to estimate the extent to which prices would

---

[62]  *See, e.g.*, Martin Dep., Exhibit 237 (3/30/20 email from Suzanne Marinkovich). Similarly, Apple's Senior Product Marketing manager explained Apple's approach to pricing MacBooks ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Deposition of Laura Metz, July 2, 2020 at 142:2-21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[63]  *See, e.g.,* Gregory Werden & Luke Froeb, *The Antitrust Logit Model For Predicting Unilateral Competitive Effects* 70 ANTITRUST LAW JOURNAL 257 (2002). *See also* Jonas Bjornerstedt & Frank Verboven, *Merger simulation with nested logit demand*, 14(3) STATA JOURNAL 511-540 (2014).

decline under the assumption of a fixed (vertical) supply relationship. Next, I use the demand system to solve for Apple's new profit-maximizing price for each of the sixteen laptops at issue. In a logit demand system, the market share for each product $j$ is given by the following formula:

$$\ln(s_j / s_0) = \delta_j - \alpha p_j, \qquad (1.2)$$

where $s_j$ is the market share of product $j$, and $s_0$ is the market share of the outside good—that is, the proportion of the market not purchasing Apple laptops.[64] The parameter $\alpha$ indicates how sensitive customers are to an increase in the price of Apple laptops. The parameter $\delta_j$ measures the value that consumers place on attributes of laptop $j$ other than its price.

46.    In a nested logit model, products are classified into groups and subgroups. Products within a given group or subgroup are closer substitutes for one another than are products outside that group or subgroup. The market share for each product $j$ is given by the following formula:

$$\ln(s_j / s_0) = \delta_j - \alpha p_j + \sigma_1 \ln(s_{j|hg}) + \sigma_2 \ln(s_{h|g}) \qquad (1.3)$$

In equation (1.3) above, $s_j$, $s_0$, $\alpha$, and $\delta_j$ are defined as before, in equation (1.2). The term $s_{j|hg}$ in equation (1.3) gives the market share of product $j$ in its subgroup $h$ of $g$, and the term $s_{h|g}$ gives the market share of subgroup $h$ in group $g$. The parameters $\sigma_1$ and $\sigma_2$ measure the extent to which consumers' preferences are correlated between products in the same group or subgroup. Both $\sigma_1$ and $\sigma_2$ fall between zero and one. For purposes of my analysis, I classify the sixteen MacBooks at issue into nine different groups.[65]

47.    For each of the sixteen laptops at issue, I used Apple's own data—its prices, quantities, and price-cost margins—to generate the demand system. First, I used standard methods

---

64. I estimated the share of the outside good using data on total U.S. sales of laptops and tablets. *See* https://www.statista.com/outlook/cmo/consumer-electronics/computing/laptops-tablets/united-states.

65. For example, I classify models J130 and J130A into the same group. Both are 13-inch MacBook Pro laptops, each with two Thunderbolt 3 ports, released in adjacent years (2016 and 2017). *See* Table 3, *supra*.

to econometrically estimate the own-price elasticity faced by Apple.[66] To do so, I ran instrumental variables regressions to estimate the logit price sensitivity parameter ($\alpha$), using Apple's cost data as an instrumental variable for its price.[67] The results indicated that Apple's own-price elasticity of demand for its MacBooks is low, as expected.[68] I then further calibrated the value of $\alpha$ such that the weighted average of the price-cost margins predicted by the demand system matched Apple's actual weighted average price-cost margins.[69] With respect to the nesting parameters, I calibrated a series of one-level nested logit models, such that $0 < \sigma_1 < 1$ and $\sigma_2 = 0$. I performed numerical simulations demonstrating that my conclusions are robust in the full range of possible values for the nesting parameter.

48.     After fitting the demand system to the *actual* world, I then used the system to predict how Apple's profit-maximizing prices would have been altered in the *but-for* world, in which demand for its laptops decline as a result of disclosure of the Keyboard Defect at the point of purchase. Let $r$ denote the weighted average percentage price decline that would be necessary in the but-for world to maintain the same demand for Apple laptops that was realized in the actual world. For any given $r$, I can solve for a new (greater), but-for price sensitivity parameter, $\alpha'$, given by:

$$\alpha' = \frac{\alpha}{(1-r)} \qquad (1.4)$$

49.     For example, suppose hypothetically that prices would have to decline by ███ in the but-for world to maintain the same level of demand of the actual world. Under this scenario,

---

66. As noted above, the own-price elasticity accounts for the conduct of rival suppliers.
67. *See, e.g.,* Jeffrey Wooldridge, INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, (THOMPSON 4TH ED. 2009), at 521-525.
68. Using instrumental variables, with fixed effects by product id, and with cost as an instrument for price, the average own-price elasticity from the estimated logit alpha parameter ███
69. *See, e.g.,* Sheu and Taragin.

PRIVILEGED AND CONFIDENTIAL

$\alpha'$ is approximately ███████ above $\alpha$.[70] Given the new $\alpha'$, I can solve for the equilibrium price level for each of the laptops at issue in the but-for world. As seen below, after accounting for supply-side effects in the nonlinear system, the (weighted) average percentage price decrease across all MacBooks at issue is ███████

TABLE 6: PRICE EFFECTS WITH SUPPLY SIDE AND NONLINEAR DEMAND
(DISUTILITY = $1,222; ATTEMPTED REPAIR RATE = ████)

| Product | Actual Price | But-For Price | % Difference |
|---|---|---|---|
| ██ | $1,308 | ██ | ██ |
| ██ | $1,453 | ██ | ██ |
| ███ | $1,316 | ██ | ██ |
| ██ | $1,846 | ██ | ██ |
| ██ | $1,934 | ██ | ██ |
| ██ | $1,284 | ██ | ██ |
| ███ | $1,020 | █ | ██ |
| ██ | $1,207 | ██ | ██ |
| ██ | $2,777 | ██ | ██ |
| ██ | $2,702 | ██ | ██ |
| ██ | $1,901 | ██ | ██ |
| ██ | $1,863 | ██ | ██ |
| ██ | $2,616 | ██ | ██ |
| ██ | $2,685 | ██ | ██ |
| ██ | $1,332 | ██ | ██ |
| ██ | $1,281 | ██ | ██ |
| **WEIGHTED AVG** | ███ | ██ | ███ |

*Note*: The weighted average price here ████ differs slightly from the weighted average price reported elsewhere ████, because the former is calculated using price-cost margin data supplied by Apple, and the latter incorporates additional sales data from third parties.

50.    As seen below, my estimate of aggregate damages accounting for supply-side factors and using a nonlinear demand system is ██████████████████

---

70. $\frac{1}{██} \approx$ ██

PRIVILEGED AND CONFIDENTIAL

-30-

TABLE 7: AGGREGATE DAMAGES WITH SUPPLY SIDE (NONLINEAR DEMAND)

| | [1] | [2] | [3] = [1]*[2] |
|---|---|---|---|
| State | Class MacBook Revenue | Price Decrease from Keyboard Defect | Aggregate Damages |
| California | ███████████ | ██████ | ████████████ |
| New York | ███████████ | ██████ | ████████████ |
| Florida | ███████████ | ██████ | ████████████ |
| Illinois | ███████████ | ██████ | ████████████ |
| New Jersey | ███████████ | ██████ | ████████████ |
| Washington | ███████████ | ██████ | ████████████ |
| Michigan | ███████████ | ██████ | ████████████ |
| **TOTAL** | ███████████ | ██████ | ████████████ |

*Notes*: *See* Table 4, *supra*.

