# Exhibit 2

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| In RE:  MACBOOK KEYBOARD LITIGATION | Case No. 5:18-cv-02813-EJD-VKD |
|---|---|

**MERITS REBUTTAL REPORT OF DENISE N. MARTIN, PH.D.**

**May 13, 2021**

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER**

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.   SUMMARY OF ASSIGNMENT AND OPINIONS ................................................. 3

II.  QUALIFICATIONS ................................................................................. 9

III. MATERIALS RELIED UPON ................................................................... 10

IV.  SUMMARY OF DR. SINGER'S PROPOSED METHODS ................................ 10

V.   DR. SINGER'S PURPORTED CBC ANALYSIS IS INCONSISTENT WITH ECONOMIC THEORY AND REAL-WORLD MARKET EVIDENCE ...................... 12

A.   Dr. Singer's Purported CBC Survey Does Not Simulate Realistic Marketplace Conditions So It Does Not and Cannot Estimate the Willingness to Pay for Any Product Attribute ................................................................................. 12

B.   Dr. Singer's Purported CBC Results Reveal Irrational Choices and Implausibly Indicate that the Presence of the Alleged Keyboard Defect Would Wipe Out Most or All of the Value of the MacBooks ............................................................ 18

C.   Dr. Singer Attempts to Adjust His Purported CBC Results to Reflect the Alleged Keyboard Defect *Risk*, but His Estimated Average Repair Rate Ignores Data for Most Laptops and Is Overstated ................................................................. 19

VI.  DR. SINGER'S SUPPLY SIDE ANALYSIS IS CONTRADICTED BY ECONOMIC THEORY AND REAL-WORLD MARKET EVIDENCE ................................... 23

A.   None of Dr. Singer's Methods Allows for the Supply Side Response that Actually Occurred, Which Is that Apple Extended Its Free Service on the Keyboard to Four Years ...................................................................................................... 23

B.   Other Flaws with Dr. Singer's Supply Side Analysis .................................... 25

i.   *Dr. Singer's Assumption that a But-For Price Can Be Determined by Assuming that the Supply Side Would be Fixed Is Contradicted by Accepted Microeconomic Theory* ........... 25

ii.  *With No Analysis of How Supply Would Have Changed, Dr. Singer's Purported CBC Estimated Damages Are, at Best, a Willingness to Pay Measure that Will Necessarily Be Wrong for Virtually Every Class Member* ...................................................... 28

iii. *Dr. Singer's Supply Side Analyses Assume a Simplistic Linear Demand and/or Do Not Allow for Competitor Response* ...................................................................... 31

VII. CONCLUSION ..................................................................................... 34

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## I.    SUMMARY OF ASSIGNMENT AND OPINIONS

1.    Plaintiffs in the above-captioned matter allege that the butterfly keyboards in certain Apple MacBook laptops (the "MacBooks") have a "Keyboard Defect" that makes them "prone to fail."[1]  Critically, they do not allege that all MacBooks with the butterfly keyboard will experience a problem but, rather, that the alleged design defect brings a *risk* that problems may arise (the "Keyboard Defect Risk").[2]  Specifically, they allege that when the Keyboard Defect Risk manifests, "the keys stick, register multiple key strikes when a key is pressed only once, or stop registering keystrokes."[3]

2.    At the request of counsel for Apple, I was asked to review the Merits Report of Hal J. Singer, Ph.D. (the "Singer Merits Report").  In three alternative models, Dr. Singer purports to be calculating damages associated with the amount by which he estimates Apple would have reduced the price of the MacBooks in a hypothetical "but-for market" in which it disclosed the Keyboard Defect Risk at the point of sale.

3.    As explained in detail below, Dr. Singer fails to properly model either the demand side or the supply side of the market for laptops, both of which are required to evaluate whether a price reduction would have occurred in the but-for market *at all* and, if so, the extent of that reduction.  Both his models and the results they generate are contradicted by economic theory and real world market evidence.

4.    More specifically, Dr. Singer purports to model the demand side of the market using a technique that he labels as Choice Based Conjoint ("CBC") analysis.  The very treatises he references indicate that for the results of CBC analysis to be reliable, choice sets must simulate marketplace realities.[4]  Dr. Singer's do not and therefore, his analysis is methodologically flawed.

---

[1]    The products at issue in the litigation are "model year 2015 or later MacBook laptops, model year 2016 or later MacBook Pro laptops, and model year 2018 or later MacBook Air laptops"  (Second Amended Consolidated Complaint (the "Complaint"), ¶ 1).

[2]    Singer Merits Report, ¶ 3; Complaint, ¶ 1.

[3]    Complaint, ¶ 1.

[4]    Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* Vol. 12, No. 4 (2014): p. 433.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

- Dr. Singer's hypothetical but-for market is unlike anything respondents or consumers more generally have experienced in the real world. While Apple and other laptop manufacturers offer warranties for free service should products need repair during the warranty period, in Dr. Singer's hypothetical but-for world in his purported CBC survey, he contends that Apple would have disclosed at the point of sale that its MacBooks had an alleged Keyboard Defect that would manifest with certainty. This departure from marketplace realities immediately focuses the attention of the survey respondents on the alleged "Defect."

- Within this unrealistic, hypothetical market, Dr. Singer then proceeds to further focus attention on the alleged "Defect" by including it as one of only four product "attributes" in each choice set, each of which has flaws.[5] The range used for a second attribute—"Price"—suggests to respondents that the alleged Defect is severe by offering prices of, *e.g.*, $799 for a MacBook with a full retail price of $2,799. A third attribute—"Discount" off full retail price—draws more attention to the unusual nature of such low prices, again suggesting to the respondents that the alleged Defect must be grave. Indeed, in his pre-test, Dr. Singer informed participants that "[s]ome of these prices will be significantly discounted from Apple's list prices. The prices you see may be much lower than what you would normally expect. These prices are not errors; they are part of the survey."[6] This warning further suggests to respondents that the alleged Defect is severe. This reiterated emphasis on the alleged Defect—which respondents are told to assume they will experience with certainty—would be likely to generate inflated estimates of its impact on respondents' willingness to pay.

- Dr. Singer's hypothetical but-for market also does not allow respondents to trade off product attributes as they would in a realistic marketplace. First, every choice set offers only Apple products. As a result, respondents are unable to consider a choice

---

[5]    Technically, Dr. Singer is offering just three attributes in his choice sets because his "Price" and "Discount" attributes are just different ways of expressing the same information. That is, his discounted "Price" is just the full retail price for the Model shown multiplied by the Discount.

[6]    Singer Merits Report, Appendix 3: Pre-Test Questionnaire.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

between an Apple MacBook with an alleged Keyboard Defect, for example, and an alternative brand they might prefer less that does not have a defect. Moreover, his fourth and final attribute is simply "Model," a broad term that asks respondents to choose between MacBooks with an array of different individual attributes embedded. They are unable to make tradeoffs between those individual attributes or between those individual attributes and the other attributes included in his choice sets. Here, importantly, the butterfly keyboard had a revolutionary design that made the MacBook lighter and thinner than it otherwise would have been.[7] Given that Plaintiffs allege that *all* MacBooks with the butterfly keyboard have the design defect, to avoid the negative utility Dr. Singer estimates is associated with the Keyboard Defect, respondents would also have to give up the *positive* utility associated with these other attributes. Dr. Singer's choice sets, however, do not even include weight or thickness, let alone allow respondents to trade off acceptance of the alleged Keyboard Defect against the loss of the other benefits the keyboard provides. This failure is again likely to lead to inflated estimates of the impact of the presence of the claimed Keyboard Defect on respondents' willingness to pay.

- Dr. Singer's hypothetical but-for market does not allow respondents to trade off the Keyboard Defect *Risk* against any other product attribute, even though the price impact associated with disclosure of this *risk* is what he is attempting to measure. In his deposition, he testified that including a specific level of risk in his conjoint would make the choice sets too complex for respondents to process.[8] In his conjoint, therefore, he instead instructs respondents to assume the Keyboard Defect would manifest *with certainty.* However, this hypothetical would be expected to generate an entirely different willingness to pay distribution than if he had asked about the Keyboard Defect *Risk*. While he asserts that Expected Utility Theory means he can arrive at a "conservative" estimate of the willingness to pay for the Keyboard Defect

---

[7]   Deposition of Shelly Goldberg, January 16, 2020 ("Goldberg Deposition"), p. 35; see, also, "Apple Unveils All-New MacBook," Apple Newsroom, March 9, 2015, https://www.apple.com/newsroom/2015/03/09Apple-Unveils-All-New-MacBook/, accessed April 28, 2021.

[8]   Deposition of Hal J. Singer, September 16, 2020 ("Singer Deposition"), pp. 257- 259;  Singer Merits Report, fn. 27.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

Risk by multiplying his estimated willingness to pay for the certainty of experiencing the alleged Keyboard Defect by his estimate of the average repair rate, that assertion is unsupported. This simplistic multiplication assumes that consumers would trade off the Keyboard Defect and other MacBook attributes in the same way they would trade off the Keyboard Defect *Risk* and these attributes. There is no reason to expect this would be the case. As noted, the MacBook laptop is light and thin but still provides a full-size keyboard. That combination may provide utility to consumers that could be more valuable than (or at least offset) any disutility associated with the Keyboard Defect Risk. A proper analysis, then, must allow respondents to trade off the Keyboard Defect *Risk* and these other product attributes. Dr. Singer's back-end multiplication by his estimated repair rate does not address the problem because it does not allow these trade-offs within the choice sets to be made.[9]

- The conclusion that Dr. Singer's purported CBC model is badly flawed and unreliable is corroborated by an inspection of his results, which suggest that respondents were unable to make meaningful selections among the choice sets. Examples of irrational results include the following:

  - 13% of respondents are willing to pay *more* for a MacBook with the alleged Keyboard Defect than without (controlling for model);

---

[9]  While Dr. Singer testified that putting the "risk" in his purported CBC analysis would be too cognitively burdensome for respondents, in the Reply Report he submitted in this matter, he nonetheless performed this exercise. According to his own testimony, then, the results presented in his Reply Report should be discredited. In that analysis, he found that the difference in the willingness to pay for a MacBook with/without the Keyboard Defect Risk was higher when he put the risk (which he at that time estimated using ▮▮▮ average repair rate) in the choice sets as compared to when he asked respondents to assume that the alleged Keyboard Defect would occur with certainty in his choice sets and then multiplied his estimated willingness to pay by ▮▮▮ He claimed that this finding supported his assertion that his back-end multiplication approach was conservative because it assumed risk neutrality when consumers are generally risk averse. At best, this assertion is misleading.

