# Exhibit 7

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

_____

*IN RE: MACBOOK KEYBOARD LITIGATION*
Case No. 5:18-CV-02813-EJD

_____

**Rebuttal Expert Report of Darran Cairns, Ph.D.**
**May 13, 2021**

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

**Page**

I.      EXPERT QUALIFICATIONS, BACKGROUND, AND ASSIGNMENT ...................... 1

II.     MATERIALS RELIED UPON ................................................................. 3

III.    SUMMARY OF OPINIONS ................................................................... 3

IV.     BACKGROUND ............................................................................... 6

        A.      Introduction ........................................................................ 6

        B.      Dr. Niebuhr ........................................................................ 6

        C.      Mr. Curley .......................................................................... 8

V.      APPLE'S BUTTERFLY KEYBOARDS ..................................................... 10

        A.      The Evolution of Apple's Butterfly Keyboards ............................. 10

                1.      Apple's First Butterfly Keyboard ................................. 11

                2.      Apple Improved Upon the Butterfly Keyboard Design in Its 2016
                        MacBook ............................................................ 12

                3.      Apple's 2016 MacBook Pro Models Incorporate Further Design
                        Changes ............................................................. 12

                4.      Apple Introduced the ████████ Design in 2017 MacBook and
                        MacBook Pro Models ................................................ 13

                5.      Apple Introduced ██████ in 2018 MacBook Pro and MacBook
                        Air Models .......................................................... 15

                6.      Apple Implemented Further Keyboard Design Changes in the 2019
                        MacBook Pro and MacBook Air Models ........................... 17

        B.      Repair Rates Disprove Dr. Niebuhr's and Mr. Curley's Theory of Alleged
                Defect .............................................................................. 17

VI.     DR. NIEBUHR'S REPORT ................................................................. 21

        A.      Dr. Niebuhr's Inspections are Flawed and Do Not Support His Opinions .......... 21

                1.      Dr. Niebuhr's Inspection Protocol is Flawed ..................... 21

                2.      Dr. Niebuhr's Analysis is Incomplete and Contains Numerous
                        Flaws ............................................................... 24

        B.      Dr. Niebuhr Did Not Perform Any Root Cause Analysis and His Report
                Suffers from Confirmation Bias ................................................ 33

                1.      Dr. Niebuhr Ignores the Clear Benefit of the ████████ Design ....... 35

                2.      Dr. Niebuhr Does Not Account For the Membrane Under Keycap
                        ("MUK") ............................................................ 39

VII.    MR. CURLEY'S REPORT ................................................................. 42

## TABLE OF CONTENTS
(continued)

Page

A.    Mr. Curley's Opinions Do Not Account for the Development of
Innovative Products ................................................................................ 42

B.    Mr. Curley's Report Suffers From the Same Flaws as Dr. Niebuhr's
Report......................................................................................................... 46

1.    Mr. Curley's Examinations and Analysis are Flawed and Do Not
Support His Conclusions........................................................... 46

2.    Mr. Curley Begins With a Predetermined Conclusion and Ignores
Available Evidence to the Contrary........................................ 48

VIII.   CONCLUSION............................................................................................... 51

## I.    EXPERT QUALIFICATIONS, BACKGROUND, AND ASSIGNMENT

1.    I have been asked by counsel for Apple Inc. ("Apple") to evaluate the reports of David V. Niebuhr, Ph.D. ("Niebuhr Report") and Charles M. Curley ("Curley Report") dated April 13, 2021.  Based on my experience in materials, manufacturing, product development, and reliability of consumer electronics, as well as my specific experience developing touch products for consumer electronics, including touch pads and membrane switches which are commonly used in keyboards and keyboard input, I evaluate the manner in which: (1) Dr. Niebuhr inspected eight MacBooks and offered opinions on the alleged defect in the MacBook butterfly keyboards; and (2) Mr. Curley analyzed keyboard design history, "examined" sixteen MacBooks, and offered opinions on the alleged defect in the MacBook butterfly keyboards and whether the keyboards meet industry and engineering standards.

2.    In my opinion, Dr. Niebuhr's and Mr. Curley's reports are flawed and their opinions are not supported by the evidence.  Dr. Niebuhr and Mr. Curley did not perform any root cause analysis to confirm the presence of an alleged common "defect" or the alleged cause of any of the three keyboard behaviors at issue.  They both included flawed inspections of butterfly keyboards, incomplete or inaccurate analysis, and their reports contain numerous inconsistencies and errors.  In short, Dr. Niebuhr's and Mr. Curley's opinions do not support Plaintiffs' claim that all MacBooks equipped with butterfly keyboards share a common "defect."

3.    I am a Fellow of both The Institute of Materials, Minerals, and Mining and The Institute of Physics.  Currently I am a faculty member at the University of Missouri – Kansas City.  I have a Ph.D. degree in Metallurgy and Materials from University of Birmingham and have over twenty years of experience in the field of materials, manufacturing, product development, and reliability of consumer electronics in both academia and industry at Brown

1

University, 3M Touch Systems, West Virginia University and University of Missouri-Kansas City.  I have taught engineering courses that include the topics of product development, reliability, and failure.  I have taught these topics at Brown University, West Virginia University, and University of Missouri-Kansas City.

4.    I began working on input devices at Brown University and investigated and published work on failure mechanisms of resistive touchscreens which are an example of a membrane switch.  In 2001, I performed cyclic testing of resistive touchscreen membrane switches and measured electrical damage and performed microscopy to identify the failure mechanism.[1]  Membrane switches consist of two conducting surfaces with one being flexible.  The flexible surface deforms when touched to make contact with the opposing surface.  Many keyboards use membrane switches or other deformable conducting structures to make electrical contact.

5.    While working for 3M, I was responsible for developing a variety of touch products for consumer electronics including touch pads and membrane switches.  I developed products from conception, through testing, and until the product design was complete and provided to customers.  I supported products through manufacturing performing defect analysis, developing testing protocols and procedures, and performing analysis of field failures.  My work on defect analysis included identifying failure modes, identifying and implementing solutions to mitigate failures, and developing and validating testing to prevent failure.

6.    While working at Brown University, West Virginia University, and University of Missouri – Kansas City I have worked on developing reliable flexible electronics for challenging

---

[1] Darran R. Cairns, et al., P-7: *Wear Resistance of Indium Tin Oxide Coatings on Polyethylene Terephthalate substrates for Touchscreen Applications*, SID 01 Digest (2001), at 574.

2

Confidential and Subject to Protective Order

applications often in partnership with industry. I have developed cyclic testing systems, identified root causes, investigated corrosion, component wear, electrical and mechanical degradation, and combinations of these factors.[2]

7.   I am knowledgeable about input devices for consumer electronics including membrane switches and the degradation of component performance. Based on my education and work experience, I am knowledgeable about the development of input devices and their mechanical performance, and about the ways to mitigate field failure through product development.

8.   A copy of my *curriculum vitae*, which includes my most recent four years of testimony, is attached hereto as Exhibit A. I am being compensated at my standard rate of $390 per hour. My compensation is not dependent in any way on the outcome of this litigation.

## II.    MATERIALS RELIED UPON

9.   A complete list of the documents and testimony I relied upon in preparing this report is provided in Exhibit B.

## III.    SUMMARY OF OPINIONS

10. I hold the following opinions to a reasonable degree of engineering certainty. In my opinion, there is no inherent defect in the MacBooks equipped with butterfly keyboards. The reports submitted by Dr. Niebuhr and Mr. Curley are methodologically flawed and do not support Plaintiffs' theory that "low travel" and "tight space around the keys" resulted in an inherent defect for the following reasons:

---

[2] S. Gorkhali, et al., 47.3: *Reliability of Transparent Conducting Substrates for Rollable Displays: A Cyclic Loading Investigation*, SID 03 Digest (2003), at 1332; T.S. Bejitual, et al., *Mechano-chemical degradation of flexible electrodes for optoelectronic device applications*, Elsevier (Sept. 13, 2013), at 252.