**CONCLUSIONS**

51.     For the reasons given above, I conclude that economic injury to the certified Class is statistically and economically significant. Under the traditional conjoint method, I estimate aggregate damages to the Class at ███████████████. When accounting for more complex supply-side factors, I estimate aggregate damages to the Class at between █████████ (using a linear approximation to the demand curve) and █████████ (using nonlinear demand systems). Although these calculations are based on an estimated Keyboard Defect Risk of █████████ my aggregate damages models can incorporate alternative estimates of the Keyboard Defect Risk with straightforward ministerial adjustments to the calculations.[71]

\*       \*       \*

_____

71.  As explained above, the estimated Keyboard Defect Risk of █████████ is calculated using all MacBooks for which Apple has produced four years of attempted repair rates. *See* Table 3 above. In the alternative, I have also calculated projected repair rates for all of the MacBooks at issue, including those for which only limited data are available, resulting in a more conservative Keyboard Defect Risk estimate of approximately █████████. *See* Appendix Tables A7 and A8. If I use this more conservative estimate of the Keyboard Defect Risk, aggregate damages range from █████████████████ *See* Appendix Table A1.

PRIVILEGED AND CONFIDENTIAL

Hal J. Singer, Ph.D.:



Executed on April 13, 2021.

PRIVILEGED AND CONFIDENTIAL

**APPENDIX 1: CURRICULUM VITAE OF HAL J. SINGER**



**Hal J. Singer**

> Econ One Research
> Suite 510 805 15th St., N.W.
> Washington, D.C. 20005
> Phone: 202.312.3065
> hsinger@econone.com

**Education**

> Ph.D., The John Hopkins University, 1999; M.A. 1996, Economics
>
> B.S., Tulane University, *magna cum laude*, 1994, Economics. Dean's Honor Scholar (full academic scholarship). Senior Scholar Prize in Economics.

**Current Positions**

> ECON ONE, Washington, D.C.: Managing Director 2018-present.
>
> GEORGETOWN UNIVERSITY, MCDONOUGH SCHOOL OF BUSINESS, Washington, D.C.: Adjunct Professor 2010, 2014, 2016, 2018, 2019, 2020.
>
> GEORGE WASHINGTON UNIVERSITY, SCHOOL OF PUBLIC POLICY, GEORGE WASHINGTON INSTITUTE FOR PUBLIC POLICY, Washington, D.C.: Senior Fellow 2016-present.

**Employment History**

> ECONOMISTS INCORPORATED, Washington, D.C.: Principal 2014-2018.
>
> NAVIGANT ECONOMICS, Washington, D.C.: Managing Director, 2010-2013.
>
> EMPIRIS, L.L.C., Washington, D.C.: Managing Partner and President, 2008-2010.
>
> CRITERION ECONOMICS, L.L.C., Washington, D.C.: President, 2004-2008. Senior Vice President, 1999-2004.
>
> LECG, INC., Washington, D.C.: Senior Economist, 1998-1999.
>
> U.S. SECURITIES AND EXCHANGE COMMISSION, OFFICE OF ECONOMIC ANALYSIS, Washington, D.C.: Staff Economist, 1997-1998.

-33-

THE JOHNS HOPKINS UNIVERSITY, ECONOMICS DEPARTMENT, Baltimore: Teaching Assistant, 1996-1998.

**Honors**

Honoree, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *In re Lidoderm Antitrust Litigation,* Oct. 9, 2018.

Finalist, Outstanding Antitrust Litigation Achievement in Economics, American Antitrust Institute, *Tennis Channel v. Comcast*, Dec. 4, 2013.

**Authored Books and Book Chapters**

*Do Municipal Broadband Networks Stimulate or Crowd Out Private Investment? An Empirical Analysis of Employment Effects*, in THE IMPACT OF THE INTERNET ON JOBS (Lorenzo Pupillo, ed. Palgrave 2017).

THE NEED FOR SPEED: A NEW FRAMEWORK FOR TELECOMMUNICATIONS POLICY FOR THE 21ST CENTURY, co-authored with Robert Litan (Brookings Press 2013).

*Net Neutrality Is Bad Broadband Regulation*, co-authored with Robert Litan, in THE ECONOMISTS' VOICE 2.0: THE FINANCIAL CRISIS, HEALTH CARE REFORM AND MORE (Aaron Edlin and Joseph Stiglitz, eds., Columbia University Press 2012).

*Valuing Life Settlements as a Real Option*, co-authored with Joseph R. Mason, in LONGEVITY TRADING AND LIFE SETTLEMENTS (Vishaal Bhuyan ed., John Wiley & Sons 2009).

*An Antitrust Analysis of the World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, co- authored with J. Gregory Sidak, in HANDBOOK OF TRANS-ATLANTIC ANTITRUST (Philip Marsden, ed. Edward Elgar 2006).

BROADBAND IN EUROPE: HOW BRUSSELS CAN WIRE THE INFORMATION SOCIETY, co-authored with Dan Maldoom, Richard Marsden and J. Gregory Sidak (Kluwer/Springer Press 2005).

*Are Vertically Integrated DSL Providers Squeezing Unaffiliated ISPs (and Should We Care)?*, co-authored with Robert W. Crandall, in ACCESS PRICING: THEORY, PRACTICE AND EMPIRICAL EVIDENCE (Justus Haucap and Ralf Dewenter eds., Elsevier Press 2005).

## Journal Articles

*Competing Approaches to Antitrust: An Application in the Payment Card Industry,* 27(3) GEORGE MASON LAW REVIEW (2020), co-authored with Kevin Caves.

*Understanding the Economics in the Dispute Between the Writers' Guild of America and the Big Four Talent Agencies,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2020), co-authored with Ted Tatos.

*Antitrust Out of Focus: The FTC's Myopic Pursuit of 1-800 Contacts' Trademark Settlements,* ANTITRUST SOURCE (2019), co-authored with Geoff Manne and Josh Wright.

*Countervailing Coordination Rights in the News Sector Are Good for the Public (A Response to Professor Yun),* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2019), co-authored with Sanjukta Paul.

*When the Econometrician Shrugged: Identifying and Plugging Gaps in the Consumer Welfare Standard,* 26 GEORGE MASON LAW REVIEW (2019), co-authored with Kevin Caves.

*Applied Econometrics: When Can an Omitted Variable Invalidate a Regression?,* ANTITRUST SOURCE (2017), co-authored with Kevin Caves.

*Paid Prioritization and Zero Rating: Why Antitrust Cannot Reach the Part of Net Neutrality Everyone Is Concerned About,* ANTITRUST SOURCE (2017).

*The Curious Absence of Economic Analysis at the Federal Communications Commission: An Agency in Search of a Mission,* INTERNATIONAL JOURNAL OF COMMUNICATIONS (2017), co-authored with Gerald Faulhaber and Augustus Urschel.

*On the Utility of Surrogates for Rule of Reason Cases,* COMPETITION POLICY INTERNATIONAL ANTITRUST CHRONICLE (2015), co-authored with Kevin Caves.