Dr. Singer changed a critical aspect of his purported CBC analysis between his original report and his Reply Report. In particular, in his Reply Report, he expanded the range of discounts, such that the maximum discount offered was increased from $800 to $2,000. Because of this change, it is not possible to directly compare the results of these purported CBC analyses, as Dr. Singer did. It is certainly not possible to conclude that a comparison of the results lends any credence to his assertion that "Expected Utility" theory provides justification for his back-end multiplication.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

- 25% of respondents prefer some hardware defect, including the alleged Keyboard Defect, to no defect (controlling for price and amount of the discount);

- 31% of respondents prefer "no discount" to one or more of the discount amounts, including the highest discount offered, which was $2,000 (controlling for price and model).

- Dr. Singer's opinion—based on his purported CBC analysis—that consumers would, on average, require a discount of $1,222 to be willing to buy a MacBook with the alleged Keyboard Defect—is not plausible. Were that estimate to be correct, it would imply that even with Apple's Keyboard Service Program that offers to fix keyboard issues free of charge for four years, the entire value of the MacBook Airs, nearly all of the value of the MacBook Pros with 13 inch screens and up to half the value of the MacBook Pros with 16 inch screens would be wiped out were some of the keys to stick, repeat, or fail to strike.

- Dr. Singer's average repair rate estimate is also fundamentally flawed. In the body of his report, he simply takes the revenue-weighted average five-year repair rate for the five oldest MacBook models, which yields ▮▮▮, and assumes this same rate would apply to the 15 later models.[10] In so doing, he ignores the fact that the observed repair rates for these later models (and, in particular, models that incorporate ▮▮▮▮▮ and other design changes to improve the performance of the keyboard) ▮▮▮▮▮.[11] Indeed, while data for four full years is not yet available for these later models, the data available to date indicates that the repair rates for the comparative time intervals ▮▮▮▮▮▮▮▮ experienced for

---

[10] Though there are 16 MacBook models with the alleged Keyboard Defect, four of those models were updated to include a keyboard with a ▮▮▮▮▮, resulting in 20 distinct model-types and associated repair rates. Dr. Singer defines the five-year repair rate as the overall attempted repair rate for models with at least four years of repair rate data available (Singer Merits Report, Appendix 5; ¶¶ 52-53), noting that this is an approximate five-year rate for the five earliest released models.

[11] Dr. Singer also includes an average rate based on predicted five-year rates from a regression analysis; as described below, these five-year predictions still extrapolate rates to the later models based on the experience of the earlier-released models.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

MacBooks with the "scissor keyboard," which is not alleged to have a defect.[12]  As a result, Dr. Singer is overstating the likely cumulative repair rate for these models.

5.    His supply side is flatly inconsistent with real world market evidence.

- The microeconomic theory of "Revealed Preference" indicates that the most reliable evidence about how an economic agent would act in a given situation is provided by examination of how they *did* act when presented with such a situation.[13]  Here, direct evidence exists of how Apple responded when it became aware that a small proportion of consumers were bringing their keyboards in for repair and this issue began to receive some publicity.  Critically, it did not lower price.  Instead, the company extended the period for which it would provide free service related to keyboard issues to four years.  This action, then, is the best evidence of how Apple would have reacted had it disclosed the alleged Keyboard Defect Risk during the class period.

- Dr. Singer's supply side model does not allow for or even contemplate a response by Apple of extending the period of free repair.  Instead, it assumes that the only market response that Apple would have engaged in would have been to adjust price and quantity.  His model does not allow for and, indeed, is contradicted by, the very action that Apple took when faced with the situation he purports to model.

- Even if it were possible to put aside this fatal flaw, each of Dr. Singer's "supply side" analyses is also unreliable.

  - The supply side "analysis" done for his purported CBC framework damages model is not an analysis at all.  Instead, he simply assumes that supply would have remained fixed in his hypothetical but-for market at the same level it was in the actual market.  For the reasons explained below, such an

---

[12]    Apple Inc.'s Opposition to Plaintiff's Motion for Class Certification, September 28, 2020, Table B.

[13]    See, *e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, 2013, pp. 92-95;  see, also, Andrés Carvajal, Rahul Deb, James Fenske, and John K.-H. Quah, "Revealed Preference Test of the Cournot Model," *Econometrica: Journal of the Econometric Society*, Vol. 81, No. 6 (November, 2013), 2351–2379.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

assumption is contradicted by accepted economic theory.  Moreover, the fact that this damages estimate includes no supply side analysis means that the estimate (were it to be reliable, which it is not) is just a measure of average willingness to pay.  As such, it will overstate or understate actual willingness to pay for virtually every class member, but to an unknowable degree.

- While used for mathematical tractability in some settings, including economic textbooks, economists understand that demand curves are not likely to be linear, as is assumed in Dr. Singer's "Linear Demand" supply side analysis.[14] By virtue of including his "Non-Linear" estimate, Dr. Singer implicitly acknowledges that an assumption of "Linear Demand," particularly one in which it is assumed (as he did) that the firm sells only one product, is a simplification.  Even in his own report, then, his "Linear Demand" model is rendered moot.

- Dr. Singer's "Non-Linear Demand" damages model continues to assume that, faced with the implausible but-for world he has created—one in which Apple decides to disclose the alleged Keyboard Defect Risk at the point of sale and reduce the prices of all of its MacBooks—its competitors would do nothing.

## II.    QUALIFICATIONS

6.    I am a Managing Director at NERA Economic Consulting ("NERA") and have been with the firm since 1991.

7.    Before joining NERA, I earned a B.A. in Economics from Wellesley College and an M.A. and Ph.D., also in Economics, from Harvard University.  My undergraduate and graduate education included coursework in microeconomics, statistics and econometrics, including both

---

[14]    See, *e.g.,* N. Gregory Mankiw, *Principles of Microeconomics,* 8th Edition, 2018, Chapter 5; Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, 2013, Chapter 2; Rabah Amir, Philip Erickson, and Jim Jin, "On the microeconomic foundations of linear demand for differentiated products," *Journal of Economic Theory*, 167 (2017): 641-665; and David A. Malueg, "Monopoly Output and Welfare: The Role of Curvature of the Demand Function," *Journal of Economic Education*, (1994): 235-250.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

classical and Bayesian methods.  Prior to attending Harvard, I served as an Assistant Economist at the Federal Reserve Bank of New York.

8.      While at Harvard, I taught classes in microeconomics, industrial organization and statistics to undergraduate and graduate students, and was awarded the Danforth Prize for Teaching.  Microeconomics includes consumer theory, which explains how individuals make decisions, including which products to buy given the attributes embodied in them and the prices at which they are offered.  Microeconomics also includes producer theory or industrial organization, which explains how firms make decisions, including what products to sell, with which attributes and at what prices.

9.      At NERA, I have been retained as an economic expert on more than 200 class actions, including consumer class actions, securities class actions and employment class actions.  In the course of these assignments, I am frequently asked to analyze issues related to class certification and damages, including whether a formulaic method can be used to estimate damages on a class-wide basis.  I frequently work with large datasets involving pricing and sales data.  I routinely use and have provided testimony regarding the application of statistical and econometric techniques, including hedonic regression and CBC analysis.

10.     My C.V., including my most recent 4 years of testimony and 10 years of publications, is included as **Exhibit A**.

11.     NERA is being compensated for my services in this matter at my standard rate of $1050 per hour.  Other NERA consultants assisted me in this engagement and are being compensated at rates ranging from $195 to $750 per hour.  No part of NERA's compensation depends on the outcome of this litigation.

## III.     MATERIALS RELIED UPON

12.     A complete list of the documents I relied upon in preparing this report is provided in **Exhibit B**.

## IV.     SUMMARY OF DR. SINGER'S PROPOSED METHODS

13.     In the Singer Merits Report, Dr. Singer asserts that the "economic risk [of the Keyboard Defect] translates into a decrease in price of the MacBook, had Apple disclosed the

**CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER**

Keyboard Defect at the point of purchase."[15]  Based on this premise, he purports to estimate the amount by which Apple would have supposedly lowered its price had it disclosed the alleged Keyboard Defect Risk at the point of sale (or the "price premium" associated with non-disclosure of the alleged Keyboard Defect Risk) using three alternative methods:

- *"Aggregate Damages Using Traditional CBC Framework."*  In this approach, Dr. Singer:

  - Conducts a purported CBC analysis to estimate a purported average difference in the amount consumers would be willing to pay for a MacBook with/without the alleged Keyboard Defect (that is, with/without a defect risk that respondents were told would manifest with certainty).  He estimates that average difference at $1,222.