Confidential and Subject to Protective Order

11. Neither Dr. Niebuhr nor Mr. Curley performed any root cause failure analysis. Dr. Niebuhr's analysis was limited to reviewing Apple's documents, testimony, and patents, reviewing Plaintiffs' allegations and online articles, and inspecting a total of eight MacBooks with butterfly keyboards. Plaintiffs and Dr. Niebuhr previously admitted that they did not believe Dr. Niebuhr needed to perform root cause analysis, despite their claim that he was engaged to "assess the underlying root cause of the reported failures in the butterfly equipped MacBooks." (Niebuhr Report ¶ 2.) Without performing a root cause analysis, Dr. Niebuhr's opinion that butterfly keyboards are "prone to fail from particles becoming trapped" due to "low travel, tight gaps, and metal dome specifications" (*id.* ¶ 64) is not supported by any data or evidence in his Report. It is my understanding that the Court excluded Dr. Niebuhr's prior report in this action, including because he had "not conducted separate root cause analysis to support his conclusions about the alleged defect." (Class Cert. Order, ECF No. 298). Mr. Curley's Report consists entirely of a biased and incomplete summary of keyboard design history and alleged "anti-contamination best practices," and brief "examinations" of butterfly keyboards, which he does not claim constitute a root cause analysis. His conclusion that Apple's butterfly keyboards do not meet industry and engineering standards is likewise unsupported by the evidence and data in his Report.

12. Dr. Niebuhr and Mr. Curley fail to take into account the significant design differences among the 20 MacBook models equipped with butterfly keyboards.[3] While they describe certain design elements, they fail to account for the fact that the three keyboard behaviors at issue—"no make," "double make," and "sticky key"—have different root causes

---

[3] Four of the MacBook models equipped with butterfly keyboards initially had a ███████████ design and were later updated to include a ███████████ design, resulting in 20 distinct keyboard models.

4

depending on the keyboard design and notebook at issue. Further, neither Dr. Niebuhr nor Mr. Curley address the varying repair rates that demonstrate the impact the design changes had on the notebooks.

13. Dr. Niebuhr's and Mr. Curley's reports suffer from confirmation bias. Both Dr. Niebuhr and Mr. Curley begin with the premise that the three keyboard behaviors at issue follow directly from the presence of debris in the keyboard. But the presence of debris under a key is not specific to butterfly keyboards—debris may be present in any keyboard regardless of the travel—and it is in fact possible for keys to function normally despite the presence of debris. Dr. Niebuhr and Mr. Curley did not perform any root cause analysis to support their premise, and they ignore evidence that contradicts their theory of common defect. For example, Dr. Niebuhr and Mr. Curley ignore evidence that design changes across 20 MacBook models ███████████ ██████████████████. The impact is evident in the ██████████████████████ ██████████████████████████████████████████.

14. Dr. Niebuhr's and Mr. Curley's inspections are incomplete and insufficient to support Plaintiffs' theory, and their reports contain incomplete and inaccurate analysis. As noted above, neither of their inspections involved a root cause analysis; instead, Dr. Niebuhr's inspection protocol essentially consisted of taking photographs of the notebooks, typing on the keyboards to determine whether one of the three keyboard behaviors at issue was observed, and noting whether debris was present under the keys. Dr. Niebuhr used inaccurate and confusing scale markers in his photographs, and misidentified the presence of debris in a number of his inspections. Mr. Curley's protocol was even more sparse and the sole purpose of his examinations was apparently to confirm the design elements of the 20 butterfly keyboard

Confidential and Subject to Protective Order

models.  His examinations contain a number of errors as well, including the inaccurate use of patent images as scale measurements.

15. Mr. Curley's summary of laptop and external keyboard design history focuses on outdated products and technology dating back to the 1980's.  His opinion that his three alleged "anti-contamination best practices"—keycap skirts, keycap gutters, and sealed switches—should be incorporated into all keyboard designs is also based on old technology, bulkier, thicker keyboards with higher travel, and external keyboards.  (*See* Curley Report ¶¶ 16-30.)  These descriptions are not relevant to thin, modern, and innovative products such as Apple's MacBook models equipped with butterfly keyboards.

## IV.    BACKGROUND

### A.    Introduction

16. Plaintiffs claim that all MacBooks, MacBook Pros, and MacBook Airs equipped with a butterfly keyboard are "prone to fail when minute amounts of dust or debris enter the sensitive area beneath the keys," leading to keys not registering ("no make"), keys repeating characters ("double make"), and "sticky keys."  (Mot. for Class Cert. at 2; *see also* Second Am. Compl. ¶¶ 1-2.)  Plaintiffs retained Dr. Niebuhr and Mr. Curley to support their theory that the 20 MacBooks equipped with butterfly keyboards are defective because they have "lower travel" (the distance a user must press a key for the keystroke to register) and "tight space around the keys." (Mot. for Class Cert. at 3.)

### B.    Dr. Niebuhr

17. Dr. Niebuhr previously submitted a report in support of Plaintiffs' Motion for Class Certification dated August 14, 2020 ("Niebuhr Class Report"), and a "Reply Expert Report" dated October 28, 2020 ("Niebuhr Class Reply Report").  In those reports, Dr. Niebuhr

6

ignored the various design differences among the 20 models and concluded that the "reduced key travel" and "tighter physical spaces inherent to the butterfly design" resulted in a common defect. He claimed that his opinions were based on Apple documents, discovery responses, and testimony of Apple employees, and claimed that he "validated [his] interpretation of Apple's findings by inspecting and disassembling" a small number of MacBooks equipped with butterfly keyboards. (Niebuhr Class Reply Report ¶ 2.)

18. It is my understanding that the Court found Dr. Niebuhr's prior report "irrelevant" and "unhelpful," including because he had "not conducted separate root cause analysis to support his conclusions about the alleged defect," and granted Apple's motion to strike Dr. Niebuhr. (Class Cert. Order at 15.) As I explain in detail below, Dr. Niebuhr's recent report suffers from the exact same flaws as his prior report.

19. In his April 2021 report that I have evaluated for purposes of this report, Dr. Niebuhr states that he was engaged to "review and assess the underlying root cause of the reported failures in the butterfly equipped MacBooks," yet he did not actually perform any root cause analysis to determine the cause of the three keyboard behaviors at issue or determine whether the alleged defect exists. (Niebuhr Report ¶ 2.) Dr. Niebuhr now attempts to repurpose his Class Report, including the same MacBooks and possibly the same inspections, as well as the same flawed analysis, without purporting to explain why his opinions are now relevant or helpful. He does not take into account the material design differences among the 20 butterfly keyboard models, or address the varying ▬▬▬▬ epair rates. Instead, Dr. Niebuhr performed "inspections" of eight MacBooks equipped with butterfly keyboards—which were limited to typing on the keys, disassembling the keyboard, noting whether particles were present, and taking photographs—and reviewing Apple documents and testimony. (*Id.* ¶ 31.) The

7

sample of MacBooks Dr. Niebuhr inspected was also skewed toward the earliest models and suggests that he avoided inspecting models ███████████████████ Five of the MacBooks he inspected were 2015 or 2016 models, and he inspected only one 2019 model. Inspecting eight MacBooks total, and only one of certain models, is not representative of millions of MacBooks sold. As I explain below, Dr. Niebuhr's current Report and opinions remain flawed.

### C.    Mr. Curley

20. Plaintiffs retained Mr. Curley to opine on whether MacBooks equipped with butterfly keyboards are defective and whether they meet industry and engineering standards. (Curley Report ¶ 1.) To support his conclusion that all 20 MacBook models equipped with butterfly keyboards are defective, Mr. Curley provides what he characterizes as a summary of keyboard design history and alleged "anti-contamination best practices." (Curley Report ¶¶ 16-30.) Mr. Curley's analysis focuses on keyboards and patents dating back to the 1980's and 1990's as well as keyboards that are much bulkier and have much higher travel than Apple's MacBooks equipped with butterfly keyboards. His summary of keyboard design history and his opinions regarding which design elements constitute "anti-contamination best practices" are outdated and do not take into account the new and innovative technology that Apple implemented into its ultrathin butterfly keyboards.