*Analyzing High-Tech Employee: The Dos and Don'ts of Proving (and Disproving) Classwide Antitrust Impact in Wage Suppression Cases,"* ANTITRUST SOURCE (2015), co-authored with Kevin Caves.

*Econometric Tests for Analyzing Common Impact,* 26 RESEARCH IN LAW AND ECONOMICS (2014), co-authored with Kevin Caves.

*Life After Comcast: The Economist's Obligation to Decompose Damages Across Theories of Harm,* ANTITRUST (Spring 2014), co-authored with Kevin Caves.

*Is the U.S. Government's Internet Policy Broken?*, 5 POLICY AND INTERNET (2013), co-authored with Robert Hahn.

*Avoiding Rent-Seeking in Secondary Market Spectrum Transactions*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL (2013), co-authored with Jeffrey Eisenach.

*Vertical Integration in Multichannel Television Markets: A Study of Regional Sports Networks*, 12(1) REVIEW OF NETWORK ECONOMICS (2013), co-authored with Kevin Caves and Chris Holt.

*Assessing Bundled and Share-Based Loyalty Rebates: Application to the Pharmaceutical Industry*, 8(4) JOURNAL OF COMPETITION LAW AND ECONOMICS (2012), co-authored with Kevin Caves.

*Lessons from Kahneman's Thinking Fast and Slow: Does Behavioral Economics Have a Role in Antitrust Analysis?*, ANTITRUST SOURCE (2012), co-authored with Andrew Card.

*Assessing Competition in U.S. Wireless Markets: Review of the FCC's Competition Reports*, 64 FEDERAL COMMUNICATIONS LAW JOURNAL (2012), co-authored with Gerald Faulhaber and Robert Hahn.

*An Empirical Analysis of Aftermarket Transactions by Hospitals*, 28 JOURNAL OF CONTEMPORARY HEALTH LAW AND POLICY (2011), co-authored with Robert Litan and Anna Birkenbach.

*Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, ANTITRUST (Summer 2011).

*Addressing the Next Wave of Internet Regulation: Toward a Workable Principle for Nondiscrimination*, 4 REGULATION & GOVERNANCE (2010), co-authored with Robert Hahn and Robert Litan.

*Class Certification in Antitrust Cases: An Economic Framework*, 17 GEORGE MASON LAW REVIEW (2010), co-authored with Robert Kulick.

*The Economic Impact of Eliminating Preemption of State Consumer Protection Laws*, 12 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 781 (2010), co-authored with Joseph R. Mason and Robert B. Kulick.

*Net Neutrality Is Bad Broadband Regulation*, THE ECONOMISTS' VOICE, Sept. 2010, co-authored with Robert Litan.

PRIVILEGED AND CONFIDENTIAL

*Why the iPhone Won't Last Forever and What the Government Should Do to Promote its Successor*, 8 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECHNOLOGY LAW 313 (2010), co-authored with Robert W. Hahn.

*What Does an Economist Have to Say About the Calculation of Reasonable Royalties?*, 14 INTELLECTUAL PROPERTY LAW BULLETIN 7 (2010), co-authored with Kyle Smith.

*Is Greater Price Transparency Needed in the Medical Device Industry?*, HEALTH AFFAIRS (2008), co-authored with Robert W. Hahn and Keith Klovers.

*Evaluating Market Power with Two-Sided Demand and Preemptive Offers to Dissipate Monopoly Rent*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS (2008), co-authored with J. Gregory Sidak.

*Assessing Bias in Patent Infringement Cases: A Review of International Trade Commission Decisions*, 21 HARVARD JOURNAL OF LAW AND TECHNOLOGY (2008), co-authored with Robert W. Hahn.

*The Effect of Incumbent Bidding in Set-Aside Auctions: An Analysis of Prices in the Closed and Open Segments of FCC Auction 35*, 32 TELECOMMUNICATIONS POLICY JOURNAL (2008), co-authored with Peter Cramton and Allan Ingraham.

*A Real-Option Approach to Valuing Life Settlement Transactions*, 23 JOURNAL OF FINANCIAL TRANSFORMATION (2008), co-authored with Joseph R. Mason.

*The Economics of Wireless Net Neutrality*, 3 JOURNAL OF COMPETITION LAW AND ECONOMICS 399 (2007), co-authored with Robert W. Hahn and Robert E Litan.

*Vertical Foreclosure in Video Programming Markets: Implication for Cable Operators*, 3 REVIEW OF NETWORK ECONOMICS 348 (2007), co-authored with J. Gregory Sidak.

*The Unintended Consequences of Net Neutrality*, 5 JOURNAL ON TELECOMMUNICATIONS AND HIGH TECH LAW 533 (2007), co-authored with Robert E. Litan.

*Does Video Delivered Over a Telephone Network Require a Cable Franchise?*, 59 FEDERAL COMMUNICATIONS  LAW JOURNAL 251 (2007), co-authored with Robert W. Crandall and J. Gregory Sidak.

*The Competitive Effects of a Cable Television Operator's Refusal to Carry DSL Advertising*, 2 JOURNAL OF COMPETITION LAW AND ECONOMICS 301 (2006).

*Uberregulation without Economics: The World Trade Organization's Decision in the U.S.-Mexico Arbitration on Telecommunications Services*, 57 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2004), co-authored with J. Gregory Sidak.

*The Secondary Market for Life Insurance Policies: Uncovering Life Insurance's "Hidden" Value*, 6 MARQUETTE ELDER'S ADVISOR 95 (2004), co-authored with Neil A. Doherty and Brian A. O'Dea.

*Do Unbundling Policies Discourage CLEC Facilities-Based Investment?*, 4 TOPICS IN ECONOMIC ANALYSIS AND POLICY (2004), co-authored with Robert W. Crandall and Allan T. Ingraham.

*Foreign Investment Restrictions as Industrial Policy*, 3 CANADIAN JOURNAL OF LAW AND TECHNOLOGY 19 (2004), co- authored with Robert W. Crandall.

*Regulating the Secondary Market for Life Insurance Policies*, 21 JOURNAL OF INSURANCE REGULATION 63 (2003), co- authored with Neil A. Doherty.

*Interim Pricing of Local Loop Unbundling in Ireland: Epilogue*, 4 JOURNAL OF NETWORK INDUSTRIES 119 (2003), co-authored with J. Gregory Sidak.

*The Benefits of a Secondary Market for Life Insurance*, 38 REAL PROPERTY, PROBATE AND TRUST JOURNAL 449 (2003), co- authored with Neil A. Doherty.

*The Empirical Case Against Asymmetric Regulation of Broadband Internet Access*, 17 BERKELEY TECHNOLOGY LAW JOURNAL 954 (2002), co-authored with Robert W. Crandall and J. Gregory Sidak.

*How Can Regulators Set Nonarbitrary Interim Rates? The Case of Local Loop Unbundling in Ireland*, 3 JOURNAL OF NETWORK INDUSTRIES 273 (2002), co-authored with J. Gregory Sidak.

*Vertical Foreclosure in Broadband Access*, 49 JOURNAL OF INDUSTRIAL ECONOMICS (2001) 299, co-authored with Daniel L. Rubinfeld.

*Open Access to Broadband Networks: A Case Study of the AOL/Time Warner Merger*, 16 BERKELEY TECHNOLOGY LAW JOURNAL 640 (2001), co-authored with Daniel L. Rubinfeld.