  - Adjusts this estimate to reflect the purported average difference in the amount consumers would have been willing to pay had they been informed of the alleged Keyboard Defect *Risk* by multiplying his purported CBC estimate by his estimated average keyboard repair rate.  To estimate this rate, he looks only at the five oldest models that have four or more years of repair data available (which account for ███████████ of the MacBooks at issue). He calculates a revenue-weighted average overall repair rate of 9.1%, yielding a willingness to pay estimate of ██████████ $1,222) or ██████ of the revenue-weighted average MacBook price of ██████.

  - Assumes the supply side of the market would have remained fixed in the "but-for world" (that is, that there would have been no response by Apple or its competitors to disclosure of the alleged Keyboard Defect Risk and his estimated decrease in demand).  As such, his estimate of the willingness to pay difference (██████) is also his estimate of the amount that the market price would have fallen in his hypothetical "but-for world."  His aggregate estimate of alleged damages under this method is $569 million.

---

[15]    Singer Merits Report, ¶ 3.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

- *"Aggregate Damages Using Linear Demand Approximation."* In this approach, Dr. Singer again starts with his estimate of the average difference in willingness to pay for a MacBook with/without the alleged Keyboard Defect Risk from his purported CBC analysis. He then combines that estimate with a supply side analysis in which he assumes Apple faces linear demand for its MacBooks (all of which are treated as a single, homogeneous product, rather than differentiated products) and that there would be no response by Apple's competitors.[16] In doing so, he arrives at an average price differential across all MacBooks at issue of ▮▮▮▮▮▮ and an estimate of aggregate alleged damages of $285 million.

- *"Aggregate Damages Using Non-Linear Demand Systems."* In this approach, Dr. Singer combines his estimate of the average difference in willingness to pay for a MacBook with/without the alleged Keyboard Defect Risk with a supply side analysis in which he allows for non-linear demand but continues to assume no response by Apple's competitors.[17] He then arrives at an average price differential across all MacBooks at issue of ▮▮▮▮▮ and an estimate of aggregate alleged damages of $238 million.

## V.    DR. SINGER'S PURPORTED CBC ANALYSIS IS INCONSISTENT WITH ECONOMIC THEORY AND REAL-WORLD MARKET EVIDENCE

14.    The design and implementation of Dr. Singer's purported CBC analysis is flawed and biased, rendering his results unreliable. Below, I review flaws that are particularly problematic from the perspective of microeconomics. These flaws render Dr. Singer's purported CBC analysis inconsistent with economic theory and real-world market evidence.

### A.    Dr. Singer's Purported CBC Survey Does Not Simulate Realistic Marketplace Conditions So It Does Not and Cannot Estimate the Willingness to Pay for Any Product Attribute

15.    As stated in the very treatises referenced by Dr. Singer, for a CBC analysis to be valid, the choice sets offered to respondents must closely approximate the experience consumers

---

[16]    Singer Merits Report, ¶¶ 38-40.

[17]    Singer Merits Report, ¶¶ 41-50.

12

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

would have in the marketplace.  Specifically referencing computers, leading CBC practitioners advise:

> The guiding principle in conjoint design for economic valuation of feature enhancement is that the conjoint survey must closely approximate the marketplace confronting consumers…  Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used.  This means that the product attributes in the study should include not only functional attributes such as screen size, memory etc. but also the major brands.[18]

Further, as noted in a reference text cited by Dr. Singer, "Conjoint analysis predictions…assume that all relevant attributes that influence share have been measured."[19]  Indeed, Dr. Singer devotes a paragraph of his report to explaining how CBC analysis (which is rooted in theories from microeconomics about consumer preferences and utility) is supposed to work:

> CBC can be used to rigorously quantify consumer valuations of product attributes that are not priced separately. CBC uses survey responses to quantify the tradeoffs that consumers reveal they are willing to make when choosing among different products comprised of different combinations of attributes. The economic models underlying CBC analysis express the utility that a consumer derives from a particular product in terms of the salient features of that product. Each product is expressed as a bundle of features, and each feature contributes something to the overall utility that the consumer derives from the product. By selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes the respondent's utility—respondents indirectly reveal the value they attribute to individual features. In this way, CBC enables the researcher to elicit consumers' valuation of an individual dimension of a multidimensional product.[20] [*Internal citations omitted.*]

---

[18]  Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* Vol. 12, No. 4 (2014): p. 433.

[19]  B.K. Orme, *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 3rd Edition (Research Publishers LLC, 2014), p. 108.

[20]  Singer Merits Report, ¶ 15.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

16.    Despite acknowledging the importance of approximating real-world conditions, Dr. Singer proceeds to disregard the literature, accepted best practices and his own explanation of how a proper CBC analysis should be done.[21]  His choice sets do not simulate a realistic marketplace experience so do not generate reliable estimates of the willingness to pay differential for a MacBook with/without the alleged Keyboard Defect or, in turn, the Keyboard Defect Risk.

17.    The first break from marketplace reality is Dr. Singer's assumption that, in his hypothetical but-for market, Apple would have supposedly disclosed at the point of sale that the alleged Keyboard Defect would manifest with certainty.  In the actual marketplace, laptops are not sold with a "Keyboard Defect" as an attribute.  Instead, like many other products, they are sold with warranties or offers to provide free repair service for a period of time.  Such programs are designed to protect the consumer should a problem arise.[22]  Immediately, then, the respondents' attention is drawn to the alleged Defect, as it is out of the realm of typical marketplace experiences.

18.    Within this unrealistic hypothetical market, Dr. Singer then additionally departs from marketplace realities by focusing attention almost exclusively on the alleged "Defect."  Indeed, he includes it as one of only four product "attributes" in each choice set.  Two other attributes are essentially just flip sides of the same coin, both of which introduce bias.  In particular, by virtue of its ranges, his "Price" attribute suggests to respondents that the alleged Defect is severe.  He offers prices of, *e.g.*, $99 for a MacBook with a full retail price of $1,299 and $799 for a MacBook with a full retail price of $2,799.  His third attribute—"Discount" off full retail price— draws more attention to the unusual nature of such low prices, further reinforcing to respondents that the alleged Defect must be grave.[23]  Indeed, in his pre-test, Dr. Singer informed participants that "[s]ome of these prices will be significantly discounted from Apple's list prices. The prices you see may be much lower than what you would normally expect. These prices are not errors;

---

[21]    Singer Deposition, pp. 206, 275-276.

[22]    D.N.P. Murthy, I. Djamaludin,, "New Product Warranty: A Literature Review," *International Journal of Production Economics*, 79 (2002), 231-260, at 231-232.

[23]    This "Discount" attribute was not used in the purported CBC survey that Dr. Singer conducted in his original report or his Reply Report.  He includes it in his most recent survey with no explanation.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

they are part of the survey."[24]  This warning further suggests to respondents that the alleged Defect is severe, which, in turn, is likely to lead to inflated estimates of its impact.

19.    Dr. Singer's choice sets introduce a third break from marketplace reality by failing to let respondents trade off other salient product attributes.  First, each of his choice sets only offers Apple products.  That restriction means that respondents are unable to consider a choice between an Apple MacBook with an alleged Keyboard Defect, for example, and an alternative brand they might otherwise prefer less without such an alleged defect.  Moreover, his fourth and final attribute is simply "Model," a broad term that asks respondents to choose between MacBooks that have an array of different attributes embedded.  Even accepting Dr. Singer's improbable but-for market for the sake of argument, the decisions made by laptop purchasers in the marketplace allow for important additional tradeoffs amongst these attributes.  Academic literature concludes that "core technical features, post purchase services, price and payment conditions, peripheral specifications, physical appearance, value added features, and connectivity and mobility are the seven factors that are influencing consumers' laptop purchases."[25]  Other academic researchers using conjoint analysis to study laptop demand include attributes such as "LCD [screen] size, laptop thickness, battery life, weight and price."[26]  Indeed, such laptop attributes are included in the choice sets described in the very articles Dr. Singer cites in his report.[27]  In his own analysis, however, he

---

[24]    Singer Merits Report, Appendix 3: Pre-Test Questionnaire.

[25]    V. Aslıhan Nasır, Sema Yoruker, Figen Güneş, and Yeliz Ozdemir, "Factors Influencing Consumers' Laptop Purchases," Working Paper prepared for 6th Global Conference on Business & Economics at Harvard University's Gutman Conference Center, October 15-17, 2006, p. 1.

[26]    Ching-Shin Shiau, Ian H. Tseng, Andrew W. Heutchy, and Jeremy Michalek, "Design optimization of a laptop computer using aggregate and mixed logit demand models with consumer survey data," in *International Design Engineering Technical Conferences and Computers and Information in Engineering Conference*, Vol. 48078, 2007, p. 5.

[27]    More specifically, Dr. Singer cites three articles:  (1) Oyatoye *et al.* include brand name, micro processor/GHz, screen size/weight, hard drive, RAM and price as attributes in their conjoint analysis involving laptops (E.O. Oyatoye, Andrew E. Otike-Obaro, and Ezeoke Golda Nkeiruka, "Using Conjoint Analysis to Study the Factors Important to University Students in Nigeria When They Select a Laptop Computer," Richards College of Business, University of West Georgia, (2016), pp. 4-6); (2) Chapman *et al.* include brand, price, and six product features, ranging from 2-5 levels per attribute as attributes in their conjoint analysis involving laptops (Christopher N. Chapman, James L. Alford, Chad Johnson, Ron Weidemann, and Michal Lahav, "CBC vs. ACBC: Comparing Results with Real Product Selection," Sawtooth Software Conference Proceedings (2009), p. 2;) and (3) Jedidi and Zhang include processing speed, hard drive, memory, price, and brand name as attributes in their conjoint analysis involving laptops (Kamel Jedidi, and Z. John Zhang, "Augmenting Conjoint Analysis to Estimate Consumer Reservation Price," *Management Science* Vol. 48, No. 10, (2002), pp. 1356-1357.)