21. Mr. Curley next describes his "examinations" of MacBooks equipped with butterfly keyboards, which he does not claim constitute a root cause analysis. Rather, Mr. Curley stated that he would only "review and analyze the changes made in each [keyboard] iteration" in this section of his report. (Curley Report ¶ 81.) Mr. Curley's claimed methodology for his keyboard examinations was even more sparse than Dr. Niebuhr's, and included "check[ing] the functionality of six sample key stations," taking measurements of the keyboard,

Confidential and Subject to Protective Order

and disassembling and taking photographs of the six sample keys.  (*Id.* ¶ 84.)  By purporting to summarize design information that Apple's own documents would show, Mr. Curley's Report suffers from the same issues the Court identified in Dr. Niebuhr's Class Report.  The Court has previously stated that "if Dr. Niebuhr's report simply relays his own interpretation of Apple's internal testing, it is unclear why his testimony is necessary at all."  (Class Cert. Order at 15.)  The same is true of Mr. Curley.

22. The sole purpose of Mr. Curley's examinations was apparently to confirm the elements of each of the 20 butterfly keyboard models and measure the "keycap gaps."  (*See* Curley Report ¶ 87.)  But Mr. Curley admits that his measurements "are not meant to provide the precise gap size," because variations are to be expected due to manufacturing tolerances and because keys can shift laterally.  (Curley Report ¶ 76.)  Following his so-called examinations of Apple's butterfly keyboards, Mr. Curley concludes that low travel, "tight key gaps," and the absence of sealed switches constitute an alleged defect in all 20 butterfly keyboard models.  (Curley Report ¶ 137.)  This conclusion is not supported by any testing or evidence, and Mr. Curley ignores or attempts to explain away any evidence that contradicts that theory.

23. As with Dr. Niebuhr, Mr. Curley does not demonstrate an understanding of the design changes among the 20 MacBook models equipped with butterfly keyboards.  As mentioned above, after Apple released its first MacBook model equipped with a butterfly keyboard in 2015, it continually improved on the design and incorporated new elements, resulting in materially different keyboards.  (*See* Section V.A.)  The varying and ███████ ███████ repair rates amongst the 20 butterfly keyboard models further prove that the design modifications ███████████████████ and had a significant impact on the MacBooks.  (*See* Section V.B.)

Confidential and Subject to Protective Order

## V.    APPLE'S BUTTERFLY KEYBOARDS

### A.    The Evolution of Apple's Butterfly Keyboards

24. Apple released its first MacBook equipped with a butterfly keyboard in 2015. The innovative butterfly keyboard design allowed Apple to provide customers with an extremely thin and portable notebook. (Deposition of Shelly Goldberg ("Goldberg Dep.") at 35:9-18.) Over the next four years, Apple continued to improve upon the butterfly keyboard design and released 20 different MacBook models equipped with butterfly keyboards. (*See* Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.) These improvements are evidenced by the ████████████████. (Apple's Feb. 23, 2021 Suppl. Resp. to Interrog. No. 9.) The most recent butterfly keyboard models have ████████████████████████████████, which Plaintiffs concede are not defective. (*See id.*; Apple's Feb. 9, 2021 Suppl. Resp. to Interrog. No. 10.)

25. ████████████████████████████, Apple has conducted rigorous and extensive testing of the butterfly keyboards. ████████████ ████████████████████████████████ ████████████████████████████ ████████████████ (Apple's May 31, 2020 Suppl. Resp. to Interrog. No. 13.) ████████████████████████████ ████████████████████████ ████████████ (*Id.*) ████████████████████ ████████████████████████████ ████████ (*Id.;* Deposition of Prad Prabhumirashi ("Prad Dep.") at 283:16-22.) ████████ ████████████████████████

Confidential and Subject to Protective Order

███████████████████████████████████. (*See* Apple's May 31, 2020 Suppl.

Resp. to Interrogatory No. 13.; Prad Dep. at 159:18-22.)

### 1.    Apple's First Butterfly Keyboard

26. Apple's first MacBook equipped with a butterfly keyboard ██████ released in

March 2015, ██████████████████████████████████████

██████. (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.) ████████████████

████████████████████████████████. (*Id.*) ████████████

███████████████████████ (*Id.*)

**Figure 1.** ████ esign Elements[4]



---

[4] APL-MBKeyboard_01195549 at APL-MBKeyboard_01195557.

11

Confidential and Subject to Protective Order

2.      **Apple Improved Upon the Butterfly Keyboard Design in Its
        2016 MacBook**

27. Before releasing the next MacBook equipped with a butterfly keyboard in April

2016, Apple implemented changes to the keyboard design ████████████████████

████████████████████ (*See* Goldberg Dep. at 103:1-20.) ████████████████

████████████████████████████████████████████████████████

████████████████████████ (*See id.*; Apple's Mar. 12, 2021 Suppl. Resp. to

Interrog. Nos. 7-8.)

**Figure 2.** ████████████████████████



3.      **Apple's 2016 MacBook Pro Models Incorporate Further
        Design Changes**

28. In October and November 2016, Apple released three MacBook Pro models with

butterfly keyboards ███████████████████ The keyboards in these models ████████

████████████████████████████████████████████████████████

████████████████████████████████ (Apple's Mar. 12, 2021 Suppl.

Resp. to Interrog. Nos. 7-8.)



---

[5] APL-MBKeyboard_01195549 at APL-MBKeyboard_01195557.

Confidential and Subject to Protective Order

Figure 3. ▇▇▇ Design Elements[6]



4.    **Apple Introduced the ▇▇▇▇ Design in 2017 MacBook and MacBook Pro Models**

29. Apple released a MacBook ("J122") and three MacBook Pro models ▇▇▇▇ ▇▇▇▇ in June 2017.  The designs utilized ▇▇▇▇ ▇▇▇▇ (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.)  The ▇▇▇▇ ▇▇▇▇. (Deposition of Bryan McDonald ("McDonald Dep.") at 221:1-9.)  Further, in August 2017 ▇▇▇▇ design for all four of these models.  (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.)



---

[6] APL_MBKeyboard_00395605 at APL_MBKeyboard_00395612.

13

30. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████



**Figure 4.**

**Figure 5.**

[7] APL-MBKeyboard_00194421 at APL_MBKeyboard_00194423.
[8] Id.

Confidential and Subject to Protective Order

**Figure 6.  Design Elements and Improvements in** ██████████ **Models[9]**



31. In addition, ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.)

**5.    Apple Introduced** ████████ **in 2018 MacBook Pro and MacBook Air Models**

32. Apple's MacBook Pro models introduced in July 2018 ████████████ and

the MacBook Air model introduced in October 2018 (████ incorporated a █████████

████████████ another significant design chang ██████████████████

███████████ (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8.)  These

---

[9] APL-MBKeyboard_01195549 at APL-MBKeyboard_001195557.

Confidential and Subject to Protective Order

models consisted of ████████████████████████████████████████

████ (*Id.*) ████████████████████████████████. (*Id.*) These models also

████████████████████████████████████████████████████

████ (*Id.*) ████████████████████████████████████████████

████████████████████████████ (*Id.*)

**Figure 7. J**███████████**) eyboard Design**[10]



**Figure 8.** ██████ **Design Elements**[11]

---

[10] APL-MBKeyboard_01195549 at APL-MBKeyboard_01195556.
[11] APL-MBKeyboard_00632759 at APL-MBKeyboard_00632759.

Confidential and Subject to Protective Order

6.    **Apple Implemented Further Keyboard Design Changes in the 2019 MacBook Pro and MacBook Air Models**

33. As Apple continued to improve on the innovative butterfly keyboard design, it released two MacBook Pro models in May 2019 ██████████████ and a MacBook Pro ████████ and MacBook Air model ████) in July 2019. ██████████████████ ████████████████████████████████████ ████████████████████ (Apple's Mar. 12, 2021 Suppl. Resp. to Interrog. Nos. 7-8; *see also* Prad Dep. at 97:16-98:14.)