*Cable Modems and DSL: Broadband Internet Access for Residential Customers*, 91 AMERICAN ECONOMICS ASSOCIATION PAPERS AND PROCEEDINGS 302 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

PRIVILEGED AND CONFIDENTIAL

*Residential Demand for Broadband Telecommunications and Consumer Access to Unaffiliated Internet Content Providers*, 18 YALE JOURNAL ON REGULATION 1 (2001), co-authored with Jerry A. Hausman and J. Gregory Sidak.

*Determining the Source of Inter-License Synergies in Two-Way Paging Networks*, 18 JOURNAL OF REGULATORY ECONOMICS 59 (2000).

*A General Framework for Competitive Analysis in the Wireless Industry*, 50 HASTINGS LAW REVIEW 1639 (2000), co- authored with J. Gregory Sidak and David Teece.

*Capital Raising in Offshore Markets*, 23 JOURNAL OF BUSINESS AND FINANCE 1181 (1999), co-authored with Ian Gray and Reena Aggarwal.

**Expert Testimony Since 2012**

Leinani Deslandes et al v. McDonald's USA, LLC, Case No. 17-cv-04857 (N.D. IL)

Stephanie Turner et al v. McDonald's USA, LLC, Case No. 19-cv-05524 (N.D. IL)

In Re: Macbook Keyboard Litigation, Case No.: 5:18-cv-02813-EJD  (N.D. Ca)

Estate of Beverly Berland v. Lavastone Capital LLC, Case No. 1:18-cv-02002-CFC (D. Del.)

Donald Conrad et al. v. Jimmy John's Franchise LLC, et al., No. 3:18-cv-00133-NJR (S.D. Ill.)

Zydus Pharmaceuticals Inc. and Cadila Healthcare Limited v. Takeda Pharmaceutical Company Limited et al., No. 18-01994 (FLW)(TJB) (D. N.J.)

In Re GSE Bonds Antitrust Litigation, No. 1:19-cv-01704-JSR (S.D. N.Y.).

beIN Sports, LLC v. Comcast Cable Communications, LLC, File No. CSR-8972-P (FCC).

Chelsea Jensen, et al. v. Samsung Electronics et al., Court File No. T-809-18 (Federal Court in Canada).

Estate of Phyllis Malkin v. Wells Fargo Bank, N.A., No. 17-cv-23136 (S.D. Fl.).

In Re Capacitors Antitrust Litigation, Master File No. 3:14-cv-03264-JD (N.D. Cal.)

In re Foreign Exchange Benchmark Rates Antitrust Litigation (S.D. N.Y.), Case No. 1:13-cv-07789-LGS.

Massachusetts Technology Park Corporation v. Axia Netmedia Corporation, KCST

USA, Inc., No. 01-17-0004-3049 (American Arbitration Association).

Cung Le et al. v. Zuffa, LLC, d/b/a Ultimate Fighting Championship and UFC, Case No.: 2:15-cv-01045-RFB-(PAL) (D. Nev.).

The Ohio State University v. New Par D/B/A Verizon Wireless, Case No. 2:15-cv-2866 (S.D. Oh.).

Authenticom, Inc. v. CDK Global, LLL; and The Reynolds And Reynolds Company, Case No. 17-cv-318 (W.D. Wis.).

Manmohan Dhillon et al. v. Anheuser-Busch, LLC et al. Case No. 14CECG03039 MBS (Cal. Fresno).

In re Lidoderm Antitrust Litigation, MDL Dkt. No. 14-md-02521-WHO (N.D. Cal.).

Maxon Hyundai Mazda et al. v. Carfax Inc., Case No. CV 2680 (AJN) (RLE) (S.D. N.Y.).

Philip R. Loy and Sharon Loy v. Womble Carlyle Sandridge & Rice, et al., Case No. 2014-cv-254012 (Ga. Super.).

In re MyFord Touch Consumer Litigation, Case No. 13-cv-3072-EMC (N.D. Cal.).

Sun Life Assurance Company of Canada v. U.S. Bank National Association, Case No. NO. 2:14-cv-04703-SJF-GRB (E.D. N.Y.).

Sun Life Assurance Company of Canada v. U.S. Bank National Association and Larry Bryan, Case No. 14-CIV-62610-BLOOM/VALLE (S.D. Fla.).

In the Matter of Flat Wireless, LLC, for and on behalf of its Operating Subsidiaries, v. Cellco Partnership d/b/a Verizon Wireless, and its Operating Subsidiaries, File No. EB-15-MD-005 (Federal Communications Commission).

Omni Healthcare et al. v. Health First Inc. et al, Case No. 6:13-CV-01509-RBD-DAB (M.D. Fla.).

Schuylkill Health System et al. v. Cardinal Health 200, LLC & Owens & Minor Distribution, Inc., Case No. 12-cv-07065-JS (E.D. Pa.).

Meda Pharmaceuticals Inc. v. Apotex, Inc and Apotex Corp., Case No. 01-14-0001-6315 (Am. Arbitration Ass'n).

Mark S. Wallach, et al v. Eaton Corporation, et al, Case No. 10-260-SLR (D. Del.).

STB Ex Parte No. 722 Railroad Revenue Adequacy (Surface Transportation Board).

PRIVILEGED AND CONFIDENTIAL

-40-

In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, MB Docket No. 14-50 (Federal Communications Commission).

Lindsay Kamakahi and Justine Levy, et al v. American Society for Reproductive Medicine and Society for Assisted Reproductive Technology, Case No.: 3:11-CV-1781 JCS (N.D. Cal.).

Salud Services, Inc. et al v. Caterpillar, Inc., Case No.: 1:12-cv-23927 (S.D. Fla.).

Gnanh Nora Krouch v. Wal-Mart Stores, Inc., Case No. CV-12-2217 (N.D. Cal.).

In the Matter of Petition for Rulemaking to Eliminate the Sports Blackout Rule, MB Docket No. 12-3 (Federal Communications Commission).

In the Matter of Review of Wholesale Services and Associated Policies, File No. 8663-C12-201313601 (Canadian Radio-Television and Telecommunications Commission).

Crafting a Successful Incentive Auction: Stakeholders' Perspectives (U.S. Senate, Committee on Commerce, Science, and Transportation).

Altergy Systems v. Enersys Delaware, Inc., Case No. 74-198-Y-001772-12 JMLE (American Arbitration Association).

In re New York City Bus Tour Antitrust Litigation, Master Case File No. 13-CV-07I1 (S.D. N.Y.).

SOCAN Tariff 22.A (Online Music Services, 2011-2013), CSI Online Music Services (2011-2013), SODRAC Tariff 6 - Online Music Services, Music Videos (2010-2013) (Copyright Board Canada).

Imperial Premium Finance, LLC, v. Sun Life Assurance Company of Canada (S.D. Fla.).

The Satellite Television Law: Repeal, Reauthorize, or Revise? (U.S. House of Representatives, Committee on Energy and Commerce).

Marchbanks Truck Service, et al. v. Comdata Network Inc., et al., Civil Action No. 07-1078-JKG (E.D. Pa.).

Patricia Reiter v. Mutual Credit Corporation, et al., Case No. 8:09-cv-0081 AG (RNBx) (C.D. Cal.).