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

ignores such product attributes and the fact that they are included in the trade-offs consumers weigh when making real world purchasing decisions.[28]

20.    Critically here, the introduction of the butterfly keyboard was revolutionary, allowing the MacBook to accommodate a full-size keyboard, while providing a thinner and lighter laptop:

> [T]he original butterfly keyboard was born of a desire to make a laptop that was significantly thinner and lighter than ones that we were making at the time.  And in order to do that, we had to reengineer every component of the product to reduce weight and thickness.
>
> The keyboard is a significant contributor to the thickness of a product, and so of course we wanted to see what could be done to reduce the keyboard's impact on the product dimension.  And so the original reason that we were looking at redesigning a keyboard was to serve that product-level goal.[29]

21.    Given that the butterfly keyboard made the MacBook lighter and thinner than it otherwise would have been and given that Plaintiffs allege that all MacBooks with the butterfly keyboard have the Keyboard Defect, the exercise Dr. Singer should be conducting would estimate the net increase in utility or willingness to pay associated with avoiding the alleged Keyboard Defect but also the net *decrease* in utility associated with losing the other benefits that the butterfly keyboard provides.[30]  Dr. Singer's choice sets do not even include weight or thickness, let alone allow respondents to trade off acceptance of the alleged Keyboard Defect against the loss of these other benefits.  This structure once again leads to inflated estimates of the difference in the willingness to pay for a MacBook with/without the alleged Keyboard Defect.

---

[28]    See, Singer Merits Report, Table 1; Singer Deposition, pp. 220-221.

[29]    Deposition of Shelly Goldberg, January 16, 2020 ("Goldberg Deposition"), p. 35; see, also, "Apple Unveils All-New MacBook," Apple Newsroom, March 9, 2015, https://www.apple.com/newsroom/2015/03/09Apple-Unveils-All-New-MacBook/, accessed April 28, 2021.

[30]    The Oyatoye *et al.* article that Dr. Singer references makes this point explicitly: "Fundamentally, the customer value concept evaluates the value a product offers to a customer, taking all its tangible and intangible features into account. It relates to a trade-off between the benefits the product offers to the customer, and the sacrifices a customer has to make to obtain it," (E.O. Oyatoye, Andrew E. Otike-Obaro, and Ezeoke Golda Nkeiruka, "Using Conjoint Analysis to Study the Factors Important to University Students in Nigeria When They Select a Laptop Computer," Richards College of Business, University of West Georgia, (2016), p. 4).

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

22.    Dr. Singer's hypothetical but-for market also does not allow respondents to trade off the Keyboard Defect *Risk* against any other product attribute, even though the price impact associated with disclosure of this risk is what he is attempting to measure. He testified that including the level of risk in his conjoint would make it too complex for respondents to process.[31] He instead instructs them to assume the alleged Keyboard Defect would manifest *with certainty*. However, this choice set would be expected to generate an entirely different willingness to pay distribution from respondents' willingness to pay had they been asked about the Keyboard Defect Risk. While he asserts that Expected Utility Theory means he can arrive at a "conservative" estimate of the willingness to pay for the Keyboard Defect *Risk* by multiplying his estimated willingness to pay for the alleged Keyboard Defect by his estimate of the average repair rate, that assertion is unsupported. This simplistic multiplication assumes that consumers would trade off the alleged Keyboard Defect and other MacBook attributes in the same way they would trade off the Keyboard Defect *Risk* and these attributes. There is no reason to expect this would be the case. For example, because the MacBook laptop is very light and thin but still has a full-size keyboard, this may provide utility to the consumer that could be more valuable to the consumer than any disutility provided by the Keyboard Defect Risk. A proper analysis, then, must allow respondents to trade off the Keyboard Defect *Risk* and these product attributes. Dr. Singer's approach does not allow this trade-off within the choice sets. His back-end multiplication by his estimated risk of repair (described further below) fails to correct the problem.[32]

23.    As a result of each of these flaws, Dr. Singer's purported CBC model does not and cannot generate a reliable estimate of consumers' willingness to pay for the alleged non-disclosure of the alleged Keyboard Defect or the Keyboard Defect Risk. Given that each of Dr. Singer's

---

[31]    Singer Deposition pp. 257- 259. Singer Merits Report, fn. 27.

[32]    As described in fn. 9 above, Dr. Singer testified that putting "risk" into his purported CBC analysis would render respondents unable to process the choices, yet he performed precisely this analysis in his Reply Report. He then compared the results of the two analyses and asserted that, because his estimated alleged damages were higher when including risk in the choice sets, it supported his assertion that his back-end multiplication approach was "conservative." However, Dr. Singer's own testimony calls into question the results presented in his Reply Report. Further, it is improper to compare the results of his two purported CBC analyses because he increased the Price and Discount ranges in the Reply Report. It is therefore misleading to assert that this comparison provides support for his back-end multiplication.

17

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

three damages estimates depend upon his purported CBC results, his unreliable CBC analysis necessarily renders each of his three damages estimates meaningless.

> **B. Dr. Singer's Purported CBC Results Reveal Irrational Choices and Implausibly Indicate that the Presence of the Alleged Keyboard Defect Would Wipe Out Most or All of the Value of the MacBooks**

24.     The conclusion that Dr. Singer's purported CBC model is badly flawed is corroborated by an inspection of his results, which appear to indicate that respondents did not make meaningful selections in the choice exercise. Looking at the output of Dr. Singer's purported CBC analysis, examples of irrational willingness to pay results are exhibited. For example:

- 13% of respondents are willing to pay *more* for a MacBook with the alleged Keyboard Defect (controlling for Model);

- 25% of respondents prefer some hardware defect, including the alleged Keyboard Defect, to no defect (controlling for Price and amount of the Discount);

- 31% of respondents prefer "no discount" to one or more of the discount amounts, including the highest discount offered, which was $2,000 (controlling for Model).[33]

25.     These results are inconsistent with rational consumer preferences. Microeconomic theory indicates that, holding everything else constant, consumers prefer outcomes that yield higher utility than lower utility and prefer outcomes in which they spend less money than more money.[34] A substantial portion of Dr. Singer's results violate these indicia of rational preferences.

26.     The overall opinion he offers regarding his CBC analysis —that consumers would, on average, require a discount of $1,222 to be willing to buy a MacBook with the alleged Keyboard Defect—is not plausible. Dr. Singer reports the full list or retail price for MacBook Airs in his "Tier 1" category as $999, which is below his estimated average discount of $1,222, and for MacBook Airs in his "Tier 2" category to be $1,299, approximately equal to his estimated average discount.[35] The full list price he uses for MacBook Pro-13s in his survey ranges from $1,299 to

---

[33]    From file "Individual Utilities.csv" of Singer's backup.

[34]    See, *e.g.,* N. Gregory Mankiw, *Principles of Microeconomics,* 8th Edition, 2018, Chapter 21.

[35]    Singer Merits Report, Table 2.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

$1,999 and for MacBook Pro-16s ranges from $2,399 to $2,799. If we believe Dr. Singer's results, then, the entire value of the MacBook Airs and some MacBook Pro-13s, and up to half the value of the MacBook Pro-16s would have been wiped out were consumers to learn that some of the keys would stick, repeat or fail to strike. This dramatic reduction in value would supposedly have occurred despite the fact that Apple had a Keyboard Service Program that offered to fix these issues free of charge. These implausibly high estimates are evidence that the flaws identified above in his purported CBC analysis—flaws that were predicted to cause his results to be overstated and unreliable—do, in fact, lead to that result.

### C. Dr. Singer Attempts to Adjust His Purported CBC Results to Reflect the Alleged Keyboard Defect *Risk*, but His Estimated Average Repair Rate Ignores Data for Most Laptops and Is Overstated

27.    While Dr. Singer's goal is to estimate the price impact associated with his hypothetical but-for disclosure of the alleged Keyboard Defect *Risk*, his purported CBC survey asks consumers to choose between a laptop with the alleged Keyboard Defect that will, *with certainty*, cause keys to stick, repeat or fail to register and a laptop with no defect. In a back-end analysis, he attempts to remedy this flaw by multiplying his purported CBC results by an "average repair rate," which he asserts is a proxy for the risk that the alleged Keyboard Defect would manifest.

28.    Critically, his alleged average keyboard repair rate is flawed and overstated, rendering his calculations unreliable. There are 16 MacBook models at issue in this case. Four of these models were released with two variants ███████████████████████████ so a total of 20 MacBook models are at issue.[36] To estimate an "average repair rate," Dr. Singer looks at *only the five oldest models*, which represent approximately ███ of total MacBook revenue over the class period. To get his estimated average repair rate of ████ he takes a revenue-weighted

---

[36]   Given that all four 2017 models were redesigned to incorporate a ███████, there were 20 distinct laptop models (and Dr. Singer provides re air rate data and ro ections for 20 separate laptop models). Accordingly, I refer to each product (including ████████████) as "models."

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

average of the cumulative overall repair rates for these five models.[37] He assumes this same ████ will be the cumulative overall repair rate for each of the other 15 MacBook models.