B.    **Repair Rates Disprove Dr. Niebuhr's and Mr. Curley's Theory of Alleged Defect**

34. The repair rates for the 20 MacBook models equipped with butterfly keyboards prove that Apple's design changes ████████████████████████ ████████ Although Dr. Niebuhr cited to the butterfly keyboard repair rates in his Class Report, neither Dr. Niebuhr nor Mr. Curley discuss repair rates in their recent reports. First, as shown by the repair rates in Table 1 below, the vast majority of consumers will never experience an issue with their keyboards. The repair rates ██████████████████ ██████████████████████████ (Apple's Feb. 23, 2021 Suppl. Resp. to Interrog. No. 9.)

35. Second, the repair rates for each of the butterfly keyboard models vary, and ████████████████████████████████████ ████████████ One direct comparison that illustrates this point is the repair rates for the 2017 MacBook and MacBook Pro models, ████████████████████████ ████ █████████████████████████████████████ ████ █████████████████████████████████████,

17

██████████████████████████████████████████ (Apple's Feb. 23, 2021 Suppl.

Resp. to Interrog. No. 9.)

36. Third, the data shows that the ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ (Apple's Feb. 9, 2021 Suppl. Resp. to Interrog. No. 10.)

████████████████████████████████████████████

███████████████████████████████████████ (Apple's

Feb. 23, 2021 Suppl. Resp. to Interrog. No. 9.) ████████████████████████

████████████████████████████████████████████

████████████████████████████.

**Table 1. Repair Rates for MacBook Models Equipped with Butterfly Keyboards[12]**



| MacBook Model Name | MacBook Model Code | Year 1 | Year 2 | Year 3 | Year 4 | Overall |
|---|---|---|---|---|---|---|
| | | | | | | |

---

[12] Apple's Feb. 23, 2021 Suppl. Resp. to Interrog. No. 9.

Confidential and Subject to Protective Order



Confidential and Subject to Protective Order

| MacBook Model Name | MacBook Model Code | Year 1 | Year 2 | Year 3 | Year 4 | Overall |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**Table 2. Repair Rates for Predecessor MacBook Models Equipped with Scissor Keyboards[13]**

| MacBook Model Name | MacBook Model Code | Year 1 | Year 2 | Year 3 | Year 4 | Overall |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

37. The variation and ▆▆▆▆▆▆ in repair rates disprove Dr. Niebuhr's and Mr. Curley's opinions that low travel and "tight key gaps" result in an inherent defect in all butterfly keyboard models. If the 20 models were defective due to low travel and tight key gaps, then the design changes would not have any effect on the repair rates. When comparing the first year repair rates across all 20 models, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆ The repair rates prove that the design changes ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆ Moreover, the repair rates ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[13] Apple's Feb. 9, 2021 Supp. Resp. to Interrog. No. 10.

Confidential and Subject to Protective Order

## VI.    DR. NIEBUHR'S REPORT

### A.    Dr. Niebuhr's Inspections are Flawed and Do Not Support His Opinions

38. Dr. Niebuhr's current Report—including the inspections and analysis contained therein—suffers from the same flaws as his Class Report.

### 1.    Dr. Niebuhr's Inspection Protocol is Flawed

39. Dr. Niebuhr included a summary of inspections of 8 MacBooks equipped with butterfly keyboards, representing 6 of the 20 MacBook models.  These MacBooks were skewed toward the earlier models: 5 of the 8 MacBooks inspected were the earliest 2015 and 2016 models, and only one was a 2019 model.  From these inspections Dr. Niebuhr purports to make conclusions regarding a common "defect" relevant to all 20 models.  But inspecting a small number of keyboards is not sufficient to draw conclusions regarding a "defect" common to all MacBook models equipped with butterfly keyboards, of which millions have been sold.

40. The eight MacBooks inspected in this Report are the same MacBooks inspected in Dr. Niebuhr's Class Report and Class Reply Report.  In fact, Dr. Niebuhr does not appear to have included any new images in this Report that were not previously included in his Class Report or Class Reply Report.  With respect to the inspections in his Class Report, Dr. Niebuhr admitted that he did not have any information about the ownership history or service history of the MacBooks. (Deposition of David Niebuhr ("Niebuhr Dep.") at 180:6-19,.)  Dr. Niebuhr similarly did not have any information about the environments in which they were used (which would include whether the MacBooks were used around liquids), and did not know whether any of the notebooks had prior damage that was not readily apparent or whether that damage could have affected the keyboards' functionality.  (*See id.* at 183:20-25, 197:22-198:1.)

Confidential and Subject to Protective Order

41. The inspection protocol outlined in Dr. Niebuhr's Report is similar but not identical to the protocol listed in his Class Report. For example, the protocol in Dr. Niebuhr's Report includes a step for "chain of custody," and a step of "Assess[ing] failure mode and root cause." (Niebuhr Report ¶ 31.) Dr. Niebuhr's "chain of custody" step was limited to documenting the receipt of each MacBook, but as mentioned above, Dr. Niebuhr previously admitted he did not have any information about the ownership or service history of the notebooks. (Niebuhr Report ¶ 31; Niebuhr Dep. at 180:6-12, 16-19.) He also does not explain how these notebooks were selected for inspection, who selected them, and how many were available for inspection. His "assess[ment] [of] failure mode and root cause" allegedly consisted of inspecting keys with a microscope, but as discussed further in Paragraph 46 below, no additional details were provided about the method for this assessment. Further, it is unclear whether Dr. Niebuhr in fact performed new inspections of the same MacBooks listed in his Class Report and Class Reply Reports, or if these inspections are the same as those documented in those reports. In any event, there are several flaws with Dr. Niebuhr's purported "methodology."

42. In the step labeled "Key performance testing," Dr. Niebuhr stated that he "evaluated the up and down motion of individual keys to check functional performance," but does not explain what that means. (Niebuhr Report ¶ 31.) He also states that to test the keys he typed the phrase "the quick brown fox jumps over the lazy dog" repeatedly and tested "the other keys on the keyboard that are not part of this sentence" a minimum of 100 times during testing. (*Id.*) He does not indicate the number of times he pressed each key, in which order he pressed the keys, and over what period of time he conducted this testing.

43. Dr. Niebuhr next "characterized the keys that failed" according to the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. (Niebuhr Report ¶ 31.) In his Class Report, Dr. Niebuhr did not document

Confidential and Subject to Protective Order

which keys corresponded to which alleged failure modes; he only listed the behaviors he claimed to have identified in that keyboard, and separately listed the keys that allegedly exhibited one of those behaviors without identifying which key exhibited which behavior.  (Niebuhr Class Report Table A.)  However, Table A in Dr. Niebuhr's new Report now indicates the behaviors allegedly attributable to each key.  It is unclear whether Dr. Niebuhr performed additional inspections of these MacBooks for purposes of this Report, and if not, how Dr. Niebuhr differentiated which keys exhibited which behaviors.  If he did perform new inspections, Dr. Niebuhr did not include any information about the condition in which the notebooks were stored, and the integrity of the keyboards could have been compromised.  In either case, Dr. Niebuhr's failure to properly document his inspections undermines the reliability of his Report.

44. Next, Dr. Niebuhr claims that he cleaned the keyboards "per Apple instructions," and "conducted further key performance testing after cleaning and again noted failure modes." (Niebuhr Report ¶ 31.)  However, Dr. Niebuhr did not mention keyboard cleaning with respect to MacBook No. 5 or MacBook No. 8, and did not indicate whether such cleaning resolved any of the alleged behaviors identified by Dr. Niebuhr.  Indeed, Dr. Niebuhr's testimony with respect to keyboard cleaning conducted in his Class Report indicated a haphazard process.  (*See* Niebuhr Dep. at 242:23-244:5 (explaining that he cleaned some of the MacBook keyboards once and some of the keyboards twice, which he described as an "experiment within the experiment," and which also deviated from his inspection protocol).)

45. Dr. Niebuhr claims that he "Evaluate[d] [the] area for presence of particles and substances" during these inspections, and that he "photographed and measured the organic and inorganic particles" he observed.  (Niebuhr Report ¶ 31.)  He does not explain how he measured these particles or where the particles were located within the key, and does not include

Confidential and Subject to Protective Order

information about any testing that was performed on the particles.  Dr. Niebuhr further did not

include any information about the conditions under which he performed these inspections (i.e.,

whether he performed the inspections in a laboratory or somewhere else).