PRIVILEGED AND CONFIDENTIAL

In re Photochromic Lens Antitrust Litigation, MDL Docket No. 2173 (M.D. Fla.).

In the Matter of the Arbitration Between Washington Nationals Baseball Club v. TCR Sports Broadcasting Holdings, L.L.P. (Major League Baseball Revenue Sharing Definitions Committee).

Miguel V. Pro and Davis Landscape et al. v. Hertz Equipment Rental Corporation, No. 2:06-CV-3830 (DMC) (D.N.J.).

Game Show Network, LLC v. Cablevision Systems Corp., File No.  CSR-8529-P (Federal Communications Commission).

Apotex, Inc., v. Cephalon, Inc., Barr Laboratories, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc., Case No. 2:06-cv-02768-MSG (E.D. Pa.).

In Re Airline Baggage Fee Antitrust Litigation, Civil Action No. 1:09-Md-2089-Tcb (N.D. Ga.).

## Memberships

American Economics Association

American Bar Association Section of Antitrust Law

## Reviewer

Journal of Risk and Insurance

Journal of Competition Law and Economics

Journal of Risk Management and Insurance Review

Journal of Regulatory Economics

Managerial and Decision Economics

Telecommunications Policy

PRIVILEGED AND CONFIDENTIAL

## APPENDIX 2: MATERIALS RELIED UPON

### LITERATURE

Amil Petrin, *Quantifying the Benefits of New Products: The Case of the Minivan* 110 (4) Journal of Political Economy (2002)

Aviv Nevo, *Mergers with Differentiated Products: The Case of the Ready-to-Eat Cereal Industry* 31 Rand Journal of Economics (2000)

Betul Lus & Ana Muriel, *Measuring the Impact of Increased Product Substitution on Pricing and Capacity Decisions Under Linear Demand Models*, 18(1) Production and Operations Management 95-113 (2009)

Bryan K. Orme, Getting Started with Conjoint Analysis: Strategies for Pricing Research, (2nd ed. Research Publishers 2005)

Christopher Chapman, James Alford, Chad Johnson, Ron Weidemann, & Michal Lahav *CBC vs. ACBC: Comparing Results with Real Product Selection*, Sawtooth Software Conference Proceedings (2009)

Daniel McFadden, *The Choice Theory Approach to Market Research* 5(4) Marketing Science 275-297 (1986)

Dick Wittnick & Philippe Cattin, *Commercial Use of Conjoint Analysis: An Update,* 53 Journal of Marketing 91-96 (1989)

E. O. Oyatoye, Andrew E. Otike-Obaro, & Ezeoke Golda Nkeiruka, *Using Conjoint Analysis to Study the Factors Important to University Students in Nigeria When They Select a Laptop Computer* Richards College of Business, University of West Georgia (2016)

Frederick Chen, *Expected Utility Illustrated: A Graphical Analysis of Gambles with More than Two Possible Outcomes* 41(1) Journal of Economic Education (2010) 63-70

Giacomo Bonanno, Uncertainty, Risk and Information: An Economic Analysis (2019) ISBN-13: 978-1708284817

Gloria Sheu and Charles Taragin, "Calibrating the AIDS and Multinomial Logit Models with Observed Product Margins," US Department of Justice, Economic Analysis Group Discussion Paper EAG 12-7 (October 2012)

Greg Allenby, Jeff Brazell, John R. Howell & Peter Rossi, *Valuation of Patented Product Features*, The Journal of Law and Economics 57(3) (2014)

Gregory Werden & Luke Froeb, *The Antitrust Logit Model For Predicting Unilateral Competitive Effects* 70 Antitrust Law Journal 257 (2002)

PRIVILEGED AND CONFIDENTIAL

Jeffrey Wooldridge, Introductory Econometrics: A Modern Approach (Thompson 4th ed. 2009)

Jerry Hausman & Gregory Leonard, *Efficiencies from the Consumer Viewpoint* 7 George Mason Law Review 707 (1999)

Jerry Hausman, Serge Moresi, & Mark Rainey, *Unilateral effects of mergers with general linear demand* 111(2) Economics Letters 119 – 121 (2011)

Jerry Hausman, *Sources of Bias and Solutions to Bias in the Consumer Price Index*, 17(1) Journal of Economic Perspectives 23-44 (2003)

John Pratt, *Risk Aversion in the Small and in the Large* Econometrica 122–136 (1964)

Jonas Bjornerstedt & Frank Verboven, *Merger simulation with nested logit demand*, 14(3) The STATA Journal 511-540 (2014)

Kamel Jedidi, K., & Z. John Zhang, *Augmenting Conjoint Analysis to Estimate Consumer Reservation Price* 48(10) Management Science, 1350–1368 (2002)

Matt Rysman, *Competition Between Networks: A study of the Market for Yellow Pages* 71 Review of Economic Studies 483-512 (2004)

Moshe Ben-Akiva, Daniel McFadden, and Kenneth Train, Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis 23-24 (Now Publishers 2019)

N. Gregory Mankiw, Principles of Microeconomics (8th ed. 2018)

Nathan Miller, Marc Remer, Conor Ryan & Gloria Sheu, *Upward Pricing Pressure as a Predictor of Merger Price Effects* EAG Discussion Paper 201602, Department of Justice Antitrust Division (2016)

Paul Green & V. Srinivasan, *Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice,* 54(4) Journal of Marketing 3-19 (1990)

Peter Lenk, Wayne DeSarbo, Paul Green, & Martin Young, Hierarchical Bayes Conjoint Analysis: Recovery of Partworth Heterogeneity from Reduced Experimental Designs 15(2) Marketing Science 173-191 (1996)

Robert S. Pindyck & Daniel L. Rubinfeld, Econometric Models & Economic Forecasts (McGraw-Hill, Inc. 3rd ed., 1991)

Steven Berry, James Levinsohn, & Ariel Pakes, *Voluntary Export Restraints on Automobiles: Evaluating a Trade Policy* 89(3) American Economic Review (1999)

Ted O'Donoghue & Jason Somerville, *Modeling Risk Aversion in Economics* 32(2) Journal of Economic Perspectives 91-114 (2018)

Vithala Rao, Applied Conjoint Analysis (Springer-Verlag 2014)

William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94 Harvard Law Review 937 (1981)

## BATES DOCUMENTS

APL-MBKeyboard_00228247

APL-MBKeyboard_00372163

APL-MBKeyboard_00637313

APL-MBKeyboard_01179069.xlsx

APL-MBKeyboard_01179071.xlsx

## TRIAL MATERIALS

Class Certification Reply Report of Hal J. Singer (October 28, 2020)

Class Certification Report of Hal J. Singer (August 14, 2020)

Defendant Apple Inc.'s  Supplemental Responses To Interrogatory Nos. 4-5 And 9-12 of Plaintiffs' First Set of Interrogatories (June 4, 2020)

*In Re: MacBook Keyboard Litigation*, Case No.: 5:18-cv-02813-EJD, Order Granting Motion to Certify Class (March 8, 2021)

*In Re: MacBook Keyboard Litigation*, Case No.: 5:18-cv-02813-EJD, Second Amended Consolidated Class Action Complaint (October 11, 2018)

## PUBLICLY AVAILABLE MATERIALS

AppleCare Products, Apple.com, available at https://www.apple.com/support/products/