29.     The five laptops he uses in his calculation, however, are not representative of the other 15 models along critical dimensions.   The keyboard characteristics of the later models differed from those the laptops released earlier, as Apple worked to address the issues reported by consumers.[38]   For example, 11 of the 15 models not included in Dr. Singer's average repair rate had a ██████████████, whereas the five models included in his average do not.[39] Empirically, this difference in design impacts repair rates:  the year one repair rates for the ████ ██████████ variants average ████ whereas the ████████████████████ Year two repair rates follow a similar trend, with ████████████████████████████ ████████████████████.  Further, year three rates for ████████████████████ ████████████████████████████████[40]  Other differences in design also exist.  Some of the 15 models include ████████████████████ ████████████████████, while none of the five models included in Dr. Singer's average repair rate share these design features.[41]  These different design features make the later models fundamentally different from the five earliest-released products.  Given that the five oldest models are not representative of the later models, it is inappropriate as a matter of statistics to extrapolate the cumulative average repair rate for these five models to the remaining MacBook population.[42]

30.     Moreover, while Dr. Singer attempts to justify his exclusion of the repair rates for the laptops that were released after 2016 because four years of repair data was not yet available, this justification has no basis.  For the other 15 models, it is possible to compare their repair rates

---

[37]  Singer Merits Report, Table 3.  In addition, even within the five oldest models included in his average, the observed repair rates are variable—for example, the cumulative four-year rates for models ████████████ ████████████████████████████████████████.  In other words, the underlying data show that rates are not even similar across the five models that Dr. Singer includes in his average. Additionally, ████████████████████████████████████████████████████████████, including those excluded from Dr. Singer's estimation of the overall average repair rate.

[38]  Goldberg Deposition, pp. 139-141.

[39]  Apple Inc.'s Opposition to Plaintiff's Motion for Class Certification, September 28, 2020, pp. 4-7.

[40]  Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.

[41]  Apple Inc.'s Opposition to Plaintiff's Motion for Class Certification, September 28, 2020, pp. 4-7.

[42]  Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence,* "Reference Guide on Statistics," David H. Kaye and David A. Freedman, 3rd Edition, 2011, p. 217.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

for the first, second and even third years after release to the rates over a similar period for the five models being used by Dr. Singer. Doing so demonstrates that the repair rates for MacBooks released after 2016 are on different trajectories than those released earlier. While the first-year repair rates of the products Dr. Singer includes in his average range from ██████████████ for example, the first-year repair rates of the products Dr. Singer excludes are ██████████████, ██████████████[43] The ranges for the second-year and third-year repair rates, where available for the other 15 models, ██████████████████████████████████████ ██████████ This empirical evidence supports the fact that the later models are not only different products in terms of keyboard design, but that the performance of the keyboards on these models is different.

31. Given these differences, Dr. Singer's use of the average cumulative repair rates from the five early models to predict the average cumulative repair rates for the 15 later ones is not just statistically inappropriate, it is also likely to ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████. No statistical justification could support an extrapolation of this type. Accordingly, applying the four-year repair rates for the five oldest models to the later models is incorrect and misleading, because it ██████ ██████████████████████████████████████████████ the likely repair rates for these models.

32. As described in a footnote to his Merits Report and in his Appendix, Dr. Singer also puts forward alternative estimations of the repair rate based on regression analyses. In one analysis, he predicts overall cumulative repair rates for each laptop model based on the observed relationship between year one and year two rates and overall cumulative rates for the five oldest

---

[43] Singer Merits Report, Table 3; ¶ 30.

[44] Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

models.[45] He claims that analysis yields a more "conservative" estimate because it generates a lower sales-weighted average repair rate of ▮▮. But simply because an estimate generates lower damages does not render it "conservative" or meaningful. His regression-based estimate suffers from the same conceptual flaws as his simple weighted average: it is still estimated based on just the oldest five MacBook models and assumes that the trends observed in the repair rates for those five models are predictive of the trajectory for the other 15 models.

33.    Dr. Singer's second purportedly "conservative" approach has a different specification but exactly the same flaw: he predicts overall cumulative repair rates for each model based on the average cumulative rate for only the five oldest models. While he does allow initial repair rates to vary by model in this specification, to estimate his cumulative predicted rates he is still extrapolating from the five earliest-released models to later-released models. As in with his simple average, this method does not incorporate the differing trends in repair rates for models with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or adjust for other characteristics that would impact on the predicted overall repair rate for a given MacBook model.

34.    Dr. Singer makes other conceptual errors in his attempt to calculate the average repair rate that serves as his estimate of the alleged Keyboard Defect Risk. Consumers purchasing complex technology products understand that there is some risk of product failure or defect associated with their purchases.[46] As described in more detail below, it is precisely for this reason that such products are sold with warranties. Some level of risk of this type could not have been avoided by consumers; as such, putting consumers back in the same economic position they would have held absent the allegations would require compensation only for any *excess* risk of defect as compared to a similar product that was not affected by the alleged non-disclosure. In other words, Dr. Singer should have adjusted any estimate of the Keyboard Defect Risk for typical rates of repair on new laptops. For example, the reported repair rates for MacBooks with the scissor keyboard ranged between ▮▮▮▮▮▮▮▮▮▮[47] Based on the data that has been reported to date,

---

[45]    Singer Merits Report, fns. 13 and 47; Appendix 5. As noted above, Dr. Singer labels the overall cumulative repair rates "Year 5" rates in his analysis and Appendix.

[46]    D.N.P. Murthy, I. Djamaludin, "New Product Warranty: A Literature Review," *International Journal of Production Economics*, 79 (2002), 231-260, at 231-232.

[47]    Apple Inc.'s Opposition to Plaintiff's Motion for Class Certification, September 28, 2020, Table B.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

the cumulative repair rates for as eight models (responsible fo ████ of sales) ████████████
█████████████████████████[48]

35.    Dr. Singer's estimated repair rate also fails to adjust for the individualized nature
of consumer complaints.  The repair rates he uses are based on percentages of MacBook products
that came back for service that were logged under certain complaint categories.[49] ████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████[52]  Without quantifying and removing those
complaints that were not attributable to the alleged Keyboard Defect, Dr. Singer's estimate is
overstated, but to an unknowable degree.

## VI.    DR. SINGER'S SUPPLY SIDE ANALYSIS IS CONTRADICTED BY ECONOMIC THEORY AND REAL-WORLD MARKET EVIDENCE

### A.    None of Dr. Singer's Methods Allows for the Supply Side Response that Actually Occurred, Which Is that Apple Extended Its Free Service on the Keyboard to Four Years

36.    In each of his models, Dr. Singer assumes that had Apple been aware of the alleged
Keyboard Defect Risk at the time of product launch, its only potential response would have been
to disclose that risk at the point of sale and then, in response to his estimate of the associated
decrease in demand, to lower the price of all associated MacBooks.  In making this assumption,
Dr. Singer ignores the real-world evidence that, as Apple became aware that a small portion of
consumers were bringing their MacBooks in for repair and the issue received publicity in the

---

[48]    Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.
Utilizing Singer's sales revenue estimates for the models with ███████████████████
keyboards (Singer Merits Report, Appendix A5, Table A7).

[49]    Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.

[50]    Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.

[51]    Apple Inc.'s Supplementary Response to Interrogatories 4-5 & 9-12, February 23, 2021, Interrogatory 9.

[52]    Goldberg Deposition, p. 199.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

market, it did not lower the prices of the MacBooks.[53]  Instead, Apple created a Keyboard Service Program that, for a period of four years from purchase, offered free repair of the keyboard.

37.    More generally, as noted above, laptops are not sold with a Keyboard Defect Risk as a product attribute.  Instead, consumers are protected against potential defects for a period of time under a product warranty.  A branch of academic literature devoted to the subject of product warranties explains that warranties provide assurance of repair, replacement or refund in the event of product failure:

> In the case of new products, another feature is that each new generation is more complex than the earlier generation it replaces. Often customers are uncertain about new product performance. Here warranties play an important role in providing product assurance to customers and different types of warranties are offered depending on the product and the buyer.[54]

38.    Perhaps unsurprisingly given the function of warranties, when Apple learned that a small proportion of its customers were experiencing keyboard issues, it extended the time during which it would provide free service for these issues to four years.  Importantly, Apple did not adjust price.  Instead, contrary to Dr. Singer's hypothetical "but-for" world assumption, Apple's response upon receiving some complaints about its keyboard was *not* to lower the prices of all associated MacBooks, but instead to offer a longer period of free repair for any consumer experiencing an issue.  In microeconomic parlance, this "revealed preference" reaction by Apple is the best evidence of how Apple would have reacted in the but-for world (or more accurately, how Apple *did* act in the real world) in which the alleged Keyboard Defect Risk was disclosed earlier.[55]  It is ignored by Dr. Singer, who instead offers a model that does not even contemplate a response via an extension of free repair service.

---

[53]   Goldberg Deposition, pp. 296-298.

[54]   D.N.P. Murthy, I. Djamaludin, "New Product Warranty: A Literature Review," *International Journal of Production Economics*, 79 (2002), 231-260, at 231-232.

[55]   See, *e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, 2013, pp. 92-95;  see, also, Andrés Carvajal, Rahul Deb, James Fenske, and John K.-H. Quah, "Revealed Preference Test of the Cournot Model," *Econometrica: Journal of the Econometric Society*, Vol. 81, No. 6 (November, 2013), 2351–2379.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

39.    Dr. Singer's estimate of alleged damages also fails to incorporate the additional value consumers received from the Keyboard Service Program.  This value was received regardless of whether they brought their keyboards in for repair.  More specifically, while Apple's products are all repaired free of charge for the first year (pursuant to the terms of the AppleCare warranty), an extended service plan may be purchased for an additional charge under AppleCare+. These additional charges reflect the additional service coverage being purchased by consumers. Here, class members who had not purchased AppleCare+ prior to the implementation of the Keyboard Service Program did not have to pay for repairs beyond the one year limited warranty period (or, if they had paid for repairs prior to the Keyboard Service Program, they could receive a refund for those repairs).[56] Those who had purchased AppleCare+ received additional service coverage beyond the AppleCare+ plan terms.  Any estimate of alleged damages should be reduced by the value of this benefit that they received.