46. Significantly, Dr. Niebuhr added the new step of "Assess[ing] failure mode and

root cause" to the protocol.  (Niebuhr Report ¶ 31.)  This step allegedly included further

inspection "with a microscope to determine the primary cause of failure."  Dr. Niebuhr does not

explain how he used a microscope to determine the "primary cause of failure," what steps he

took during this assessment, or how the "primary cause of failure" was determined at all in light

of the fact that he did not perform any root cause analysis.  Dr. Niebuhr also states that he

"inspected keys that did not exhibit failures," though he did not include any such analysis in his

Report.  (*Id.*)

### 2. Dr. Niebuhr's Analysis is Incomplete and Contains Numerous Flaws

47. Dr. Niebuhr's inspections and his related analysis contain a number of material

errors, including his microscopical analysis and depiction of the butterfly keyboards he

examined.  Starting with Figure 2 in his Report, Dr. Niebuhr has added two inaccurate and

confusing scale markers.  It can clearly be seen that he added one scale bar in the <u>bottom right

corner</u> labeled 500 μm.  This represents 500 micrometers which are also known as microns.  On

the <u>left hand side</u> of the figure he shows a different scale bar labeled < 500 microns, which

means less than 500 microns or less than 500 μm.  I examined the text for context but there is no

reference to the figure from the text.  The only description is the figure caption which states that

"Figure 2 better illustrates gap that can range from 350 to 500 microns."  It is standard practice

to use actual dimensions on scale bars rather than "less than" or "greater than," but more

importantly the scale bar which purports to show a gap of less than 500 microns, or perhaps in

24

the range 350 to 500 microns, *is significantly larger than* the scale bar that indicates 500 microns.  The scale bars on the figure are thus contradictory and unusable.

48. I have created a figure showing this discrepancy below.  The image on the right is Figure 2 from Dr. Niebuhr's report.  I added a red box around the scale bar that Dr. Niebuhr claims is less than 500 microns, and a green box around the scale bar that Dr. Niebuhr claims is 500 microns.  The image on the left below is a close up of these two scale bars, showing that the scale bar purporting to be less than 500 microns is larger than the scale bar purporting to be 500 microns.  There is no way to reconcile this contradiction and Dr. Niebuhr's "analysis" of the gap in the keys is of no value.



49. This error is the first of many.  I have prepared a table listing the issues with the photographs provided by Dr. Niebuhr.

Confidential and Subject to Protective Order

**Table 3.**

| Figure Number | Issue |
|---|---|
| 10 | No scale |
| 13 | No scale |
| 14 | No scale |
| 15 | Non-specific measurement (450 – 500 microns) |
| 17 | No scale |
| 18 | Non-specific measurement (approximately 550) |
| 18 | No scale |
| 19 | No scale |
| 20 | No scale |
| 21 | No scale |
| 22 | No scale |
| 29 | No scale |
| 31 | Inconsistent discussion of the figures – heading states MacBook 7 but text MacBook 5 |
| 32 | Inconsistent discussion of the figures – heading states MacBook 7 but text MacBook 5 |
| 33 | Inconsistent discussion of the figures – heading states MacBook 7 but text MacBook 5 |
| 34 | Inconsistent discussion of the figures – heading states MacBook 7 but text MacBook 5 |
| 34 | No scale |
| 36 | No scale |
| 38 | No scale |
| 39 | No scale |

50. As illustrated in the table above, at least 15 micrographs have no scale. This is a fatal flaw in an analysis that purports to focus on the identification of particles of a particular size. In addition, the inconsistencies in the scale bars that are present are even more worrying. Figure 2 shows two measurements that cannot be reconciled. I examined the primary images for

26

additional understanding of the scale bar issues and was surprised to see that there was no scale

on any of the primary images.  I then looked for any images of a standard that could be used to

calibrate the scale bars and was unable to find one.  I also note that it appears that the images

provided by Dr. Niebuhr for the MacBooks inspected were taken at different magnifications with

no indication of the corresponding magnification for each image.  It is unclear how Dr. Niebuhr

measured the particles without noting what magnification was used for that particular image.

Finally, Dr. Niebuhr does not describe any protocol by which he performed any measurements of

a standard to create a scale bar after the fact.  As a consequence, Dr. Niebuhr's measurements

cannot be used for any evaluation of particle size.

    51. These serious inconsistencies with measurement are not limited to the

photographs.  In Paragraph 37 he states:

> The down arrow key in MacBook No. 1 also exhibited the no make failure.
> Foreign debris was present as illustrated in Figures 17 and 18.  Figure 17 is an
> overview of down arrow after keycap removal.  Numerous particles were present,
> with at least six exceeding 500 microns in size.  This is significant as a particle of
> between 300 and 500 microns can wedge itself under the butterfly key and freeze
> its motion.  Figure 18 is the magnified image of a hard particle observed in the
> vicinity of the butterfly mechanism.

(Niebuhr Report ¶ 37.)

Dr. Niebuhr purports to have identified six particles exceeding ▮▮▮▮▮▮ in size.  As we have

discussed above, I do not believe his measurement method can support this claim because of

errors, inconsistencies, and inaccuracies related to his measurements.  However, even if this is

true, according to Dr. Niebuhr particles ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  As noted above,



Dr. Niebuhr also indicates that the "gaps" around the keys can ▮▮▮▮▮▮▮▮▮▮▮▮,

27

Confidential and Subject to Protective Order

again indicating that particles greater than 500 microns would be too large to interfere with the butterfly mechanism.  (*See* Niebuhr Report, Figure 2 (stating that "Figure 2 better illustrates gap that can range from 350 to 500 microns.").)

52. Further, Dr. Niebuhr misidentifies the presence of debris in a number of his inspections, mostly related to keys that allegedly experienced "sticky key" behavior.  A



(*See* McDonald Dep. at 190:15-22)

; *see also id.* at 213:10-17

53. In his inspection of MacBook No. 1, Dr. Niebuhr identified that the right arrow key exhibited sticky key.  (Niebuhr Report ¶ 35.)  He includes a photo of the area under the keycap and claims that the sticky key failure was caused by debris.  (*Id.* at ¶ 36, Figure 13.)  This same figure was included in his Class Report as Figure 3.  Dr. Niebuhr previously testified that there was no evidence of any liquid on any of the notebooks he inspected in his Class Report, which included this MacBook No. 1.  (Niebuhr Dep. at 184:7-10.)  However, an inspection of the photograph shows red residue from a liquid spill, where one can clearly see the result of a liquid flowing around the raised features of the key.  The curvature seen at the end of the red residue results from the flow of the liquid through a relatively narrow channel.  I have prepared a figure

28

Confidential and Subject to Protective Order

to highlight just one area in the top right-hand corner where, based on my experience, it is evident that the residue was left by a liquid. ████████████████████ ████████████████████ yet Dr. Niebuhr's analysis misses the clear presence of liquid and instead focuses on debris. The presence of the debris shown in these pictures could be residue after evaporation of the spill. The sticky key behavior observed, however, is clearly caused by liquid ingress, and Dr. Niebuhr's analysis misses the known root cause.

 

54. This liquid damage evident in the photograph of MacBook No. 1 above is nearly identical to the water damage seen in photographs of the ███ MacBook that Niebuhr claims he received but did not inspect because it was non-operational due to water damage. I have added a red arrow to indicate where the residue from liquid damage can be seen along the bottom of the key:

Confidential and Subject to Protective Order



(Image produced in connection with 12" MacBook, 2015 (C02RC2JJGCN3).)