BestBuy.com, Geek Squad Protection, available at https://www.bestbuy.com/site/geek-squad/geek-squad-protection/pcmcat159800050001.c?id=pcmcat159800050001

Buy 13-inch MacBook Air, Apple, available at https://www.apple.com/shop/buy-mac/macbook-air

Conjoint Analysis Software Tool, Qualtrics, available at https://www.qualtrics.com/core-xm/conjoint-analysis/

-45-

Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro - Apple Support, available at https://support.apple.com/keyboard-service-program-for-mac-notebooks

Lisa Cameron, Michael Cragg & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," *Law360* (October 16, 2013)

Qualtrics, Conjoint Analysis White Paper, available at: https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-choice-based/conjoint-analysis-white-paper/

LEGAL DOCUMENTS

*Apple Electronics Co. Ltd. v. Samsung Electronics Co. Ltd.,* No. 11-CV-1846 [N.D. Cal. Dec. 2, 2011]

*Expert Report of John R. Hauser* in *Apple v. Samsung* (July 26, 2012)

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018)

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018)

*In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016)

*Microsoft Corp. v. Motorola Inc.,* 696 F.3d 872 [9th Cir. 2012]

DEPOSITIONS

*Deposition of Cheri Gandy (July 16, 2020)*

*Deposition of Denise Martin, Ph.D. (October 21, 2020), Exhibit 237*

*Deposition of Jared Williams (July 14, 2020)*

*Deposition of Laura Metz (July 2, 2020)*

### APPENDIX 3: PRE-TEST QUESTIONNAIRE

Q1 In which state do you currently reside?
▼ Alabama (1) ... I do not reside in the United States (53)

*Skip To: End of Block If Q1 = I do not reside in the United States*

Q2 What is your age?

○ Younger than 18  (1)

○ 18-21  (2)

○ 22-29  (3)

○ 30-39  (4)

○ 40-49  (5)

○ 50-59  (6)

○ 60-69  (7)

○ 70 or older  (8)

*Skip To: End of Block If Q2 = Younger than 18*

Q3
Have you taken any surveys in the last 30 days on these topics? (Select all that apply.)

☐ Vitamins/Dietary Supplements  (1)

☐ Clothing  (2)

☐ Advertisements on TV  (3)

☐ Video Games  (4)

☐ Consumer Electronics  (5)

PRIVILEGED AND CONFIDENTIAL

☐    Cosmetics  (6)

☐    Other Category  (8)

☐    I have not taken any surveys  (9)

*Skip To: End of Block If Q3 = Consumer Electronics*

Q4
Have you purchased any of these Consumer Electronics products within the past 5 years? (Select all that apply.)

☐    Desktop Computer  (1)

☐    Laptop Computer  (2)

☐    Tablet  (3)

☐    Smart TV  (4)

☐    Smartwatch  (5)

☐    Smartphone  (6)

☐    None of these  (7)

*Skip To: End of Block If Q4 != Laptop Computer*
*Skip To: End of Block If Q4 = None of these*

Q5 Which brand(s) of Laptop Computer did you purchase within the last 5 years? (Select all that apply.)

☐    HP  (1)

☐    Lenovo  (2)

☐    Dell  (3)

☐     Acer  (4)

☐     Apple  (5)

☐     Other brand  (9)

☐     None of these  (10)

*Skip To: End of Block If Q5 != Apple*
*Skip To: End of Block If Q5 = None of these*


Q6
Please select the type(s) of Apple Laptop Computer you purchased within the last 5 years. (Select all that apply.)

☐     MacBook  (1)

☐     MacBook Air  (2)

☐     MacBook Pro  (3)

☐     None of these  (4)

*Skip To: End of Block If Q6 = None of these*


Q7
You have been selected to participate in our survey about **Apple Laptop Computers.**


To participate in this survey, you must agree to answer the questions by yourself and without asking for help from anyone else. You also must answer the questions with your honest answers and opinions.  We ask that you complete the survey in one sitting and without stopping in the middle.


Do you agree to these instructions?

○ Yes, I agree.  (1)

PRIVILEGED AND CONFIDENTIAL

-49-

○ No, I don't agree.  (2)

*Skip To: End of Block If Q7 = No, I don't agree.*


Q8
For the remainder of this survey, please assume you are shopping for an **Apple Laptop Computer.**

You will be shown a set of three MacBooks with different features and prices. After carefully considering the options available to you, **please select the product that you would actually purchase in real life.** If you would not purchase any of the options shown to you, please select the fourth option ("I would not purchase any of the three laptops here").

The survey will ask you to make this decision ten times.


○ I understand.  (1)

○ I do not understand.  (2)

*Skip To: End of Block If Q8 = I do not understand.*


Q9 There are eight MacBooks in total that may appear each time you make a puchase decision:
        Two MacBook Air laptops.    Four MacBook Pro 13-inch laptops.  Two MacBook Pro 16-inch laptops.  You will now be shown the features of each of these laptops.


Q10 Below is the first of two MacBook Air laptops.

 1.1GHz Dual-Core Core Processor
 Turbo Boost up to 3.2GHz
 256GB Storage
 Touch ID

○ I have reviewed this MacBook's features.  (1)


Q11
Below is the second of two MacBook Air laptops.

 1.1GHz Quad-Core Core Processor
 Turbo Boost up to 3.5GHz

512GB Storage
Touch ID

◯ I have reviewed this MacBook's features.  (1)


Q12
Below is the first of four MacBook Pro 13-inch laptops.

1.4GHz Quad-Core Processor
Turbo Boost up to 3.9GHz
256GB Storage
Touch Bar and Touch ID

◯ I have reviewed this MacBook's features.  (1)


Q13
Below is the second of four MacBook Pro 13-inch laptops.

1.4GHz Quad-Core Processor
Turbo Boost up to 3.9GHz
512GB Storage
Touch Bar and Touch ID

◯ I have reviewed this MacBook's features.  (1)


Q14
Below is the third of four MacBook Pro 13-inch laptops.

2.0GHz Quad-Core Processor
Turbo Boost up to 3.8GHz
512GB Storage
Touch Bar and Touch ID

◯ I have reviewed this MacBook's features.  (1)


Q15 Below is the fourth of four MacBook Pro 13-inch laptops.

2.0GHz Quad-Core Processor
Turbo Boost up to 3.8GHz
1TB Storage
Touch Bar and Touch ID

◯ I have reviewed this MacBook's features.  (1)


Q16 Below is the first of two MacBook Pro 16-inch laptops.

2.6GHz 6-Core Processor
Turbo Boost up to 4.5GHz
512GB Storage
Touch Bar and Touch ID
AMD Radeon Pro 5300M

◯ I have reviewed this MacBook's features.  (1)


Q17 Below is the second of two MacBook Pro 16-inch laptops.

2.3GHz 8-Core Processor
Turbo Boost up to 4.5GHz
1TB Storage
Touch Bar and Touch ID
AMD Radeon Pro 5500M

◯ I have reviewed this MacBook's features.  (1)


Q18 Some of the MacBooks shown to you will have a hardware defect. The defects will be described to you.    If you select a MacBook with a **defect**, please assume the defect will appear some time **after** your purchase. Once the defect appears, you will have the following options: (1) ship the laptop to Apple for Apple to attempt a free repair; (2) take the laptop to an Apple store for Apple to attempt a free repair. These repair options will be available to you for four years from the date of purchase.