**B.  Other Flaws with Dr. Singer's Supply Side Analysis**

40.    Putting aside this fatal flaw with Dr. Singer's supply side analysis, his other analyses are contradicted by economic theory and/or the marketplace realities relevant for this case.

*i.  Dr. Singer's Assumption that a But-For Price Can Be Determined by Assuming that the Supply Side Would be Fixed Is Contradicted by Accepted Microeconomic Theory*

41.    In his first CBC Framework damages method, Dr. Singer does no analysis of how the supply side of the market would have responded to the purported reduction in demand (willingness to pay) that he estimates using his purported CBC analysis.  In attempted justification of using such an approach to estimate a "price" effect, he asserts that his CBC analysis *does* consider the supply side, it just assumes that the supply side would have remained fixed in the but-for world.  This assertion is flatly inconsistent with economic principles.  It is not possible to generate an estimate of how price would have changed in the but-for world without explicitly modeling how both demand and supply would have changed.

---

[56]    See, "Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro," https://support.apple.com/keyboard-service-program-for-mac-notebooks, accessed May 13, 2021.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

42.    More specifically, every introductory economic textbook includes the following fundamental tenets:

a)  Demand is determined by consumers.[57]  Consumers value products because of the various attributes they embed and, given their preferences, budget constraints, and the array of available alternative products, decide what price they would be willing to pay for a given product (that is, the "value" they assign to the product).

b)  Supply is determined by producers.  Producers consider the costs of bringing each product to market (*e.g.*, inputs, manufacturing, distribution, and marketing) and, in a differentiated product market, also consider how competing products are priced/marketed, setting prices to maximize profits.[58]

c)  Market prices are determined by the interaction of these demand and supply processes.  If there is an intersection of supply and demand, a market for the good will exist; if not, the product will not be brought to market or will not survive.

43.    Conjoint analysis is a purely *demand* side tool that (at best) measures consumers' willingness to pay for or valuation of a product attribute.[59]  Dr. Greg Allenby, an accepted academic authority in conjoint analysis makes this point clearly, cautioning:

> The WTP (willingness to pay) … cannot be a measure of the market value of a product feature….  The WTP measure utilizes only demand-side information and is independent of costs or the competitive structure of the industry…. [60]

---

[57]  See, *e.g.*, N. Gregory Mankiw, *Principles of Microeconomics*, 8th Edition, 2018, p. 67.

[58]  See, *e.g.*, Richard G. Lipsey and Peter O. Steiner, *Economics*, 6th Edition, p. 66.

[59]  See, *e.g.*, Greg Allenby, Jeff Brazell, John R. Howell and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics*. Vol. 57, No. 3 (August 2014) ("Allenby *et al.*, 2014") , pp. 629-663; also, Greg M. Allenby, Jeff D. Brazell, John R. Howell and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics* Vol. 12 No. 4 (2014), 421-456.  Dr. Allenby is widely recognized as an academic authority on conjoint analysis.

[60]  Allenby *et al.,* 2014, p. 647, p. 649.

26

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

> WTP… [is] purely demand-based…and [does] not take into account changes in prices and costs as the feature is enhanced and a new industry equilibrium is achieved. [61]

44.    Dr. Allenby goes on to explain:

> It is the marginal rather than the average consumer that drives the determination of equilibrium prices.  Exactly where in the distribution of the WTP the marginal consumer will be is determined by the nature of the distribution *as well as where supply factors that slice into the distribution of WTP lie*…. If the bulk of the market has a low value of WTP, and there is a small portion of the market with an extremely high WTP, then a profit-maximizing firm may set the price much lower than the average WTP so as to sell to the majority of customers…. In these cases, the mean WTP will vastly overstate the price premium a firm will charge.[62]

45.    Even if, on average, consumers have a positive willingness to pay for or valuation of an attribute, contrary to Dr. Singer's assumption, that willingness to pay may not translate into a price premium at all:

> A major finding is that there are reasonable circumstances in which some portion of consumers is willing to pay a price premium but a premium (price differential) will not arise in the market.  An implication of the findings is that even if surveys that indicate that consumers are willing to pay a premium are correct, this is not a sufficient condition to generate a premium in the market.[63]

46.    Dr. Singer's assertion that he can generate an estimate of the but-for price of the MacBooks without modeling how the supply side would have shifted is contradicted by economic

---

[61]    Allenby *et al.,* 2014, p. 650.  See, also, B.K. Orme, *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, 3rd Edition (Research Publishers LLC, 2014), p. 108.

[62]    Allenby *et al.,* 2014, p. 652, emphasis added.

[63]    See, R.A. Sedjo and S.K. Swallow, "Voluntary Eco-Labeling and the Price Premium," *Land Economics*, Vol. 78, No. 2 (2002), pp. 272-284 at p. 282.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

theory.  This theory indicates that it is impossible to generate an estimate of the difference in price of a MacBook with/without the Keyboard Defect without explicitly modeling the supply side.

> ### ii. With No Analysis of How Supply Would Have Changed, Dr. Singer's Purported CBC Estimated Damages Are, at Best, a Willingness to Pay Measure that Will Necessarily Be Wrong for Virtually Every Class Member

47.    Without analysis of the supply side, a well-designed and well-implemented CBC analysis (which Dr. Singer's is not) can only estimate willingness to pay, not price.  Unlike price, however, willingness to pay is an inherently individualized metric.  As such, any average willingness to pay generated by Dr. Singer's CBC analysis will mis-estimate the willingness to pay of each individual class member, but to an unknowable degree.

48.    Under microeconomic theory, individuals have preferences and make decisions regarding product purchases according to those preferences, with the goal of maximizing their "utility" or satisfaction subject to budget constraints.[64]  The individualized preferences of a particular consumer determine how much value that consumer assigns to each product, and are a key input into how he or she makes purchase decisions.  The demand curve, then, is a reflection of the various unique valuations of all individual consumers in the market.

49.    A simplified market equilibrium chart, representing the interaction of the demand and supply curves in a market with homogeneous or undifferentiated products, is depicted in Figure 1 below:

---

[64]    See, *e.g.,* N. Gregory Mankiw, *Principles of Microeconomics,* 8th Edition, 2018, Chapter 21.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER



50.    At a market clearing price of $P^*$, those consumers whose willingness to pay is below $P^*$ (those to the right of P* on the demand curve) will stay out of the market.  Subject to their current budget constraints, as well the prices of competing products, those consumers who value the product at more than $P^*$ (those to the left of $P^*$ on the demand curve) will elect to purchase.  Any positive difference between each individual's value and the market price is his or her "consumer surplus."

51.    In the graph above, Consumer A has a value of $D^A$.  At a market price of $P^*$, Consumer A receives a consumer surplus or utility from purchase of $D^A$ minus $P^*$.  Consumer B, however, has a value of $D^B$.  At a price of $P^*$, Consumer B receives a consumer surplus from purchase of $D^B$ minus $P^*$.  Even though they pay the same market price, then, the value received by these consumers—even for a homogeneous product—differs, depending on their individual valuations.  While the aggregate willingness to pay in the graph above is the area of the triangle between the demand curve and the market price, it is made up of the summation of valuations that

29

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

vary across individual consumers. This construct from introductory microeconomics makes it clear that market demand is made up of a distribution of individual consumer's varying values. Further, Figure 1 above is a snapshot at a point in time: to the extent that budget constraints, available alternatives and/or the prices of alternatives change, the value that individual consumers assign to a product would be also be expected to change.

52.    When products are "differentiated" rather than homogeneous, as is true of laptop computers, more avenues exist for variability in values across consumers. According to microeconomic models of consumer choice, the preferences of individual consumers in the market for laptops will vary across model attributes, including the value each consumer assigns to getting a full-sized keyboard in a very thin, light laptop, which the butterfly mechanism allowed. For example, some consumers may place a high value on obtaining the thinnest, lightest product on the market regardless of other product characteristics, or be willing to trade off other characteristics—*e.g.*, screen size or battery life—to obtain a thinner laptop.[65]  Others may plan to use their laptop at home and not assign value to whether the laptop is thin, focusing more on display quality and size.

53.    According to the *Reference Manual on Scientific Evidence,* economic damages are defined as the compensation needed to place the plaintiff in the same economic position that she would have occupied if the alleged wrongdoing had never occurred.[66]  Because preferences for product attributes vary from person to person, to compensate class members using a willingness to pay approach would require an assessment of *each* class member's preferences to determine the difference in value (if any) that *each* class member would subjectively assign to MacBooks that were otherwise identical but had/did not have the alleged Keyboard Defect Risk. Even if he were reliably estimating average willingness to pay (which for the reasons above, he is not), Dr. Singer's proposed approach simply gets the answer wrong for each consumer, understating the willingness to pay for some and overstating it for others.

---

[65]    As noted above in fn. 30, the Oyatoye *et al.* article referenced by Dr. Singer makes exactly this point.

[66]    Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence, "*Reference Guide on Estimation of Economic Damages," Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, 3rd Edition, 2011, p. 432.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

### iii. *Dr. Singer's Supply Side Analyses Assume a Simplistic Linear Demand and/or Do Not Allow for Competitor Response*

54.     Dr. Singer purports to incorporate supply-side behavior by estimating how Apple alone would have responded to the change in demand that he assumes would have occurred had consumers been told at the point of sale that the alleged Keyboard Defect would manifest with certainty.[67]  Under his "linear demand" approach, he generates this estimate by assuming that Apple's response would be a formulaic re-estimation of price based on the estimated change in demand and a simplistic estimate of the elasticity of demand for the MacBooks.  That is, he assumes that Apple would passively let its prices fall by one-half the amount of the estimated change in demand.[68]  While used for mathematical tractability in economic textbooks, economists understand that demand curves are not likely to be linear.[69]  Further, in his application of this linear demand approach, he assumes that Apple sells just one product.  While Apple's laptops are branded as "MacBooks," they are differentiated within that broader umbrella, having different attributes, prices and, of particular importance here, repair rates.