55. Dr. Niebuhr also states that MacBook No. 2 had a sticky key (in this case the down arrow key) and two other keys exhibited "no make" (the "Z" and "X" keys) and repeat characters (the "Z" key).  (Niebuhr Report ¶ 38.)  Only one image for this MacBook is shown in the report and it is for the key exhibiting "sticky key."  (*Id.* at Figure 19.)  I examined the original photographs and was not surprised, based on the presence of a sticky key behavior, that there was evidence of liquid damage to the keyboard.  The image below produced by Dr. Niebuhr in connection with MacBook No. 2 shows liquid residue around the "Z" key and not the neighboring keys:

Confidential and Subject to Protective Order



56. This liquid damage is evident from the back of the keypad. Liquid residue can clearly be seen in a number of places including surrounding the "Z" and "X" keys and the arrow keys. I have added red boxes to indicate the liquid residue:



Confidential and Subject to Protective Order

57. The liquid damage evident from the back of the keypad in the photos above is nearly identical to the water damage seen in the photographs of the ▮ MacBook that Dr. Niebuhr claims he received but did not inspect because it was non-operational due to water damage:



(Image produced in connection with 12" MacBook, 2015 (C02RC2JJGCN3)).)

58. Dr. Niebuhr also identifies the spacebar of MacBook No. 5 as exhibiting a sticky key failure. (Niebuhr Report ¶ 44.) This was not surprising to me upon examining Figure 26, as residue from a liquid spill was evident but was mischaracterized as particles adhered to the PCB. Liquid spills can introduce particles to any keyboard after evaporation of the solvent, regardless of travel, and it appears to me that that is what is shown in Figure 26. Both sugar and salt precipitate out of solution upon drying and I am not surprised by the presence of crystals in the photograph. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This is another example of mischaracterization by Dr. Niebuhr.

Confidential and Subject to Protective Order

*Figure 26*



### B.    Dr. Niebuhr Did Not Perform Any Root Cause Analysis and His Report Suffers from Confirmation Bias

59. As mentioned above, Dr. Niebuhr did not perform any root cause analysis of the keyboard behaviors he claimed to identify in his inspections in order to determine the specific nature and source of the issue.

60. Further, Dr. Niebuhr's conclusions are the result of confirmation bias and are not grounded in any reliable methodology.  Rather than developing hypotheses and testing them to determine which of a number of alternative outcomes were correct, Dr. Niebuhr only focuses on one pre-determined theory that keyboard failure follows directly from the presence of debris.  Dr. Niebuhr hypothesizes that internal or external debris can "lodge[] itself between the dome contact point and the PCB or within the butterfly hinge, causing the no make, sticky key, and double-click failures."  (Niebuhr Report ¶ 33.)  The method by which Dr. Niebuhr purports to test this theory is not consistent with any reasonable hypothesis testing because it does not test whether there are any alternative possible outcomes.  Rather than test alternative hypotheses, Dr. Niebuhr only looked at one possible outcome and ignored or explained away any evidence that contradicted that theory.  However, as explained below, the presence of debris within a keyboard

33

is not enough to establish root cause of the behaviors at issue.  Correlation is not causation.  Dr. Niebuhr's inspections did not constitute root cause testing sufficient to adequately test his theory and rule out other possible causes.  In fact, Dr. Niebuhr admitted that it is possible for keys to function normally despite the presence of debris, and that debris may be present under a key regardless of the length of travel.  (Niebuhr Dep. at 275:18-25, 279:7-13.)

61. Dr. Niebuhr's analysis does not identify root causes but rather repeatedly points to debris that was present anywhere in the keyboard to support a predetermined conclusion.  This is evidenced in Figure 11 and Figure 12 that show the presence of debris inside the notebook. Instead of identifying debris that was "███████████████████████████████████

████ which is where Dr. Niebuhr claims failures will result, he included photographs of particles found "inside [the] computer case."  (Niebuhr Report ¶¶ 31(i), 33.)  Simply pointing to particles that are present somewhere within the notebook or keyboard is not sufficient to prove Plaintiffs' theory—that all 20 MacBook models equipped with butterfly keyboards share a common defect due to "low travel" and "tight spaces around the keys."  (Mot. for Class Cert at 3.)

62. Dr. Niebuhr did not take samples of the debris found in the keyboards, did not identify any particles by source, █████████████████████████████████████

████████████.  Such an analysis is necessary because, for example, organic material and sugar may result from a liquid spill. ██████████████████████████████████████

██████

63. Dr. Niebuhr did not conduct any analysis of keys that did not exhibit one of the three keyboard behaviors at issue, despite the fact that this would have been important for a root cause analysis determination.  It would be relevant to compare debris or particles found within keys that allegedly exhibited one of the keyboard behaviors, with debris or particles found within

Confidential and Subject to Protective Order

keys that functioned normally.  Dr. Niebuhr in fact received four MacBooks in addition to the eight he "inspected" for purposes of his report; however, he did not include an analysis of those four MacBooks.  (Niebuhr Report ¶ 21, fn. 2.)  Dr. Niebuhr claims that one was nonoperational due to water damage, one was nonoperational due to a corrupted system, one was only "partially operational," and one was operational, did not exhibit any keyboard behaviors, and allegedly did not contain any debris.  (Niebuhr Report, Appendix 3.)

64. A true root cause analysis would attempt to reproduce or eliminate the purported issue or would compare working keys with those exhibiting an issue.  For example, a root cause analysis would attempt to answer the following questions:

- Why do some keys exhibit issues and others do not?

- What are the specific causes of the three identified behaviors?

- How are the behaviors and repair rates different after design changes?

65. Niebuhr's inspection does not address any of these questions.  In fact, in at least two instances he has access to information that contradicts his predetermined conclusions related to the impact of design changes on the root cause and on repair rates: ███████████████ design elements.

### 1.    Dr. Niebuhr Ignores the Clear Benefit of the ██████████ Design

66. As explained in Section V.A.4 above, ████████████████



67. The development of the █████████████████████ ████████████████████ This is clearly shown by data provided by

35

Apple in response to Plaintiffs' interrogatories.  (Apple's Feb. 23, 2021 Suppl. Resp. to Interrog. No. 9.)  I have plotted the data for four different MacBook models that were first produced with a ████████████████, and transitioned to a ██████████████ partway through production as that design change was completed and implemented into the MacBook keyboards.  The graphs show the cumulative repair rate for the three keyboard behaviors at issue versus the number of weeks.  ██████████████ data are shown as solid circles and the ██████████ data as open circles.  I have added a trend line to illustrate the differences.  In all four designs the use of a ██████████ reduced the cumulative repair rate to less than half that of a ████████████████ ████.

**Figure 9.**  ████████████████████████████████████



Confidential and Subject to Protective Order

**Figure 10.**          **Repair Rates**



**Figure 11.**          **Repair Rates**

Confidential and Subject to Protective Order

**Figure 12.**  **Repair Rates**



68. The efficacy of the ████████ change is evidenced by the data which were available to both Dr. Niebuhr and Mr. Curley, but they chose to ignore it.  In fact, they tried to contradict the available data with unproven hypotheses that support their beginning assumption that failures are inevitable for keyboards with low travel.

69. Dr. Niebuhr purports to assess root cause analysis for a ██████ keyboard on MacBook No. 5 but does no more than ████████████████████████████████.  (*See* Niebuhr Report ¶ 44.)  This is not surprising because as I discussed above in reference to Dr. Niebuhr's purported analysis of MacBook No. 5 had a sticky key and appears to have precipitated debris away from the dome due to a liquid spill.

70. Dr. Niebuhr also shows a ██████████ in MacBook No. 8 with discoloration at the edges, which he labels as debris.  (*See* Niebuhr Report ¶ 51.)  In fact, this discoloration appears to be corrosion – possibly as the result of a liquid spill.  In my experience tarnishing and

38

discoloration as seen in Figure 37 of Dr. Niebuhr's report is consistent with corrosion.  I attempted to review a higher resolution figure but was unable to find it in Dr. Niebuhr's produced images.  Dr. Niebuhr does not show any micrographs of the ██████ for MacBook No. 6 or MacBook No. 7, and did not identify any debris that could possibly cause the failure he purports.  Dr. Niebuhr inspected four MacBooks with ████████ and proposed a failure mechanism that was not supported by his analysis.  In two cases he mischaracterized debris and in two he did not show any debris.

## 2.    Dr. Niebuhr Does Not Account For the Membrane Under Keycap ("MUK")

71. With the development and adoption of ████████████████████ ██████████████████████████████████████████████ █████████████████████████████████  As explained by one Apple witness, ███████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████

(Goldberg Dep. at 234:19-235:3.)