Q19 Some MacBooks will have a defective **keyboard.** Customers who experience this defect report that the "keys do not respond," or the "keys are sticky," or that "letters or characters repeat unexpectedly."

◯ I understand this defect.  (1)

◯ I do not understand this defect.  (2)

*Skip To: End of Block If Q19 = I do not understand this defect.*


PRIVILEGED AND CONFIDENTIAL

Q20 Some MacBooks will have a defective **trackpad.** Customers who experience this defect report that the "trackpad does not respond," or the "trackpad cursor jitters," or the "trackpad cursor moves unexpectedly."

○ I understand this defect.  (1)

○ I do not understand this defect.  (2)

*Skip To: End of Block If Q20 = I do not understand this defect.*

Q21 Some MacBooks will have a defective **speakers.** Customers who experience this defect report that there is a "crackling sound in the speakers," or the "speakers cut out frequently."

○ I understand this defect.  (1)

○ I do not understand this defect.  (2)

*Skip To: End of Block If Q21 = I do not understand this defect.*

Q22 Some MacBooks will have a defective **webcam.** Customers who experience this defect report that the "webcam image is distorted," or the "webcam won't start."

○ I understand this defect.  (1)

○ I do not understand this defect.  (2)

*Skip To: End of Block If Q22 = I do not understand this defect.*

Q23 Some MacBooks will have a defective **microphone.** Customers who experience this defect report that the "microphone input is distorted," or the "microphone cuts out frequently."

○ I understand this defect.  (1)

○ I do not understand this defect.  (2)

*Skip To: End of Block If Q23 = I do not understand this defect.*

Q24 Finally, each of the MacBooks shown to you will have a price. Some of these prices will be significantly discounted from Apple's list prices. The prices you see may be much lower than what you would normally expect. These prices are not errors; they are part of the survey.

PRIVILEGED AND CONFIDENTIAL

◯ I understand.  (1)

◯ I do not understand.  (2)

*Skip To: End of Block If Q24 = I do not understand.*

**APPENDIX 4: ADDITIONAL ANALYSES**

TABLE A1: AGGREGATE DAMAGES SUMMARY (ALTERNATE ATTEMPTED REPAIR RATES)

| Class States | Method | Attempted Repair Rate | Aggregate Damages |
|---|---|---|---|
| ALL | Traditional CBC | ■■ | ■■ |
| ALL | Traditional CBC | ■■ | ■■ |
| ALL | CBC + Supply Side Model (Linear Demand) | ■■ | ■■ |
| ALL | CBC + Supply Side Model (Linear Demand) | ■■ | ■■ |
| ALL | CBC + Supply Side Model (Nonlinear Demand) | ■■ | ■■ |
| ALL | CBC + Supply Side Model (Nonlinear Demand) | ■■ | ■■ |

PRIVILEGED AND CONFIDENTIAL

-55-

TABLE A2: APPLE DIRECT* NATIONAL CLASS MACBOOK SALES (APRIL 2015 – DECEMBER 2020)

| Model | Revenues | Units |
|-------|----------|-------|
| ████ | ████ | ████ |
| ████ | ████ | ████ |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | |
| ████ | ████ | ████ |
| ████ | ████ | ████ |
| ████ | ████ | ████ |
| **Total** | ████ | ████ |

*Note:* Sales data are for model year 2015 through 2017 MacBooks, model year 2016 through 2019 MacBook Pros, and model year 2018 through 2019 MacBook Airs, equipped with a "butterfly" keyboard and sold in the United States.

*\* Sales Channels include:*

**ONLINE STORE:** Apple online store (apple.com).

**RETAIL KIOSK:** Orders at an Apple Retail Store using a computer within the Apple Retail Store (e.g. out of stock items).

**RETAIL POS:** Traditional Apple Retail Store sales.

**RETAIL WEB**: Orders online at apple.com, but the product is picked up in an Apple Retail Store.

*Source*: APL-MBKeyboard_01179069.xlsx

PRIVILEGED AND CONFIDENTIAL

TABLE A3: APPLE DIRECT* CLASS STATE CLASS MACBOOK SALES (APRIL 2015 – DECEMBER 2020)

| Model | Revenues | Units |
|---|---|---|
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| ███ | ███ | ███ |
| Total | ███ | ███ |

*Note:* Sales data are for model year 2015 through 2017 MacBooks, model year 2016 through 2019 MacBook Pros, and model year 2018 through 2019 MacBook Airs, equipped with a "butterfly" keyboard and sold in the United States.

\* *Sales Channels include:*

  **ONLINE STORE:** Apple online store (apple.com).
  **RETAIL KIOSK:** Orders at an Apple Retail Store using a computer within the Apple Retail Store (e.g. out of stock items).
  **RETAIL POS:** Traditional Apple Retail Store sales.
  **RETAIL WEB**: Orders online at apple.com, but the product is picked up in an Apple Retail Store.

*Source*: APL-MBKeyboard_01179071.xlsx

TABLE A4: APPLE DIRECT & THIRD PARTY SALES (APRIL 2015 – DECEMBER 2020)

| Model | Class MacBook Revenues | Class MacBook Unit Sales |
|---|---|---|
| California | ███ | ███ |
| New York | ███ | ███ |
| Florida | ███ | ███ |
| Illinois | ███ | ███ |
| New Jersey | ███ | ███ |
| Washington | ███ | ███ |
| Michigan | ███ | ███ |
| TOTAL | ███ | ███ |

*Notes*: Sales data are for model year 2015 through 2017 MacBooks, model year 2016 through 2019 MacBook Pros, and model year 2018 through 2019 MacBook Airs, equipped with a "butterfly" keyboard and sold in CA, FL, IL, MI, NJ, NY, and WA. Sales data include Apple's direct sales and third-party sales to individuals. Third party data missing for some time periods. Missing third party data is extrapolated using the ratio of Apple's direct sales to third-party sales. For example, if Amazon sells 10% as many MacBooks as Apple, Amazon's sales are projected at 10% of Apple sales for missing time periods.

PRIVILEGED AND CONFIDENTIAL

TABLE A5: ATTEMPTED REPAIR RATES BY MODEL (CLASS STATE SALES ONLY)

| MacBook Model Name | Model Code | Apple Direct National Sales (Class Period) | Year 1 Repair Rate | Year 2 Repair Rate | Year 3 Repair Rate | Year 4 Repair Rate | Weeks of Data* | Overall (Cumulative) Repair Rate |
|---|---|---|---|---|---|---|---|---|
| MacBook (Retina, 12-inch, Early 2015) | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| MacBook (Retina, 12-inch, Early 2016) | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| MacBook Pro (13-inch, 2016, Two Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| MacBook Pro (13-inch, 2016, Four Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| MacBook Pro (15-inch, 2016) | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| MacBook (Retina, 12-inch, 2017) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| MacBook Pro (13-inch, 2017, Two Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| MacBook Pro (13-inch, 2017, Four Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| MacBook Pro (15-inch, 2017) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| MacBook Pro (13-inch, 2018, Four Thunderbolt 3 Ports) | ■ | ■ | ■ | ■ | ■ | | ■ | ■ |
| MacBook Pro (15-inch, 2018) | ■ | ■ | ■ | ■ | ■ | | | ■ |
| MacBook Air (2018) | ■ | ■ | ■ | ■ | | | | ■ |
| MacBook Pro (13-inch, 2019, Four Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | | | ■ | ■ |
| MacBook Pro (15-inch, 2019) | ■ | ■ | ■ | ■ | | | ■ | ■ |
| MacBook Air (2019) | ■ | ■ | ■ | ■ | | | ■ | ■ |
| MacBook Pro (13-inch, 2019, Two Thunderbolt 3 ports) | ■ | ■ | ■ | ■ | | | ■ | ■ |
| **WEIGHTED AVERAGE CUMULATIVE ATTEMPTED REPAIR RATE - MODELS WITH 4 YRS OF DATA** | | | | | | | | ■ |