55.     Dr. Singer acknowledges that an assumption of "Linear Demand" is a simplification and offers a "Non-Linear" version that he acknowledges is appropriate in multi-product situations.[70]  Even in his own report, then, his "Linear Demand" model is rendered moot.

56.     In his "Non-Linear Demand" estimate, he allows that Apple sells more than one product and allows for "cross-price elasticities" of demand to come into play, although he still continues to assume that Apple's competitors would continue to behave in the but-for world as they had in the actual world.  He makes this assumption despite the fact that Dr. Singer's but-for

---

[67]    Singer Merits Report, Table 1; ¶ 39.

[68]    Singer Merits Report, ¶ 40.

[69]    See, *e.g.,* N. Gregory Mankiw, *Principles of Microeconomics,* 8th Edition, 2018, Chapter 5. See, also, Rabah Amir, Philip Erickson, and Jim Jin, "On the microeconomic foundations of linear demand for differentiated products," *Journal of Economic Theory,* 167 (2017): 641-665; and David A. Malueg, "Monopoly Output and Welfare: The Role of Curvature of the Demand Function," *Journal of Economic Education,* (1994): 235-250.

[70]    Singer Merits Report, ¶¶ 41-42.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

world presumes that Apple, in an unprecedented move, would have disclosed at the point of sale that its MacBooks have a Keyboard Defect and lowered it prices.[71]

57.    In reality, the supply side response in such an unprecedented but-for world would have been complex.  The market for laptops is comprised of a few relatively large firms, who develop their product offerings and price strategically.  These firms use product differentiation, branding, bundling of product attributes, and warranty or service repair offers to compete for market share.[72]  Apple describes the markets in which its products are sold in its annual 10-K:

> The markets for the Company's products and services are highly competitive and the Company is confronted by aggressive competition in all areas of its business…. The Company is focused on expanding its market opportunities related to smartphones, personal computers, tablets and other electronic devices. These markets are highly competitive and include many large, well-funded and experienced participants. The Company expects competition in these markets to intensify significantly as competitors imitate features of the Company's products and applications within their products, or collaborate to offer solutions that are more competitive than those they currently offer. These markets are characterized by aggressive price competition, frequent product introductions, evolving design approaches and technologies, rapid adoption of technological advancements by competitors, and price sensitivity on the part of consumers and businesses.[73]

58.    Other companies manufacturing or selling laptops similarly note the strategic and competitive nature of the industry is in terms of pricing and product offerings.  For example, Dell reports that all areas of its business face "rapid technological advances" and "ongoing product and price competition."[74]  Another competitor, HP, reports that the PC market is "characterized by

---

[71]    While Plaintiffs point to selected Apple testimony the but-for market created by Dr. Singer would have been an unprecedented one in which Apple would disclose at the point of sale and that its MacBooks have a "Keyboard Defect Risk" and lower the prices of these products.  This response (which is contradicted by Apple's actual response, as noted above) would be expected to attract the attention of Apple's competitors.  While Dr. Singer speculates that they may have decided to lower their own prices in response, he offers no support for such an assertion.

[72]    Apple Inc., Form 10-K for the Fiscal Year Ended September 28, 2019, p. 2.

[73]    Apple Inc., Form 10-K for the Fiscal Year Ended September 28, 2019, p. 2.

[74]    Dell Technologies Inc., Form 10-K for the Fiscal Year Ended January 31, 2020, p. 9.

price competition and introduction of new products and solutions."[75]  Lenovo similarly notes how they operate in a "highly competitive industry."[76]  Apple observes that "[m]any of the Company's competitors that sell mobile devices and personal computers based on other operating systems seek to compete primarily through aggressive pricing and very low cost structures."[77]  As an example, a 2015 Fortune magazine article noted how "Dell unveiled the XPS 13, a svelte, high-end notebook aimed at the 13-inch MacBook Pro… But arguably the most important feature [is] Dell's decision to offer the XPS 15 at a starting price of $999… [while] comparably equipped MacBook Pros can be hundreds of dollars more expensive."[78]

59.    Treatises from academics and practitioners note the complexities associated with attempting to incorporate conjoint analysis into an equilibrium model of prices.  For example:

> [A] conjoint survey, in and of itself is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we *must also compute industry equilibria*. This requires *measures of costs,* a demand system not only for the focal product *but also for the major competing products*, and an equilibrium concept.[79]

60.    Given the unprecedented nature of the presumed but-for market, Apple's competitors and retailers would have been expected to update their strategies, but such adjustments are not contemplated in Dr. Singer's simplistic model.  In fact, *Dr. Singer made no attempt to incorporate any market response at all*, having chosen not to investigate the market or its other players.[80]  Here, sophisticated modeling is critical because the best evidence we have is that the price of the MacBooks would not have adjusted *at all*.  To the extent the willingness to pay of some consumers was reduced on account of the risk disclosure, Apple may have elected (as it ultimately did) to extend the service coverage to four years and offer free keyboard repair, thereby

---

[75]    HP Inc., Form 10-K for the Fiscal Year Ended October 31, 2019, p. 7.

[76]    Lenovo Group Limited, 2019/20 Annual Report, p. 23.

[77]    Apple Inc., Form 10-K for the Fiscal Year Ended September 28, 2019, p. 2.

[78]    Don Reisinger, "How Dell is taking on Apple to 'make the PC cool again,'" *Fortune*, October 14, 2015, accessed via https://fortune.com/2015/10/14/dell-apple-competition/ on September 9, 2020.

[79]    Allenby *et al.,* 2014, p. 630, emphasis added.

[80]    Singer Deposition, pp. 78-80.  While Dr. Singer states that competitors would be likely to lower their prices in response to Apple's hypothetical but-for risk disclosure and reduction in price, he does not provide any support for this assertion.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

increasing its own costs of servicing the warranty.[81]  As noted above, while this response was the one actually implemented by Apple, Dr. Singer's method does not even allow for this type of adjustment, instead assuming that a price reduction would be the only possible response to an observed reduction in demand.

## VII.    CONCLUSION

61.    For all of the reasons outlined above, each of Dr. Singer's three methods is methodologically flawed and none generates a reliable estimate of any damages in this matter, class-wide or otherwise.

******** 

My work in this matter is ongoing.  I reserve the right to update or modify the opinions expressed above if additional information becomes available to me.

_____
Denise Neumann Martin, 5/13/21

---

[81]    See, Deposition of Cheri Gandy, July 16, 2020, pp. 66-69; and APL- MBKeyboard_00666279-80.

**Exhibit A**

# DENISE NEUMANN MARTIN
## Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1991
M.A., Economics, 1988

**Wellesley College**
B.A., *magna cum laude*, Economics and French, 1985
Honors: Phi Beta Kappa

## Professional Experience

|  | **NERA Economic Consulting** |
|---|---|
| 2001- | Managing Director |
| 1998-2000 | Vice President |
| 1994-1997 | Senior Consultant |
| 1991-1993 | Senior Analyst |

|  | **Harvard University** |
|---|---|
| 1986-1990 | Teaching Fellow, Department of Economics<br>Taught courses in Microeconomics and Industrial Organization at the graduate and undergraduate levels. Assisted senior honors candidates with theses. Awarded Danforth Prize in Teaching. |
| 1986-1990 | Research Associate, Department of Economics<br>Projects included an investigation of the timing of international horizontal mergers, an evaluation of the effect of generic entry into the pharmaceutical market, and a comparison of technical efficiency across countries. |

|  | **Urban Systems Research and Engineering/Economica, Inc.** |
|---|---|
| 1987-1988 | Economic Consultant<br>Consulted on all aspects of government agency projects, including proposals and the design of survey instruments.  Provided economic forecasts and technical support. |

**Federal Reserve Bank of New York**
1985-1986     Assistant Economist, International Financial Markets
              Analyzed Eurobond markets, interest rate swap markets, and US commercial
              banks' balance sheets.


## Testimony (4 years)

Deposition and Rebuttal Report, United States District Court, Northern District of Illinois in the matter of *In Re: Shelly Benson and Lisa Caparelli, et al. v. Newell Brands, Inc. and Nuk USA, LLC, 2021.*

Expert Report, Supreme Court of New South Wales, Australia in *The Takata Class Action Proceedings, 2021.*

Testimony and Declaration, United States Bankruptcy Court for the District of Delaware *In re: Boy Scouts of America and Delaware BSA, LLC,* 2021.

Deposition and Rebuttal Report, United States District Court, Northern District of California, San Francisco Division in the matter of *Vicky Maldonado and Justin Carter, et al. v. Apple Inc., AppleCare Service Company, Inc., and Apple CSC, Inc.*, 2020.

Deposition Testimony and Rebuttal Declaration, United States District Court, Norther District of California, San Jose Division in the matter of *In RE: MacBook Keyboard Litigation,* 2020*.*

Deposition and Rebuttal Declaration, United States District Court for the District of Pennsylvania in the matter of *Marchell Davis and Brandy Gress et al. v. Progressive Advanced Insurance Company and Progressive Specialty Insurance Company*, 2020.

Rebuttal Declaration, United States District Court for the Southern District of New York, in the matter of *Matthew Chamlin, et al. v. Johnson & Johnson and McNeil Nutritionals, LLC,* 2020.