72. ████████████████████████████████████ ██████████████  One way to confirm the efficacy of a barrier is to observe the buildup of unwanted debris on the walls of the barrier.  This can be seen clearly in the image below taken by Dr. Niebuhr which shows the buildup of debris at the barrier of three neighboring keys of MacBook No. 7.  This photograph was not shown in Dr. Niebuhr's report but was provided as supporting information.  It is not clear which keys are shown in the photo, but Dr. Niebuhr states that the B, I, and K keys on this MacBook exhibited failures.  Since the B, I, and K keys do not

39

Confidential and Subject to Protective Order

neighbor each other, we can conclude that at least one of the keys in the photo that shows a buildup of debris around the MUK did not exhibit any issues.



73. It is clear from the image above that debris is ████████████ for keys that exhibit no issues. The mere presence of debris around the periphery of the MUK does not determine an issue with the keys. Dr. Niebuhr does not show this debris around working keys in his report but rather he focuses on attempting to support his pre-determined conclusions that the presence of debris alone causes failure. In Figure 36 he shows a close up image of the edge of ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ I observed particles in the key mechanism of the failed keys. Figure 35 illustrates particles found in the area of the Z key and Figure 36 shows particles from the Return (Enter) key." (Niebuhr Report ¶ 51.)

Confidential and Subject to Protective Order



74. With reference to Figure 35 (reproduced above), the MUK has clearly prevented the vast majority of particles shown from interfering with the mechanism and the small rock particle identified by Dr. Niebuhr is far larger than the 1 mm scale bar in the bottom right. Even if the rock particle is the root cause then it would likely also interfere with keyboards with much larger travel. It is also not clear how such a particle could enter the keyboard.

75. In reference to Figure 37 Dr. Niebuhr states: "I found organic material adhering to the dome, which is shown in Figure 37. This material could migrate and prevent electrical contact, resulting in a key failure." (Niebuhr Report ¶ 51.) As I discussed above, the purported debris looks more like corrosion because the discoloration is continuous and is primarily evident at the edge of the metal ███████. Based on my experience, this discoloration is consistent with corrosion from liquid ingress.

76. It is clear from the build-up of debris at the MUK that it is preventing debris from entering the butterfly mechanism. Thus, contrary to the assertions of Mr. Curley and Dr. Niebuhr, the MUK is successful in keeping debris out of the switch housing and preventing failures.

Confidential and Subject to Protective Order

## VII.    MR. CURLEY'S REPORT

### A.    Mr. Curley's Opinions Do Not Account for the Development of Innovative Products

77. Mr. Curley purports to summarize the history of keyboard design and "anti-contamination best practices" in his report. However, he fails to consider the development of thin, modern keyboards or innovative technology in his review. Mr. Curley's summary also provides a biased and incomplete version of history, highlighting only the products and technology relevant during Mr. Curley's career at Smith Corona years ago, and placing emphasis on certain anti-contamination measures while ignoring others. This summary is insufficient to support Mr. Curley's opinion that Apple's MacBooks equipped with butterfly keyboards are "defective" and do not meet industry and engineering standards. (Curley Report ¶¶ 5, 137.)

78. Mr. Curley describes three characteristics that he claims are "anti-contamination best practices" and should be included in all keyboard designs: (1) keycap skirts; (2) keycap gutters; and (3) sealed switches. (Curley Report ¶ 20.) It is true that gutters, skirts, and sealed switches are methods to reduce the impact of debris and sometimes liquids; however, they are not the only way to mitigate. In fact, Apple successfully included several mitigation measures:

████████████████████████████████████████████████████████████████████

████████████████████████████████████ design elements. In particular, ████████

████████████████████████████████████████████ Mr. Curley cites to certain patents that reference one or more of these elements, and where they do not include all three, Mr. Curley points to other references to support his theory. (*See* Curley Report ¶¶ 36-38.)

79. Mr. Curley worked for Smith Corona for 26 years during the first half of his career. (Curley Report ¶ 7.) His Report provides an overview of Smith Corona's products and Mr. Curley's work on their devices, as if that were the benchmark against which to evaluate

42

Apple's development of modern, innovative, low-travel keyboards.  However, this lens is not accurate or unbiased.  Rather than provide an objective description of keyboard design history and current keyboard technology, Mr. Curley focuses on the technology developed by Smith Corona when he worked there decades ago.  Mr. Curley's opinions related to keyboards are biased in favor of his work during that time.  His bias is evident when Mr. Curley discusses "Smith Corona's first laptop keyboard introduced in 1988," the PWP 7000 LT.  According to Mr. Curley "the term LT stood for 'laptop' and was coined by Smith Corona marketing folks, and the term has survived even to this day."  (Curley Report ¶ 31.)  But "laptop" was not a term that originated with "Smith Corona marketing folks" in 1988; rather, the Gavilan SC is widely considered to be the first computer marketed as a "laptop" in 1983.[14]  Mr. Curley's personal lens gives a narrow view of keyboard design.

       80. Mr. Curley's description of keyboard design begins with the INIK (integrated non-invasive keyboard) he worked on in the 1980's at Smith Corona, which is a very large and bulky keyboard by today's standards.  (Curley Report ¶ 31.)  Mr. Curley next reviews a competitor of Smith Corona and turns to a patent assigned to Brother regarding a scissor keyboard (U.S. Patent 5,278,372).  (*Id.* ¶ 36.)  The patent issued in 1994 but was based on a Japanese application filed in 1991.  This patent does not describe the incorporation of keycap gutters, which Mr. Curley claims is one of the three "anti-contamination best practices," so Mr. Curley supplements his summary of scissor keyboards by referencing another patent from 1998 to show a particulate shelf, or "gutter" incorporated during that time (U.S. Patent 5,758,763).  (*Id.* ¶ 38.)

---

[14] https://en.wikipedia.org/wiki/Gavilan_SC

Confidential and Subject to Protective Order

81. Next, Mr. Curley turns to the Kensington Pro keyboard to show a "modern" example of a keyboard using Mr. Curley's alleged best practices. As Mr. Curley notes, "there are no patent claims marked on the Kensington keyboard or packaging" because the "keyboard construction is actually a reproduction of the sealed electronic keyboards that were taught in the 1980's." (Curley Report ¶ 44.) Thus, the technology incorporated into this keyboard was decades-old and not an appropriate marker with which to gauge Apple's innovative technology incorporated into the new, light, and thin MacBooks equipped with butterfly keyboards released beginning in 2015. Mr. Curley then goes on to highlight the same design features in external desktop keyboards—*not* embedded laptop keyboards—manufactured by Microsoft and HP. (*Id.* ¶¶ 42, 45.) He later concludes his summary with a small keyboard for a "flip phone Bluetooth case" he designed for use with an iPhone with 1mm travel. (*Id.* ¶ 73.)

82. Mr. Curley's biased summary is meant to espouse the virtues of the keyboards he worked on in the early 1980's. His entire focus is on washable desktop keyboards that have similar goals to the INIK (integrated non-invasive keyboard) he worked on. Washable keyboards are not the norm for consumer electronics and typically have associated tradeoffs in other design features, such as greater travel distance and the need for complex venting. Many of the keyboards were desktop or external keyboards, and none of the keyboards he highlighted are suitable for modern high-performance, mobile laptops such as Apple's range of MacBooks.

83. The figure below shows images from Mr. Curley's report. These pictures of technology dating back to the 1980's, external, bulky keyboards with high travel, and a small flip phone Bluetooth case are the predecessor keyboards that Mr. Curley purports to compare to Apple's innovative, light, thin keyboard embedded into a portable notebook. These keyboards have minimal relevance to Apple's MacBooks equipped with butterfly keyboards, as they have

44

different sizes, are meant to be used with different products, have different goals, and different design trade-offs.

**Figure 13.  Images from Mr. Curley's Report**



84. As mentioned above, Mr. Curley describes three characteristics that he claims are "anti-contamination best practices": (1) keycap skirts; (2) keycap gutters; and (3) sealed switches.  While it is true that these are methods to reduce the impact of debris, they are not the only measures.  There are in fact many other mitigation measures available.  Each design element or debris mitigation measure may be best suited with certain products and designs, and it cannot be said that any one measure should be implemented over another in any given product.