*Sources*: Repair rates from Defendant Apple Inc.'s Supplemental Responses to Interrogatory Nos. 4-5 And 9-12 of Plaintiffs' First Set of Interrogatories (February 23, 2021), Response to Interrogatory 9. Apple Direct Class State Sales data from "APL-MBKeyboard_01179071.xlsx". *See* Appendix Table A2. *Weeks of Data: Many of Apple's self-reported repair rates are partial recordings for the final year of data. For example, although Apple reports a Year 4 Repair rate for model■ it is only for half of year 4. (4 years * 52 Weeks = 208 Weeks. 180 Weeks / 52 Weeks = 3.5 years.)

PRIVILEGED AND CONFIDENTIAL

TABLE A6: KEYBOARD DEFECT DISUTILITY CALCULATION

| [1]<br><br>Class MacBook Revenues | [2]<br><br>Class MacBook Unit Sales | [3] = [1] / [2]<br><br>MacBook Weighted Average Price | [4]<br><br>Attempted Repair Rate | [5]<br><br>CBC Disutility from Keyboard Defect | [6] = [4] * [5]<br>Expected Disutility from Keyboard Defect | [7] = [6] / [3]<br>Percentage Disutility from Keyboard Defect |
|---|---|---|---|---|---|---|
| ███████ | ██████ | ████ | ███ | █████ | ███ | ████ |
| ███████ | ██████ | ████ | ███ | █████ | ███ | ████ |

PRIVILEGED AND CONFIDENTIAL

**APPENDIX 5: PREDICTED REPAIR RATES FOR NEWER MACBOOK MODELS**

52.    Table 3 above reports Apple's attempted repair rates for class MacBooks with four complete years of data. In this Appendix, I demonstrate that it is possible to conservatively extrapolate what the repair rate for newer models of MacBooks would be if they had four complete years of data. As explained below, the prediction models yield a weighted average predicted Attempted Repair Rate of between ████████████████████

53.    It is a ministerial adjustment for damages to use *predicted* values for the "fifth-year" Attempted Repair Rate of the newer laptop models.[72] These methods are charitable to Apple because they afford predicted values the same weight as realized Attempted Repair Rates. These methods also are conservative because they predict a given model's fifth-year Attempted Repair Rate based on its first- or second-year rates, which may be understated. For example, Apple provided 72 weeks' worth of data for ██████████ and the Attempted Repair Rate in the second year is based on only 20 weeks of data (or less than half a year). Using the mid-year estimate as a proxy for the end-of-year estimate understates the true Attempted Repair Rate as of the end of the second year, which will cause my prediction of its fifth-year rate to be too low.

54.    Under one approach, I can estimate the fifth-year Attempted Repair Rate using the (limited) sample of models with five years' worth of data to understand the relationship between a model's fifth-year Attempted Repair Rate and its first- and second-year Attempted Repair Rates. This regression model yields an R-squared of 99.9 percent. For models such as ██████████████ the fifth-year predicted Attempted Repair Rate is █████████████████████ respectively. For the ██████████████████ the fifth-year predicted Attempted Repair Rate is ████████████ When I replace

───────────────

72.  Note that the "fifth year" is reported as the "Overall" cumulative repair rate for each MacBook model. For the oldest five models of class MacBooks with 4 full years of data, this is approximately equal to five years of data.

PRIVILEGED AND CONFIDENTIAL

the missing values with predicted fifth-year values and weight these predicted values *as if they were actual values*, the weighted average Attempted Repair Rate is ████████ [73] Table A7 shows the predicted fifth-year Attempted Repair Rate for each model under these assumptions. The model cannot predict values for the last four models because those models have incomplete Year 2 data.

APPENDIX TABLE A7: PREDICTED FIFTH-YEAR ATTEMPTED REPAIR RATES
(DEPENDENT VARIABLE: FIFTH-YEAR ATTEMPTED REPAIR RATE)

| Model | Apple Revenue (Class Period) | Year 1 Repair Rate | Year 2 Repair Rate | Year 3 Repair Rate | Year 4 Repair Rate | Year 5 Repair Rate |
|---|---|---|---|---|---|---|
| | | | | | | |

*Notes*: ████████  * Predicted values. Year 5 Repair Rate is equal to the Overall Attempted Repair Rate for models with Year 4 Repair Rate data available. Models with partial Year 2 data excluded.

55.     Under an alternative approach, I can predict the fifth-year Attempted Repair Rate of the newer laptops by estimating a model that exploits every data point, and which seeks to predict a model's Attempted Repair Rate in a given year as a function of the model type ("model fixed effects"), and each year's worth of repair rate data. This regression model yields an R-squared of 90

73. Apple's sales figures do not indicate whether a MacBook is a ████████ or not. When weighting for the average repair rate, I decompose sales revenues evenly between the base model and the variant.

PRIVILEGED AND CONFIDENTIAL

percent. For models such as the ██████████ the fifth-year predicted Attempted Repair Rate is ███████████████████ respectively. For the ██████████████ the fifth-year predicted Attempted Repair Rate is ████████████ When I replace the missing values with predicted fifth-year values from this alternative model, and weight these predicted values *as if they were actual values*, the weighted average Attempted Repair Rate is ███████████ Table A8 shows the predicted fifth-year Attempted Repair Rate for each model under this alternative prediction model.

APPENDIX TABLE A8: PREDICTED FIFTH-YEAR ATTEMPTED REPAIR RATES
(DEPENDENT VARIABLE: ATTEMPTED REPAIR RATE IN ANY YEAR)

| Model | Apple Revenue (Class Period) | Year 1 Repair Rate | Year 2 Repair Rate | Year 3 Repair Rate | Year 4 Repair Rate | Year 5 Repair Rate |
|---|---|---|---|---|---|---|
| ██ | ████ | ██ | ██ | ██ | | ██ |
| ███ | ████ | ██ | ██ | ██ | ███ | ██ |
| ████ | ████ | ██ | ██ | ██ | | ██ |
| ████ | ████ | ██ | ██ | ██ | | ██ |
| ████ | ████ | ██ | ██ | ██ | | ██ |
| ████ | ████ | ██ | ██ | ██ | ███ | |
| ████ | ████ | ██ | ██ | ██ | | ██ |
| ████ | ████ | ██ | ██ | ███ | | ██ |
| ███ | ████ | ██ | ██ | | | ██ |
| ██ | ████ | | | | | ██ |
| ██ | | | | | | ██ |

*Notes* ████████████████ * Predicted values. Year 5 Repair Rate is equal to the Overall Attempted Repair Rate for models with Year 4 Repair Rate data available.

PRIVILEGED AND CONFIDENTIAL