Deposition and Declaration, Indiana Commercial Court, State of Indiana, County of Marion in the matter of *Amanda Haywood, et al. v. Progressive Palloverde Insurance Company*, 2020.

Expert Report before the United States District Court, District of New Jersey in *Zachary Galicki, et al., v. State of New Jersey, et al.,* and *GW Car Service, LLC, et al., v. State of New Jersey, et al.*, 2020.

Declaration, United States District Court, Southern District of Florida in the matter of *Michael Paris, as Personal Representative of the Estate of Henry Paris, Jr., deceased, et al. v. Progressive American Insurance Company, and Progressive Select Insurance Company*, 2020.

Deposition Testimony and Rebuttal Report, United States District Court, Southern District of New York in the matter of *Angel Hernandez v. The Office of the Commissioner of Baseball and Major League Baseball Blue, Inc.*, 2020.

Expert Report, United States District Court, Southern District of New York in the matter of *In Re Signet Jewelers Limited Securities Litigation*, 2019.

Deposition Testimony, Supplementary Response Affidavit and Affidavit, Ontario Superior Court of Justice in the matter of *Dara Fresco vs. Canadian Imperial Bank of Commerce*, 2017/2019.

Testimony, Supplemental, Expert and Rebuttal Reports, United States District Court Eastern District of New York, in the matter of *D. Joseph Kurtz, et al. vs. Kimberly-Clark Corporation and Costco Wholesale Corporation*, 2015/2019.

Deposition Testimony and Rebuttal Declaration, United States District Court for the Southern District of New York in the matter of *Nicholas Parker, et al. v. United Industries Corporation*, 2019.

Declaration, United States Bankruptcy Court Southern District of New York in the matter of *Rapid-American Corporation, et.al., v. Travelers Casualty and Surety Company, et al.*, 2019.

Deposition Testimony, Rebuttal and Expert Reports, United States District Court Central District of California, Western Division in the matter of *Oaktree Principal Fund V, LP., et al. v. Warburg Pincus LLC, et al.*, 2018/2019.

Rebuttal Report, United States District Court, Northern District of California, San Jose Division, in the matter of *Patricia Weeks, et al v. Google, LLC,* 2019.

Reply Declaration, Deposition Testimony, and Rebuttal Declaration, United States District Court for the Southern District of New York, in the matter of *Suzanna Bowling, et al. v. Johnson & Johnson and McNeil Nutritionals, LLC,* 2018.

Deposition Testimony and Expert Report, United States District Court Northern District California in the matter of *Colleen Gallagher et al. v. Bayer AG, Bayer Corporation, and Bayer Healthcare LLC*, 2018.

Deposition Testimony, Alameda County Superior Court in the matter of *Stephen M. Snyder, Jack L. Luikart, and Sandra R. Hernandez, solely in their capacities as trustees of the Western Asbestos Settlement Trust v. California Insurance Guarantee Association.* 2018.

Rebuttal Declaration, United States District Court for the Northern District of California, in the matter of *Jackie Fitzhenry-Russell v. The Coca Cola Company; and DOES 1-10, and DOES 1-50,* 2018.

Rebuttal Report, United States District Court Central District of California, in the matter of *David Spacone v. Elmer's Products, Inc., a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Rebuttal Report, United States District Court Central District of California, in the matter of *Stephen Wilson v. Odwalla, Inc., a California Corporation; The Coca Cola Company, a Delaware Corporation; and DOES 1-10, inclusive*, 2018.

Testimony, Deposition and Expert Report, United States District Court Southern District of New York, in the matter of *Effat S. Emamian v. Rockefeller University*, 2018.

Deposition Testimony, Rebuttal and Supplemental Declarations, U.S. District Court, Northern District of California, in the matter of *Preston Jones and Shirin Delalat, et al. v. Nutiva, Inc.*, 2017/2018.

Supplemental and Rebuttal Declarations, United States District Court Eastern District of California, in the matter of *Joan Martinelli, et al. v. Johnson & Johnson and McNeil Nutritionals,* LLC, 2017/2018.

Rebuttal Declaration, United States District Court Southern District of New York, in the matter of *Jaish Markos, et al. v. Russell Brands, LLC*, 2018.

Testimony, Deposition and Expert Reports, Circuit Court of Cook County, Illinois County Department, Chancery Division in the matter of *John Crane, Inc. v. Allianz, et al.*, 2015, 2016, 2017.

Deposition Testimony and Declaration, United States Court District of South Carolina Greenville Division in *Myriam Fejzulai and Monica Moore, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.*, 2017.

Declaration, United States Court Central District of California in the matter of *Morgan Chikosi, et al. v. Sam's West, Inc.; Sam's East Inc.; and Wal-Mart Stores, Inc.,* 2017.

## Publications and Presentations (10 years)

"Trends in Wage and Hour Settlements: 2013 Update," (co-author) NERA Monograph, November 2013.

"Trends in Wage and Hour Settlements: 2012 Update," (co-author) NERA Monograph, March 2013.

"Trends in Wage and Hour Settlements: 2011 Update," (co-author) NERA Monograph, March 2012.

March 2021

# Exhibit B

# Materials Relied Upon

- Second Amended Consolidated Class Action Complaint. *In Re: MacBook Keyboard Litigation*. United States District Court for the Northern District of California. Case No. 5:18-cv-02813-EJD, May 8, 2020.

- Merits Expert Report of Hal J. Singer, Ph.D., April 13, 2021.

- Deposition of Hal J. Singer, Ph.D., September 16, 2020.

- Deposition of Cheri Gandy, July 16, 2020.

- Deposition of Shelly Goldberg, January 16, 2020.

- Apple Inc.'s Opposition to Plaintiff's Motion for Class Certification, September 28, 2020.

- Apple Inc.'s Supplemental Responses to Nos. 4-5, 9-12 of Plaintiffs' First Set of Interrogatories, Interrogatory 9, February 23, 2021.

- Amir, Rabah, Philip Erickson, and Jim Jin. "On the microeconomic foundations of linear demand for differentiated products." *Journal of Economic Theory* 167 (2017).

- Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi. "Economic Valuation of Product Features." *Quantitative Marketing and Economics* 12 (December 2014).

- Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi. "Valuation of Patented Product Features." *Journal of Law and Economics* 57, No. 3 (August 2014).

- APL- MBKeyboard_00666279-80.

- Apple Inc. Form 10-K for the Fiscal Year Ended September 28, 2019.

- "Apple Unveils All-New MacBook." Apple Newsroom. March 9, 2015. https://www.apple.com/newsroom/2015/03/09Apple-Unveils-All-New-MacBook/, accessed April 28, 2021.

- Carvajal, Andrés, Rahul Deb, James Fenske, and John K.-H. Quah. "Revealed Preference Test of the Cournot Model." *Econometrica: Journal of the Econometric Society* 81, No. 6 (November, 2013).

- Chapman, Christopher N., James L. Alford, Chad Johnson, Ron Weidemann, and Michal Lahav. "CBC vs. ACBC: Comparing Results with Real Product Selection." Sawtooth Software Conference Proceedings (2009).

- Dell Technologies Inc. Form 10-K for the Fiscal Year Ended January 31, 2020.

- Federal Judicial Center and National Research Council. *Reference Manual on Scientific Evidence*. 3rd Edition. National Academies Press, 2011.

- HP Inc. Form 10-K for the Fiscal Year Ended October 31, 2019.

- Individual Utilities.csv

- Jedidi, Kamel, and Z. John Zhang. "Augmenting Conjoint Analysis to Estimate Consumer Reservation Price." *Management Science* 48, No. 10, (2002).

- "Keyboard Service Program for MacBook, MacBook Air, and MacBook Pro." https://support.apple.com/keyboard-service-program-for-mac-notebooks, accessed May 13, 2021.

- Lenovo Group Limited. 2019/20 Annual Report.

- Lipsey, Richard G. and Peter O. Steiner. *Economics*. 6th Edition.

- Mankiw, N. Gregory. *Principles of Microeconomics*. 8th Edition, 2018.

- Malueg, David A. "Monopoly Output and Welfare: The Role of Curvature of the Demand Function." *Journal of Economic Education* (1994).

- Murthy, D.N.P., I. Djamaludin. "New Product Warranty: A Literature Review." *International Journal of Production Economics* 79 (2002).

- Nasır, V. Aslıhan, Sema Yoruker, Figen Güneş, and Yeliz Ozdemir. "Factors Influencing Consumers' Laptop Purchases." Working Paper prepared for 6th Global Conference on Business & Economics at Harvard University's Gutman Conference Center, October 15-17, 2006.

- Orme, B.K. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. 3rd Edition, 2014.

- Oyatoye, E.O., Andrew E. Otike-Obaro, and Ezeoke Golda Nkeiruka."Using Conjoint Analysis to Study the Factors Important to University Students in Nigeria When They Select a Laptop Computer." Richards College of Business, University of West Georgia (2016).

- Pindyck, Robert S. and Daniel L. Rubinfeld. *Microeconomics*. 8th Edition, 2013.

- Reisinger, Don. "How Dell is taking on Apple to 'make the PC cool again.'" *Fortune*. October 14, 2015, accessed via https://fortune.com/2015/10/14/dell-apple-competition/ on September 9, 2020.

- Sedjo, R.A., and S.K. Swallow. "Voluntary Eco-Labeling and the Price Premium." *Land Economics*. 78, No. 2 (2002).

- Shiau, Ching-Shin, Ian H. Tseng, Andrew W. Heutchy, and Jeremy Michalek. "Design optimization of a laptop computer using aggregate and mixed logit demand models with consumer survey data." *In International Design Engineering Technical Conferences and Computers and Information in Engineering Conference*, 48078 (2007).