85. Mr. Curley criticizes Apple for not using a rubber dome in its butterfly keyboard models.  He cites to his experience at Smith Corona, where he states that rubber dome keyboard switches were routinely used and tested.  (*See* Curley Report ¶ 79.)  But he fails to account for



(Goldberg Dep. at 50:3-18.)

(*Id.*)  Further, Mr. Curley admits that keycap skirts can be implemented on keyboards with travel ███████████ but does not claim that they could be used with a ██████████████████████████████████ (*See* Curley Report ¶ 32.)  Mr. Curley bases his opinions on outdated experience that is not relevant to Apple's modern and innovative design.

86. In fact, Apple implemented several design elements aimed at mitigating debris ingress, including the ███████████████████████████████ ███████████████████ As explained further above, these design improvements were innovative and, particularly in the case o ███████████████████ ██████████████████████████████████

### B.    Mr. Curley's Report Suffers From the Same Flaws as Dr. Niebuhr's Report

#### 1.    Mr. Curley's Examinations and Analysis are Flawed and Do Not Support His Conclusions

87. Mr. Curley claims that his conclusions are based in part on a "methodical examination" of 16 MacBooks equipped with butterfly keyboards.  (Curley Report ¶ 82.)  He does not claim that these examinations constitute a root cause analysis.  Mr. Curley described a "methodology" that included six steps: (1) unboxing and photographing the notebook, recording the serial number, and setting up the system; (2) "check[ing] the functionality of six sample key stations,"; (3) measuring the "gaps between the keycap and mask"; (4) disassembling the keycap, suspension mechanism, and switch for the six sample key stations; (5) taking photographs of the

46

Confidential and Subject to Protective Order

six sample key stations; and (6) "analyz[ing] and compar[ing] the relevant keyboard components to the reported design specifications from Apple." (Curley Report ¶ 84.)

88. The sole purpose of these examinations was apparently to confirm the elements of each of the butterfly keyboard models and measure the "keycap gaps." (*See* Curley Report ¶ 87.) But Mr. Curley admits that his measurements "are not meant to provide the precise gap size," because variations are to be expected due to manufacturing tolerances and because keys can shift laterally. (*Id.* ¶ 76.) ███████████████████████

███████████████████████████████████████

████████████ After measuring 16 MacBooks equipped with a butterfly keyboard, ████████

███████████████████████████████████ (*Id.*; Appendix C.) While Mr. Curley does not highlight his measurements of the keygaps in the Apple scissor model keyboard, the numbers listed in Appendix C indicate that the gap size ███████████████

████████ (Curley Report, Appendix C.)

89. Mr. Curley's Report includes a number of other flaws and inconsistencies. For example, in Paragraph 76 he indicates that the █████████████████████

█████████████████████ Mr. Curley then inexplicably states that a █████████

█████████████████████████████████████

█████████████████████████████████

████████ (Curley Report ¶ 76.) It is unclear and confusing why Mr. Curley would choose to state that a ███████████████████████████████

█████████████████████████████████

████████████

Confidential and Subject to Protective Order

90. In addition, Mr. Curley uses patent images to purport to prove that certain design elements would not be achievable with one of Apple's butterfly keyboard configurations. Mr. Curley includes an image from one of Apple's patents depicting a butterfly key configuration with a gutter and keycap skirt. (*See* Curley Report ¶ 122.) Mr. Curley added notations to this image purporting to show that, ███████████████ and "by proportionality" ███████████████, "the skirted configuration disclosed in the Apple patent" ███████████████. (*Id.*) Mr. Curley asserts that, based on his observation of the patent image, ████████████████████████████████████████████ ███████████████." (*Id.*) But Mr. Curley bases this conclusion solely on the proportionality of the patent drawing and not on any actual measurements or testing.

91. Following his "examinations" of Apple's butterfly keyboards, Mr. Curley concludes that low travel, "tight gaps," and the absence of sealed switches constitute an alleged defect in all butterfly keyboard models. (Curley Report ¶ 137.) This conclusion is not supported by any testing or evidence, and Mr. Curley ignores or attempts to explain away any evidence that contradicts that theory.

## 2.     Mr. Curley Begins With a Predetermined Conclusion and Ignores Available Evidence to the Contrary

92. Mr. Curley's report does not support his conclusion that low travel, tight key gaps, and the absence of sealed switches result in a common defect among all 20 butterfly keyboard models. Similar to Dr. Niebuhr, Mr. Curley starts with the premise that the presence of particles in a keyboard must result in a keyboard failure. But simply identifying an alleged correlation between the presence of debris and certain keyboard behaviors does not establish causation. Mr. Curley's analysis did not conform with any accepted methodology  which would have required him to develop and test hypotheses to determine which of a number of possible

Confidential and Subject to Protective Order

outcomes was the actual root cause of the behavior at issue.  Mr. Curley did not attempt to test

alternative hypotheses, and instead only focused on one possible outcome and purported to

confirm his preconceived theory.  Mr. Curley failed to conduct robust hypothesis testing, and as

a result his Report is unreliable.

93. Mr. Curley ignores all available evidence that contradicts his opinions, including

evidence showing the impact of design changes over the course of 20 different butterfly

keyboards, and varying ▆▆▆▆▆▆▆ repair rates across these models.  (*See* Section V.)



        a.      **Mr. Curley Ignores the Impact of** ▆▆▆▆▆▆
               ▆▆ **Design Elements**

94. Mr. Curley attempts to minimize the significant impact that the ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆ had on the butterfly keyboard models.  He claims that ▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆ (Curley Report ¶ 142.)  He also stated, without any support, that ▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆ (*Id.*)  These conclusions are incorrect for a number of reasons.

95. Firstly, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆ (*See* Section V.B.)  Mr. Curley's confirmation bias is

apparent in this argument.  He claims that because ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Curley Report ¶ 142.)  But the

fact that a design element does not prevent particle ingress altogether does not make it

ineffective.  In fact, Dr. Niebuhr has admitted that debris may be present under a key regardless

49

of the length of travel. (Niebuhr Dep. at 279:7-13.) It is not the presence of debris alone that

causes a key failure; it is only when those particles ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ Secondly, Mr. Curley's assertion that the

███████████████████████████████████████████████████████████

████████████ is not supported by any citation or data. (Curley Report ¶ 100.) Mr. Curley does

not cite to any experience, keyboard examination, or Apple documents to support this assertion.

96. Mr. Curley also disregards MUK without any real analysis. As explained above,

the ████████████████████████████████████████████████████████████

████████████ (*See* Goldberg Dep. at 148:1-17.) In support of his opinion that MUK was

"ineffective," Mr. Curley claims that he performed a test to "determine how contaminants would

flow around and under the MUK membrane by using some red dye." (Curley Report ¶ 108.) His

Report includes a picture that Mr. Curley claims "illustrated that the lower butterfly pivots were

not protected." (*Id.*) But pouring liquid dye into a keyboard and observing that the liquid flowed

into a keyboard cannot be used to show that solid particles would behave in the same manner.

These are two entirely different mediums and would result in different root causes and keyboard

behaviors. Liquid would also be able to enter into a keyboard much more easily than solid

particles. Notably, liquid ingress is not part of Plaintiffs' theory of alleged common defect. As

such, Mr. Curley's test involving red dye does is irrelevant, and his opinion that MUK is

ineffective is unsupported.

Confidential and Subject to Protective Order

## VIII.  CONCLUSION

97. For the reasons stated above, Dr. Niebuhr's report is flawed and his central opinion that the butterfly keyboards are "prone to fail from particles becoming trapped" due to "low travel, tight gaps, and metal dome specifications" is not supported by the evidence.

98. For the reasons stated above, Mr. Curley's report is flawed and his central opinion that Apple's butterfly keyboards do not meet industry and engineering standards because they share a "defective low travel design" and do not contain one of Mr. Curley's alleged "anti-contamination best practices" is not supported by the evidence.

99. I reserve the right to supplement or modify the opinions expressed in this Report if additional information becomes available to me.

Executed this 13th day of May, 2021.

_____

Darran Cairns, Ph.D.

51