# Exhibit 2

1  Daniel C. Girard (SBN 114826)
Jordan Elias (SBN 228731)
2  Adam E. Polk (SBN 273000)
Simon S. Grille (SBN 294914)
3  **GIRARD SHARP LLP**
4  601 California Street, Suite 1400
San Francisco, CA 94108
5  Telephone: (415) 981-4800
*dgirard@girardsharp.com*
6  *jelias@girardsharp.com*
*apolk@girardsharp.com*
7  *sgrille@girardsharp.com*
8
9  Steven A. Schwartz (*pro hac vice*)
Benjamin F. Johns (*pro hac vice*)
10  Beena M. McDonald (*pro hac vice*)
**CHIMICLES SCHWARTZ KRINER**
11  **& DONALDSON-SMITH LLP**
One Haverford Centre
12  361 West Lancaster Avenue
Haverford, PA 19041
13  Telephone: (610) 642-8500
*sas@chimicles.com*
14  *bfj@chimicles.com*
15  *bmm@chimicles.com*
16
17  *Class Counsel*

18

**UNITED STATES DISTRICT COURT**
19  **NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**
20

21  | | |
|---|---|
| IN RE: MACBOOK KEYBOARD LITIGATION | Case No. 5:18-cv-02813-EJD-VKD |

22  IN RE: MACBOOK KEYBOARD
LITIGATION

**PLAINTIFFS' OPPOSITION TO APPLE**
23  **INC.'S MOTION TO STRIKE EXPERT**
**OPINIONS OF HAL J. SINGER, PH.D.**

24  Judge:  Hon. Edward J. Davila
Date:   November 18, 2021
25  Time:   9:00 a.m.
Courtroom: 4 – 5th Floor
26

27  **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

28

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

II.  SUMMARY OF DR. SINGER'S DAMAGES ANALYSES ......................................... 2

    A.   Dr. Singer's Qualifications to Evaluate Damages in This Case ........................... 2

    B.   Dr. Singer's CBC Analysis Reliably Determines Damages to the Class ............. 2

        1.   The CBC Survey ...................................................................................... 2

        2.   Accounting for the Risk of Manifestation ............................................... 3

        3.   Accounting for the Supply Side and Calculating Damages ..................... 4

III. LEGAL STANDARD ...................................................................................................... 4

IV.  ARGUMENT .................................................................................................................. 5

    A.   Dr. Singer's CBC Survey Reliably Applies Accepted CBC Methodologies ..................... 5

        1.   Dr. Singer Reliably Selected Attributes for the CBC Survey ................. 6

        2.   Dr. Singer Appropriately Described the Attributes in His CBC Survey ............. 10

        3.   Dr. Singer's CBC Survey Measured All Relevant Tradeoffs ............................ 11

        4.   Dr Singer's CBC Properly Presented a Choice Among Defects ........................ 13

        5.   Dr. Singer's CBC Measured All Relevant Features. ........................................... 15

    B.   Dr. Singer's CBC Analysis Yields Intuitive Results and a Conservative Damages Calculation .................................................................................................. 16

    C.   Dr. Singer's Repair-Rate Calculations Are Methodologically Sound............................. 20

    D.   Dr. Singer's CBC Analysis Is Consistent with Plaintiffs' Theory of Liability and Measures the Damages They Seek Under Their Claims................................................. 23

V.   CONCLUSION................................................................................................................ 24

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Target Corp.*
    2014 WL 12558858 (C.D. Cal. Nov. 25, 2014) ........................................................................ 10

*Apotex, Inc. v. Cephalon, Inc.*
    321 F.R.D. 220 (E.D. Pa. 2017) ............................................................................................... 20

*Apple, Inc. v. Samsung Elecs. Co.*
    2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ............................................................... 11, 16, 20

*Briseno v. ConAgra Foods, Inc.*
    674 F. App'x 654 (9th Cir. 2017) ............................................................................................... 5

*Conrad v. Jimmy John's Franchise, LLC*
    Case No. 18-CV-00133-NJR, Dkt. No. 223 (S.D. Ill. Feb. 16, 2021) ....................................... 23

*Daubert v. Merrell Dow Pharms., Inc.*
    509 U.S. 579 (1993) ................................................................................................................... 5

*Earl v. The Boeing Co.*
    2021 WL 3140545 (E.D. Tex. July 26, 2021) ................................................................. 9, 13, 16

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*
    618 F.3d 1025 (9th Cir. 2010) ......................................................................................... 5, 6, 16

*GPNE Corp. v. Apple, Inc.*
    2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ......................................................................... 13

*Hadley v. Kellogg Sales Co.*
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) .................................................................................. 5, 8

*Hemmings v. Tidyman's Inc.*
    285 F.3d 1174 (9th Cir. 2002) .................................................................................................... 5

*Hopkins v. Dow Corning Corp.*
    33 F.3d 1116 (9th Cir. 1994) ...................................................................................................... 5

*In re Arris Cable Modem Consumer Litig.*
    327 F.R.D. 334 (N.D. Cal. 2018) ................................................................................. 13, 15, 24

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................................................... 23

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*
    984 F. Supp. 2d 1021 (C.D. Cal. 2013) ................................................................................... 22

*In re Dial Complete Mktg. & Sales Practices Litig.*
    320 F.R.D. 326 (D.N.H. 2017) ................................................................................................... 6

ii

*In re General Motors LLC Ignition Switch Litig.*
    407 F. Supp. 3d 212 (S.D.N.Y. Aug. 6, 2019) ............................................................. 24

*In re High-Tech Emp. Antitrust Litig.*
    2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ................................................................ 5

*In re MyFord Touch Consumer Litig.*
    291 F. Supp. 3d 936 (N.D. Cal. 2018) ........................................................................ 15

*In re SFPP Right-of-Way Claims*
    2017 WL 2378363 (C.D. Cal. May 23, 2017) ............................................................. 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*
    500 F. Supp. 3d 940 (N.D. Cal. 2020) ................................................................... 19, 24

*In re: MacBook Keyboard Litigation*
    2021 WL 1250378 (N.D. Cal. Apr. 5, 2021) ......................................................*passim*

*Kennedy v. Collagen Corp.*
    161 F.3d 1226 (9th Cir. 1998) .................................................................................... 5

*Kwikset Corp. v. Super. Ct.*
    51 Cal. 4th 310 (2011) ............................................................................................... 23

*MacDougall v. Am. Honda Motor Co.*
    2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) ...................................................... 10, 19

*Maldonado v. Apple, Inc.*
    2021 WL 1947512 (N.D. Cal. May 14, 2021) .............................................................. 7

*Marsu, B.V. v. Walt Disney Co.*
    185 F.3d 932 (9th Cir. 1999) ...................................................................................... 7

*Nguyen v. Nissan N. Am., Inc.*
    932 F.3d 811 (9th Cir. 2019) ...................................................................................... 23

*Oracle Am., Inc. v. Google Inc.*
    2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ............................................................. 10

*Pulaski & Middleman, LLC v. Google, Inc.*
    802 F.3d 979 (9th Cir. 2015) ...................................................................................... 23

*Sanchez-Knutson v. Ford Motor Co.*
    181 F. Supp. 3d 988 (S.D. Fla. 2016) ......................................................................... 15

*Southland Sod Farms v. Stover Seed Co.*
    108 F.3d 1134 (9th Cir. 1997) .................................................................................... 6

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*
    648 F. App'x 609 (9th Cir. 2016) ........................................................................... 6, 13

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

*TV Interactive Data Corp. v. Sony Corp.*
  929 F. Supp. 2d 1006 (N.D. Cal. 2013) ................................................................. 8, 11, 16

*Wendt v. Host Int'l, Inc.*
  125 F.3d 806 (9th Cir. 1997) .................................................................................. 7

*Williams v. Apple, Inc.*
  2021 WL 2186223 (N.D. Cal. May 28, 2021) ...................................................... *passim*

**Rules**

Fed. R. Evid. 702 ........................................................................................................ 2, 5

**Other Authorities**

Fed. R. Evid. 702 advisory committee's note (2000) ............................................... 5

Greg Allenby et al., "Calculating Reasonable Royalty Damages Using Conjoint Analysis,"
  45(2) AIPLA Quarterly Journal (2017) ................................................................. 8

Richard H. Thaler, From Homo Economicus to Homo Sapiens
  14 J. Econ. Perspectives 133 (2000) ...................................................................... 19

iv

I.      **INTRODUCTION**

Plaintiffs' expert economist, Dr. Hal Singer, will explain to the jury how his Choice-Based Conjoint ("CBC") analysis establishes economic injury to Plaintiffs and the other class members. CBC is widely approved for calculating damages to consumer classes, and this Court already found "Dr. Singer's CBC analysis reliable and relevant to Plaintiffs' theory of class-wide damages." *In re: MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5, 2021) ("Class Cert. Order"). Dr. Singer's methodology and execution have not changed since the Court's assessment of his CBC survey at class certification. Apple's various attempts to poke holes in his analysis misconstrue his methodology, go to the weight of his opinions and do not affect their admissibility.

For example, although they lack CBC experience of their own, Apple's experts dispute Dr. Singer's interpretation of one of many conjoint authorities on which he relied. Apple also disputes Dr. Singer's selection of survey attributes, maintaining that his survey is overly suggestive and yielded counterintuitive results. These critiques are misleading and unfounded. Dr. Singer's survey simulates a realistic MacBook purchasing experience by using images, features, and language taken directly from Apple's online store. The results are statistically significant and reflect economically sensible consumer reactions, including strong distaste for defects and preference for pricing discounts, consistent with the economics literature. The responses Apple mistakenly characterizes as "irrational" are either not irrational at all or represent expected deviations from a large sample of survey data.

Apple repeats its mantra that the defect does not manifest for all Class members within four years, but as the Court recognized, Dr. Singer addresses this point by adjusting his point-of-sale damages calculation to reflect the likelihood of manifestation. He derives this defect manifestation rate from Apple's records and uses standard, accurate projection techniques to account for missing data. The projection models make use of all available data and are statistically sound and robust. At the same time, Dr. Singer's CBC model does not rise or fall based on any particular repair rate. It is instead designed to account for *any* repair rate deemed appropriate by the fact finder (or differing repair rates for each model).

While Apple also continues to spill considerable ink reframing Plaintiffs' theory of liability to

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

its own liking, this Court already rejected Apple's contention that Dr. Singer must ask survey respondents about a specific percentage of failure to align with Plaintiffs' claims for relief. As the Court explained, "Plaintiffs allege that Apple failed to disclose the existence of the defect not the risk that the defect would manifest. Based on that alleged omission, they contend that every Class member was damaged at the point of sale." Class Cert. Order, 2021 WL 1250378, at *14. Dr. Singer accounts for the expectations of a typical Apple consumer and his approach for addressing the manifestation rate "is supported by legitimate economic literature and is reliable." *Id.* at *5.

Thus, Dr. Singer's expert work is admissible under Rule 702. Apple may present its opposing views at trial through cross-examination and competing expert testimony. Its motion to strike should be denied.

## II.    SUMMARY OF DR. SINGER'S DAMAGES ANALYSES

### A.    Dr. Singer's Qualifications to Evaluate Damages in This Case

Apple does not contest Dr. Singer's qualifications to serve as Plaintiffs' damages expert. Dr. Singer earned a master's degree and a Ph.D. in economics from Johns Hopkins University, and a B.S. *magna cum laude* in economics from Tulane. *See* Declaration of Simon S. Grille ("Grille Decl."),[1] Ex. 1 (Merits Expert Report of Hal J. Singer, Ph.D. ("Singer Rpt."), ¶ 10). He is a Senior Fellow at George Washington University's Institute for Public Policy and an Adjunct Professor at Georgetown University's McDonough School of Business, where he has taught Advanced Pricing to MBA candidates since 2014. *Id.* ¶ 7. Dr. Singer has received economics awards, authored numerous articles and other publications, and testified as an expert in over 40 cases. *Id.*, Appx. 1 (Curriculum Vitae).

### B.    Dr. Singer's CBC Analysis Reliably Determines Damages to the Class

#### 1.    The CBC Survey

In this case, Dr. Singer developed a CBC Analysis to calculate how much class members overpaid for a MacBook with an undisclosed keyboard defect. Dr. Singer surveyed 1,044 consumers who previously purchased a MacBook. *Id.* ¶¶ 16-17. These participants were presented with choice sets of alternative MacBooks offered at different prices. *Id.* ¶¶ 20-21. The participants were asked to select the laptop they would buy among the presented configurations and prices, or respond that they would not

---

[1] All subsequent citations to exhibits refer to exhibits to the Grille Declaration, filed herewith.

purchase any of the MacBooks in a choice set. *Id.* The choice sets used actual MacBook models and graphics from Apple's website to present a realistic purchasing experience. *Id.* ¶ 20 n.32.[2] Some of the products that respondents were shown included hardware defects disclosed at the point of purchase. Consistent with Apple's Keyboard Service Program (KSP), products labeled with a defect attribute were accompanied by a notice that Apple would attempt to repair the defect free of charge. *Id.* ¶ 18. In addition to varying features and price levels, the choice sets included as attributes not just a defective keyboard but also a defective microphone, speaker, webcam, and trackpad, along with a no-defect attribute, so as to avoid tipping off respondents to what the survey was measuring. *Id.* ¶ 19.

Dr. Singer then used standard statistical methods to calculate with a 95% confidence interval the discount in price that consumers would demand for a MacBook with the keyboard defect disclosed. *Id.* ¶ 26. The survey demonstrated that consumers are significantly averse to the keyboard defect and would require a discount of ▮▮▮ to make them indifferent as between a MacBook with a keyboard defect and an otherwise identical MacBook without that latent defect, after accounting for the probability that the defect will manifest. *Id.* ¶ 32. Dr. Singer also accounted for potential changes (or lack thereof) in Apple's supply-side market behavior, as discussed in more detail below. *Id.* ¶¶ 34-50.

### 2.    Accounting for the Risk of Manifestation

While the CBC survey discloses a change in customer preference for a MacBook with a keyboard defect arising after purchase, not all MacBook purchasers experience this defect during the product's useful life. Accordingly, following standard economic principles, Dr. Singer multiplied the price premium calculated from his CBC survey by the reasonable probability of the keyboard defect manifesting during the first four years of ownership. *Id.* ¶¶ 28-33. This approach is conservative not only because it relies on Apple's data that understate the true number of keyboard failures, but also because it assumes class members are risk-neutral instead of risk-adverse. *Id.* ¶¶ 30 & 33.

Dr. Singer used Apple's own repair-rate data to estimate the likelihood that the defect will manifest for any given class member. Apple has provided cumulative repair rates, which increase year

---

[2] *E.g.*, Ex. 2 (https://web.archive.org/web/20190904024609/https://www.apple.com/shop/buy-mac/macbook-air (last visited July 22, 2021)); Ex. 3 (https://web.archive.org/web/20191114170233/https://www.apple.com/shop/buy-mac/macbook-pro/16-inch (last visited July 22, 2021)).

over year, but the data is incomplete because not all models[3] have been in the field for four years. *See* Ex. 1 (Singer Rpt., Table 3). Dr. Singer addresses this data deficiency by calculating an average repair rate based on available data and conservatively projecting repair rates for the newer models with incomplete data. *Id.* ¶¶ 30, 52-55. Under each of Dr. Singer's projections, as one would expect, models with lower initial repair rates have lower predicted fifth-year rates. *Id.*, Tables A7 & A8. It bears emphasis as well that the repair rate is just one input to Dr. Singer's damages model, not its foundation, and he can incorporate *any* repair rate into the analysis. *Id.* ¶ 51.

### 3. Accounting for the Supply Side and Calculating Damages

Apple has dropped its previous criticism that Dr. Singer failed to account for the supply side of the market. Dr. Singer calculates damages using the traditional supply-side approach by reasonably assuming that the quantity of MacBooks that Apple would have supplied had it disclosed the defect would be no different because the disclosure does not add to Apple's variable production costs. *Id.* ¶ 34. He also "models Apple's potential supply-side behavior using both a linear demand system and a more complex non-linear demand system." *Id.* ¶¶ 36-50. His analyses rely on real-world data showing Apple's actual prices, quantities, and costs for each of the MacBooks at issue. Ex. 4 (Reply Expert Report of Hal J. Singer, Ph.D. ("Singer Reply Rpt."), ¶ 79). Under these repair-rate and supply-side scenarios, the aggregate damage estimates are conservative, ranging from $178 to $569 million for the Class. Ex. 1 (Singer Rpt., Table A1). On a per-computer basis, applying a weighted average price of ███, Dr. Singer's analyses calculate damages ranging from about ███ to ███ per MacBook. *See id.*, Tables 4, 5, 7. These estimates are generally consistent with the price of Apple's $99 baseline external keyboard. *See* Ex. 5 (marketing for Apple's "Magic Keyboard").

## III. __LEGAL STANDARD__

A witness may testify as an expert by knowledge, skill, experience, training, or education if his scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence

---

[3] There are 16 MacBook models in the Class. *See* 2d Am. Compl., Dkt. No. 219, ¶ 205. Apple previously took the position that there were 16 models. Class Cert. Opp., Dkt. No. 235, at 4. Apple now attempts to manufacture complexity by claiming there are 20 models. Mot. at n.1. Regardless, it remains undisputed that all of the Class computers contain a butterfly mechanism keyboard that Plaintiffs allege is defective.

1  or to determine a fact in issue. *See* Fed. R. Evid. 702 (requiring that testimony be "based upon sufficient

2  facts or data" and be "the product of reliable principles and methods," and that the expert "apply those

3  principles and methods reliably to the facts of the case."). Rule 702 was intended to "relax[] the

4  traditional barriers to opinion testimony." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir.

5  1994) (internal quotation marks omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

6  588-89 (1993)). As such, "rejection of expert testimony is the exception rather than the rule." Fed. R.

7  Evid. 702 advisory committee's note (2000).

8         "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to

9  the jury must such testimony be excluded." *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-

10  LHK, 2014 WL 1351040, at *22 (N.D. Cal. Apr. 4, 2014) (citation omitted). "Disputes as to the strength

11  of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for

12  his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161

13  F.3d 1226, 1231 (9th Cir. 1998) (citation and alterations omitted).

14         Of particular relevance here, the Ninth Circuit has "long held that survey evidence should be

15  admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'" *Fortune

16  Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010)

17  (alteration in original). The court has further "made clear that 'technical inadequacies' in a survey,

18  'including the format of the questions or the manner in which it was taken, bear on the weight of the

19  evidence, not its admissibility.'" *Id.* (citation omitted); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d

20  1174, 1188 (9th Cir. 2002) (recognizing general rule that "objections to the inadequacies of a study are

21  more appropriately considered an objection going to the weight of the evidence").

22  **IV.    ARGUMENT**

23       **A.    Dr. Singer's CBC Survey Reliably Applies Accepted CBC Methodologies**

24         As this Court noted, "Choice-based conjoint ('CBC') analysis is a well-recognized economic

25  method used to study and quantify consumer preferences." Class Cert. Order, 2021 WL 1250378, at *5;

26  *see also Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 657 (9th Cir. 2017) (describing conjoint

27  analysis as a "well-established damages model" for measuring "the classwide price premium attributable

28  to [plaintiffs'] theory of liability"); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107-09 (N.D.

Cal. 2018) ("well-accepted economic methodology") (citing *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 331 (D.N.H. 2017) (collecting cases recognizing same)).

Apple devotes the bulk of its motion to arguing that Dr. Singer's survey design choices do not approximate a realistic purchasing experience because he does not include and measure all MacBook features, does not properly explain some features, and is overly suggestive by emphasizing defects. Mot. at 5-17. Apple also argues that these design flaws lead to illogical responses. Mot. at 18. These arguments afford no basis to disallow Dr. Singer's testimony. In *Fortune Dynamic*, 618 F.3d at 1037, the Ninth Circuit reversed an order that had excluded an expert's survey "because the survey compared the products side-by-side, failed to replicate real world conditions, failed to properly screen participants, and was 'highly suggestive.'" The court reasoned that even if criticisms that the survey was "suggestive" and "quite possibly produced counterintuitive results" were valid, they "go to the weight of the survey rather than its admissibility." *Id.* at 1038. Apple's similar critiques likewise go to the weight of Dr. Singer's opinions and do not support exclusion. *See also ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 613 (9th Cir. 2016) (reversing exclusion: "Although the district court faulted the survey's biased questions and unrepresentative sample, neither defect was so serious as to preclude the survey's admissibility"); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (holding that the proffered objections—that a survey "asked leading questions—go only to the weight, and not the admissibility, of the survey.").

### 1. Dr. Singer Reliably Selected Attributes for the CBC Survey

After failing to exclude Dr. Singer's CBC analysis at class certification, Apple pivots to argue that Dr. Singer's survey is not really a CBC. *Compare* Apple's previous motion to strike, Dkt. No. 238 (referring repeatedly to "Dr. Singer's Conjoint Analysis"), *with* Apple's present motion, Dkt. No. 333 (calling it a "purported conjoint" or "purported CBC"). Apple now says Dr. Singer's analysis is not a CBC because it does not include a full description of every feature displayed on Apple's website. Mot. at 6-10. Setting aside how cumbersome that would be in the survey context, Apple's experts lack any relevant background or experience in CBC design that would qualify them to make these critiques. *See* Ex. 6 (Martin Class Dep. at 201:23-202:7 ("Q. Have you ever designed, run, or performed your own conjoint? A. I have not")); Ex. 7 (Simonson Class Dep. at 24:19-23; 27:22-28:4; 31:5-32:22 (only a

"vague recollection of doing something" conjoint-related once with a former student 20 years ago, which Simonson couldn't remember anything about)); Ex. 8 (Song Dep. at 26:9-10 (Apple's latest expert conceding, "I have not designed a choice-based conjoint survey")).

Unable to draw on their own experience, Apple's experts argue incorrectly that Dr. Singer deviated from the principles of a 2019 Daniel McFadden article he cites in his reports. Mot. at 5.[4] In line with that McFadden article and other CBC authorities, Dr. Singer designed his survey to mimic a realistic purchase experience while testing the impact of a counterfactual scenario where Apple disclosed a latent defect. *See* Ex. 4 (Singer Reply Rpt., ¶ 15); Ex. 9 (Singer Dep. at 77:25-78:14; 94:21-95:3; 109:11-17). As Dr. Singer explained:

> We're trying to replicate the purchasing environment of the actual world as close as we possibly can. That's why you get to see the actual pictures and descriptions from the -- from the actual Apple website. The one place where we have to depart from the marketplace reality is -- concerns the nature of the challenged conduct here, which is that Apple did not disclose the product defect, the alleged product defect, and we are going to disclose it now, and we want to -- we want to gauge the reaction of consumers in this hypothetical or counterfactual world in which everything is the same.

Ex. 9 (Singer Dep. at 110:1-13). The survey need not be identical to an actual purchasing experience, of course, because "any economic model inevitably will[] simplify the world." *Maldonado v. Apple, Inc.*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021). "Damages calculations have long been understood to involve a degree of approximation; because of the economic complexities of the real world, it could not be otherwise or recovery could rarely be had." *Id.* (citing *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999)). It follows that arguments about "market realities are for rebuttal experts, cross-examination, and argument" when, as here, "a methodologically sound conjoint and real-world historical supply data yields a sufficiently reliable result to go to the jury." *Id.* at *23; *see Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) (stating the general rule that "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility.").

Dr. Singer's survey realistically approximates the marketplace conditions facing an Apple customer

---

[4] The McFadden article is one of several that Dr. Singer has cited and relied upon in developing his damages analysis, including at class certification. *See, e.g.*, Singer Class Cert. Rpt., Dkt. No. 224-10 at nn. 41, 43-46, 62. In its first attempt to exclude Dr. Singer, however, Apple's experts made no mention of this article and did not assert that Dr. Singer's survey departed from its teachings. Dkt. No. 238.

"by using the same branding, primary attributes, and images that Apple itself used on its website store." Ex. 4 (Singer Reply Rpt., ¶ 10). Dr. Singer not only displayed the same key laptop features that Apple displays in its marketing materials but also standardized the presentation of various MacBook models. *Id.* ¶ 15; Ex. 9 (Singer Dep. at 95:8-9 ("We literally fed them information from the Apple website.")). Apple's expert agreed that Apple's website reflects a "realistic purchase environment" and "presents relevant information," and conceded that CBC studies "may very well include attributes that the manufacturer advertises." Ex. 7 (Simonson Class Dep. at 16:24-17:9; 184:1-5).

Apple now quibbles that Dr. Singer's CBC leaves out features that a hypothetical consumer could find on Apple's website. Yet Dr. Singer purposely chose not to include every possible feature in his CBC survey to avoid overburdening respondents. *See* Ex. 4 (Singer Reply Rpt., ¶ 19 n.53 ("testing too many features and levels can lead to respondent fatigue, inconsistent responses, and worthless data")); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1025 (N.D. Cal. 2013) ("[T]he literature on conjoint analysis condones testing six or *fewer* variables to produce results with a better predictive value.") (emphasis added). As Professor McFadden has explained, "humans are limited in their capacity for choosing among a large number of options." Ex. 1 (Singer Rpt., ¶ 20 n.56).[5] Thus, there is no methodological requirement that a CBC display every single detail or every last feature, which would often be counterproductive. *Id.*; *see also Hadley*, 324 F. Supp. 3d at 1108 (N.D. Cal. 2018) (declining to exclude CBC analysis based on argument that "conjoint survey fails to include other 'critical' attributes 'that consumers consider' when purchasing" because "it is well-established that these types of critiques merely go to the weight, but not to the admissibility, of survey-based analyses.").

In *Williams v. Apple, Inc.*, No. 19-CV-04700-LHK, 2021 WL 2186223, at \*19 (N.D. Cal. May 28, 2021), Apple advanced nearly identical arguments for exclusion of a CBC analysis, relying on some of the same authorities it relies on here and claiming that an expert's "election of features (or attributes) [was] not based on features consumers value" and the expert "should have also included other attributes." The court was not persuaded, explaining that the argument that the "conjoint survey

---

[5] *See also* Ex. 10 (Greg Allenby et al., "Calculating Reasonable Royalty Damages Using Conjoint Analysis," 45(2) AIPLA Quarterly Journal (2017) at 239 ("In the case of complex, multi-featured products, the conjoint survey will focus on only a subset of product attributes.")).

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

overstates the magnitude or frequency" of a certain attribute "is a merits argument about the proper amount of damages." *Id.*; *see also Earl v. The Boeing Co.*, No. 4:19-CV-507, 2021 WL 3140545, at *7 (E.D. Tex. July 26, 2021) ("[T]he quantity of features included in the survey and the identity of those selected features goes to the weight of Allenby's testimony, not its admissibility.").

While Apple studiously compiles features and information on its website that were not specifically referenced in Dr. Singer's survey, it fails to articulate why inclusion of these features would be necessary to measure the pricing effect of a disclosed keyboard defect. Apple's inability to connect these analytical dots is fatal to its critique. *See Earl*, 2021 WL 3140545, at *7 (reasoning that "critiquing an expert's opinion simply by suggesting an alternative and allegedly superior methodological approach is, without more, insufficient to push back on Plaintiffs' relevant arguments."). For instance, Apple nowhere explains why listing the specific height or weight of MacBooks would be meaningful when *all* of the butterfly MacBooks at issue were designed to be thin and light. *E.g.*, Ex. 11 (Metz Dep. at 61:5-7 (the "overall positioning of the product was Apple's thinnest and lightest notebook ever.")). And contrary to Apple's claim that Dr. Singer did not indicate to respondents how thin these MacBooks are (Mot. at 9), the survey presents images of the MacBooks that clearly show their slim profiles. Ex. 9 (Singer Dep. at 119:1-4 ("[Y]ou can see the thinness when you're -- when you're shopping online. And when we grab the screen images and we show them to the respondents.")); Ex. 4 (Singer Reply Rpt., ¶ 15 (images of the MacBooks convey product attributes "such as thickness, resolution, and display."))

Apple's remaining argument that Dr. Singer "excluded brand" (Mot. at 9)—a criticism advanced by its experts at class certification—also is wrong and misunderstands how Dr. Singer structured his CBC analysis. To begin with, the Apple and MacBook brands are ubiquitous throughout the survey. *E.g.*, Ex. 1 (Singer Rpt., Figure 1 & Appx. 3 at Q7). Moreover, the survey is limited to prior *MacBook* purchasers who are necessarily familiar with the brand and product. *Id.* ¶¶ 15, 17. In addition, by giving respondents the option to state that they would not purchase any of the laptops shown to them, Dr. Singer's survey "leaves open purchases of other MacBooks or other laptop brands available on the market." Ex. 4 (Singer Reply Rpt., ¶ 47). There is no methodological requirement that a CBC survey include competitor brands, and Apple has not explained why a survey designed to measure the impact of the keyboard defect upon MacBook purchasers would need to include non-Apple brands. No such need

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

exists. *Id.* ¶ 32.

Apple's cases do not support a finding that Dr. Singer's choice of attributes renders his survey unrealistic or unreliable. The court in *MacDougall v. Am. Honda Motor Co.*, No. SA-cv-171079-JGB-DFMx, 2020 WL 5583534, at *5-6 (C.D. Cal. Sept. 11, 2020), *appeal filed*, No. 20-56060 (9th Cir.), excluded a conjoint analysis for failure to address supply-side factors, which Dr. Singer has thoroughly addressed in an analysis Apple does not challenge. The court in *MacDougall* also found that the expert gave no explanation for why he selected only four of the 32 attributes he included in his pretest when those four were not even the attributes the pretest respondents identified as most important. *Id.* at *7. By contrast, Dr. Singer here chose features by reference to items that Apple itself highlighted on its website, to accurately reflect what a prospective MacBook purchaser would see. Ex. 1 (Singer Rpt., ¶ 20). In *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *9 (N.D. Cal. Mar. 13, 2012)—also unlike here—the expert's conjoint was used to measure an "increase in market share due to [patent] infringement." The court was careful to limit its findings to the facts of the case, noting that the expert's "conjoint analysis *in this particular instance* is an unreliable predictor of market share" and finding that "*on this record for this application*" the expert had "inappropriately focused consumers on artificially-selected features." *Id.* (emphasis added). Whereas the expert in *Oracle* "had no reasonable criteria for choosing the four non-patented features to test," Dr. Singer's attribute selection for estimating damages corresponds to Plaintiffs' claims in this case. And the expert in *Adams v. Target Corp.*, No. CV 13-5944-GHK (PJWx), 2014 WL 12558858, at *3 (C.D. Cal. Nov. 25, 2014), had not submitted a fully developed damages model that the court could examine, so the court could not "even tell what data [the expert] will be working with when making these unexplained calculations."

### 2. Dr. Singer Appropriately Described the Attributes in His CBC Survey

In addition to quibbling with the attributes Dr. Singer included in his CBC survey, Apple argues that he failed to adequately describe some attributes and "lumped" features together. Mot. at 11-12. Apple and its experts contend that by not replicating Apple's marketing materials verbatim for each feature, Dr. Singer gave incomplete descriptions. Yet Apple does not and cannot point to any evidence that any survey respondent did not understand the standard features shown to them. Further, the McFadden authority that Apple cites notes only that CBC can be problematic when "products are

*unfamiliar* or incompletely described." Mot. at 11 (emphasis added). By targeting his survey to former MacBook purchasers, Dr. Singer ensured that the product features shown would *not* be unfamiliar. Ex. 1 (Singer Rpt., ¶ 17). He elaborated at his deposition that "[w]e condition on the respondents having a familiarity with the products already. They have to have bought or been in the market within the last five years. Then we ask them to affirm that they understand all of the features in the survey." Ex. 9 (Singer Dep. at 85:14-19). Thus, there is no need to include all of Apple's website marketing.

Apple posits that Dr. Singer could have included links to Apple's website since he employed a "pop-up box" (without links, *see* Ex. 9 (Singer Dep. at 298:8-12)) to provide additional information about the defect feature to respondents. Apple's criticism is again misplaced. First, the survey respondents were asked to complete the survey in one sitting without stopping, and navigating to a hyperlink would have interfered with that process. Ex. 1 (Singer Rpt., Appx. 3 at Q7). Second, for the reasons stated above, it is unnecessary to link to more Apple marketing and doing so would just burden the respondents with superfluous material. *See TV Interactive*, 929 F. Supp. 2d at 1025; *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *16 (N.D. Cal. Feb. 25, 2014).

Apple also protests that Dr. Singer's survey presents groups of features within each MacBook model instead of segregating and varying each feature. But Dr. Singer's presentation ensures a more realistic experience. By grouping certain features, Dr. Singer prevents respondents from being exposed to nonexistent product-feature combinations for a particular model (*e.g.*, a MacBook Air with a processor that was only available on a MacBook Pro). Ex. 4 (Singer Reply Rpt., ¶ 14). Therefore, separating out and varying each individual feature would make the survey *less* realistic. *Id.*

### 3.    Dr. Singer's CBC Survey Measured All Relevant Tradeoffs

Apple next recycles its critique that Dr. Singer's survey fails to trade off the risk of experiencing the keyboard defect with the benefits of a MacBook's other working features. Mot. at 13-15. As in its prior motion to strike, "Apple argues that if consumers are unable to accurately assess what they would pay for a computer with a risk of a keyboard defect, then a CBC analysis is an unreliable method for measuring damages." Class Cert. Order, 2021 WL 1250378, at *5. The Court "disagreed" with this argument and approved of Dr. Singer's choice "not to incorporate the risk of manifestation in the survey, but rather to apply that risk to the survey results instead." *Id.*

---

11

Dr. Singer outlines three reasons that he designed his conjoint study to incorporate the risk of the keyboard defect manifesting on the back end of the analysis. First, doing so allows him to present a simpler choice task to consumers to reduce the risk of confusion and promote accurate responses. Ex. 1 (Singer Rpt., ¶ 19 n.27). Second, accounting for the risk of defect manifestation after conducting the survey makes his conjoint study more conservative, as it builds in the assumption that laptop purchasers are risk-neutral rather than risk-averse. *Id.* ¶ 33. Third, accounting for the defect on the back end also allows Dr. Singer to adjust the damages estimate by whatever failure rate(s) the trier of fact determines. Ex. 4 (Singer Reply Rpt., ¶ 27); Ex. 9 (Singer Dep. at 203:20-204:2). Accordingly, Dr. Singer's treatment of the risk of manifestation is "supported by legitimate economic literature and is reliable." Class Cert. Order, 2021 WL 1250378, at *5.

Apple speculates that because the butterfly keyboard contributed to the thinness and lightness of the MacBooks, those features might outweigh any disutility consumers associate with a specified risk of keyboard failure. Dr. Singer's class certification reply report demonstrates the fallacy of this reasoning. For purposes of his exercise documented in that report, he included an ██% chance of failure in the actual survey—which caused respondents to demand *higher* compensation for being sold a MacBook with a latent keyboard defect. Ex. 1 (Singer Rpt., ¶ 4 n.10); Ex. 4 (Singer Reply Rpt., ¶ 30). Like Dr. Singer's other surveys, his class certification reply survey showed images of the laptop demonstrating its thin profile, and was limited to respondents who previously purchased a MacBook and thus were familiar with its thinness and lightness. Singer Class Cert. Reply Rpt., Dkt. No. 259-54, ¶ 33. The respondents nonetheless exhibited an even greater distaste for the keyboard defect. *Id.* ¶ 34.

Contrary to Apple's assertion that Dr. Singer's analytical approach is unsupported by academic literature, there are abundant studies and analyses on expected utility theory that bear out his analysis in this case. *See* Ex. 9 (Singer Dep. at 195:20-25; 196:16-22 ("I'm relying on a huge body of literature that allows and justifies an economist discounting a known loss with some realized probability of that loss occurring.")). Apple's claim that expected utility theory has been debunked is nonsense. Dr. Singer cites peer-reviewed publications as recent as 2019 demonstrating that expected utility is "standard, widely used, and widely taught." Ex. 4 (Singer Reply Rpt., ¶ 29 n.75). Economic textbooks refer to this theory as "the central framework used to analyze decision under uncertainty." *Id.* ¶ 29 n.77. What's more, if Dr.

Singer had used the "prospect theory" that Dr. Simonson claims has supplanted expected utility theory, damages would be higher: In the application of prospect theory, Dr. Simonson conceded, "losses loom larger than gains." Ex. 12 (Simonson Merits Dep. at 60:13-19). In short, consumers are not only risk-averse but also loss-averse such that reliance on Dr. Simonson's alternative theory would yield higher damages than Dr. Singer's conservative assumption of risk neutrality. Ex. 4 (Singer Reply Rpt., ¶ 30). Finally, even if Apple were correct that Dr. Singer's expected utility approach is novel (and it is not), a "lack of textual support may go to the weight, not the admissibility of [expert] testimony." *Earl*, 2021 WL 3140545, at *7.

The cases Apple cites in this argument are inapposite. The expert in *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014), who purported to calculate royalty damages in a patent dispute, did not use CBC analysis. *Id.* at *1-2. The expert provided "no methodology" to support his analysis. *Id.* at *3. When pressed to provide the calculations supporting his damage calculation, the expert was forced to concede "there's no specific math." *Id.* at *4. That is a far cry from Dr. Singer's comprehensive CBC analysis, which is supported by extensive calculations and data; Apple's experts have not identified any flaws in those workpapers. Nor does *In re SFPP Right-of-Way Claims*, No. CV-1507492-JVS (DFMx), 2017 WL 2378363 (C.D. Cal. May 23, 2017), help Apple's argument. The court there excluded an expert opinion that based its analysis on a twelve-year-old appraisal (a) of a property that was different from the property in question and (b) which did not even account for changes in the market since the appraisal was made. *Id.* at *6. The expert also proposed using an untested damages model that he developed just for the litigation. *Id.* at *7. The contrasts are stark: Dr. Singer neither ignored relevant market data nor based his calculations on a tangential product, and conjoint analysis is widely used, including outside of litigation. Ex. 1 (Singer Rpt., ¶ 13.)

### 4.    Dr Singer's CBC Properly Presented a Choice Among Defects

Apple claims that Dr. Singer's survey is too suggestive because the "choice sets focus almost exclusively on the 'defect' attribute." Mot. at 15. Apple again ignores that "the Ninth Circuit has held the critiques of survey design, *including that a survey was unduly suggestive*, typically go to the weight, not the admissibility, of a survey." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 371 (N.D. Cal. 2018) (emphasis added) (citing *ThermoLife Int'l*, 648 F. App'x at 613).

Apple erroneously asserts that three of four features in each of Dr. Singer's choice sets are solely related to the defect. In fact, the defect is a single attribute presented to survey respondents. *See* Ex. 1 (Singer Rpt., Fig. 1). The remaining attributes and features—price, name of the product, its size, image of the product, processor, whether it has a turbo boost, amount of storage, whether it has touch bar and touch ID, and graphics card—have nothing to do with a defect. *Id.* And the product name, image, and screen size attributes all appear much larger than the defect attribute in the survey. *Id.* Survey respondents also "were never told that the discounts shown were in any way connected to the Keyboard Defect." Ex. 4 (Singer Reply Rpt., ¶ 11). Consistent with CBC best practices, the survey assigns discounts randomly—so, for example, a model with "no defect" might show a discount. *Id.* Apple ignores these survey features crafted to avoid tipping off respondents and overlooks that the keyboard defect is one of five defects presented randomly to prevent an exclusive focus on the keyboard defect. Ex. 1 (Singer Rpt., ¶ 37). Apple's own expert admitted that no single defect in Dr. Singer's survey was presented more prominently than any other. *See* Ex. 8 (Song Dep. at 80:7-11).

Apple seizes on the relevant defect attribute being underlined, but ignores why. The population of former MacBook purchasers who completed the survey likely would be less familiar with a defect disclosure than with the other attributes shown, such as name, size, price, or processor speed. Ex. 8 (Singer Dep. at 294:6-21). Straining to impute some bias, Apple claims "[r]espondents were told to click on the defect feature"—which is false. Respondents could hover their mouse over the various defects being described to see further background in a pop-up window, but they were not told to do so and they were free to complete the choice sets without doing so. *See id.* at 296:10-19 (testifying that "we just wanted to give them the option to be able to refresh or familiarize themselves back with what -- what the defect meant"). Apple is also wrong that the defect was the only attribute presented in Dr. Singer's pretest. The respondents there were asked to confirm that they reviewed each of the MacBook configurations that would be shown in the survey. *See* Ex. 1 (Singer Rpt., Appx. 3 at Q9-Q17).

Apple gains no traction with its related claim that Dr. Singer's analysis is unrealistic because consumers would not encounter a defect attribute in the real world. The purpose of the CBC study is to measure a change in Apple consumers' willingness to pay in a but-for world where Apple disclosed the latent defect. Thus, including a defect attribute necessarily departs from Apple's historical marketing of

the laptops. Dr. Singer's damages model is appropriate because Apple's concealment of the defect is a basis for Plaintiffs' claims. *See* Class Cert. Order, 2021 WL 1250378, at *5 ("By determining the price at which a consumer would choose a laptop with a keyboard defect over laptops with no defects, Dr. Singer's model measures the discount a customer would demand before purchasing a MacBook with a disclosed keyboard defect.").

The 2019 McFadden article that Apple attached also states that "revealed product defects" are a legitimate application of CBC analysis. Grant Decl., Ex. 6 at 109-10. For example, researchers have used conjoint to measure the impact of a washing machine defect that did not manifest for all users. Ex. 13 (Jindal, Pranav, "Risk Preferences and Demand Drivers of Extended Warranties" at 39). Similarly, courts in products liability litigation have repeatedly allowed use of conjoint to measure damages based on a revealed defect. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 943 (N.D. Cal. 2018) (expert "used a survey method called choice-based conjoint analysis to infer how consumers valued the MFT system in four scenarios where they were exposed to varying levels of information about the MFT defect, its safety implications, and Ford's knowledge of and failure to disclose information about the defect")[6]; *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 995-96 (S.D. Fla. 2016) (CBC analysis measured impact of alleged auto defect); *In re Arris*, 327 F.R.D. at 367-73 (CBC analysis measured change in willingness to pay for modems with alleged latency defect where the defect was one of the product attributes presented in the conjoint survey).

### 5. Dr. Singer's CBC Measures All Relevant Features.

Apple criticizes Dr. Singer's survey design for "fail[ing] to measure the value that respondents attribute to any individual MacBook features." Mot. at 17. But this critique is a strawman. Apple can articulate no methodological justification for Dr. Singer to have measured, for example, the value of the MacBook's Wi-Fi range. Dr. Singer measures the attributes that are necessary to his analysis—various model configurations, price, and the defect. Ex. 1 (Singer Rpt., ¶ 14). No more is required for a reliable

---

[6] Apple overstates Dr. Singer's criticisms of an opposing expert's work in *MyFord Touch*. Mot. at 16. The portion of Dr. Singer's testimony that Apple cites does not, in fact, include any of the quoted language. That language actually comes from Dr. Singer's rebuttal report in that case, where he criticized the Plaintiffs' expert's analysis for a variety of reasons, including that the expert failed to properly measure the impact of the defect on the product's value. Dr. Singer developed his CBC survey methodology in this case to avert the types of problems he identified in *MyFord Touch*.

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

CBC analysis here. *See Apple v. Samsung*, 2014 WL 794328, at *16 ("The literature on conjoint analysis and the case law recognize that there are limitations on the number of distraction features that can be surveyed in a conjoint survey."). In a patent dispute, Apple's expert Dr. Hauser, whom Apple retained to perform a CBC analysis, testified that it "would not be feasible" to "include each and every possible other feature of a smartphone" in his survey because "it would be a very difficult survey to take." *Id.* He continued, "this is the way that we do it in the industry. It's a very accepted form of doing a conjoint analysis." In a separate declaration, Dr. Hauser wrote that "from a scientific perspective, it is unnecessary to include all features of a product when designing a conjoint study." *TV Interactive*, 929 F. Supp. 2d at 1025 (quoting Dr. Hauser's declaration in *Apple v. Samsung*).

**B.    Dr. Singer's CBC Analysis Yields Intuitive Results and a Conservative Damages Calculation**

Apple's claim that Dr. Singer's CBC generated illogical results is yet another argument that implicates the weight, rather than the admissibility, of his testimony—and it is also misconceived and incorrect. *See Fortune Dynamic*, 618 F.3d at 1037-38 (criticisms that survey "quite possibly produced counterintuitive results . . . go to the weight of the survey rather than its admissibility").

In the *Earl* case, for example, the defendants argued that a conjoint survey should be excluded because it produced "irrational, self-contradictory results." 2021 WL 3140545, at *5. The court found this request to be tantamount to "asking the Court to exclude [an expert's] testimony based on the conclusions he draws." *Id.* Exclusion on this basis "contravenes *Daubert*'s command to focus 'solely on principles and methodology, not on the conclusions that they generate.'" *Id.* Thus, any "inconsistencies Defendants perceive" in the expert's report "go to its weight, not its admissibility." *Id.*

The *Williams* case is instructive as well. There, Judge Koh rejected Apple's contentions of irrational survey responses, citing economics authorities to conclude that "economically irrational decisions are occasionally human nature" and "the results may not be irrational at all. Counterintuitively, some consumers prefer higher prices in certain circumstances." 2021 WL 2186223, at *22.

In this case, the results of Dr. Singer's CBC survey are intuitive and should be uncontroversial: consumers prefer defect-free MacBooks over defective MacBooks, and prefer larger price discounts

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

over smaller discounts. Ex. 4 (Singer Reply Rpt., ¶ 49). As shown in Figure 2, reproduced here, the greater the pricing discount the respondents were offered, the greater the utility they derived:



FIGURE 2: RESPONDENTS PREFER GREATER DISCOUNTS

*Id.* ¶ 50. Dr. Singer confirmed this result was statistically significant by performing a "fixed-effects regression that controls for all individual-specific characteristics of survey respondents." *Id.* ¶ 51 n.130. This standard econometric method confirmed "a positive and highly statistically significant relationship between the dollar amount of the discount and the net utility derived from it." *Id.* ¶ 51. The survey also showed that respondents derive disutility from each of the defects presented to them, and express the greatest disutility for the keyboard defect, as shown in Figure 3 below. *Id.* ¶ 52. Dr. Singer confirmed the statistical significance of these findings using the same standard econometric methods—a fixed-effects regression that controls for individual characteristics. *Id.* ¶ 53.



FIGURE 3: RESPONDENTS PREFER DEFECT-FREE MACBOOKS

17

Apple**,** relying primarily on the opinions of Dr. Song, isolates and cherry-picks data to generate

misleading statistics for its claim that Dr. Singer's survey produced unreliable results. Mot. at 18. Apple

and its experts would classify a respondent as "irrational" if the respondent indicated "even the slightest

deviation in a single level of a single attribute." Ex. 4 (Singer Reply Rpt., ¶ 54). Consider Figure 4,

which shows the survey responses of a person whom Apple and its experts would characterize as

"irrational":



FIGURE 4: EXAMPLE OF "IRRATIONAL" RESPONDENT ACCORDING TO DR. SONG

*Note*: Response ID = R_0J1TWTL18BQJ2QB

Taken as a whole, this respondent's choices clearly demonstrate a preference for larger price discounts.

But because the respondent's net utility from a $1,000 discounts dips slightly below the net utility for an

$800 discount, Dr. Song and Apple jump to the broad conclusion that the respondent did not understand

the survey and it must be thrown out as unreliable. In fact, there is nothing unusual about responses that

deviate from the general trend line of economic rationality. Ex. 4 (Singer Reply Rpt., ¶¶ 56-58);

*Williams*, 2021 WL 2186223, at *22. Dr. Singer used a fixed effects regression to analyze the complete

responses for all of the purported "67%" of respondents Dr. Song classified as "irrational" with respect

to their discount preferences. *Id.* ¶ 55. The regression confirms that the responses even of this subgroup

demonstrate a statistically significant preference for larger discounts. *Id.* Thus Apple's claim of irrational

responses proceeds from a faulty premise that attributes "undue significance to the minor variations one

would expect in any given set of survey results." *Id.* ¶ 54.

Dr. Song's position reflects a fundamental misunderstanding of how conjoint results should be

18

1    analyzed (which is unsurprising given her relative inexperience in this area). *See* Ex. 8 (Song Dep. at

2    29:9-10 (admitting this case was the first time she "performed any analysis or any review of literature of

3    CBC.")). According to Dr. Song, if a single respondent makes single choice (out of 10) that appears to

4    deviate even slightly from "the textbook model of a rational consumer" the CBC must be excluded. This

5    position does not accord with the CBC literature, which provides that even if 15-20% of respondents

6    exhibit some lack of understanding, the survey remains reliable. Ex. 4 (Singer Reply Rpt., ¶ 56); *see also*

7    Ex. 9 (Singer Dep. at 317:22-318:18). Some variation in responses is "precisely why CBC analysts

8    obtain a sufficiently large sample size," as Dr. Singer did here. *Id.* No human survey respondent will

9    ever fit the myth of a 100% economically rational actor. *See Williams*, 2021 WL 2186223, at *22

10   ("[E]conomically irrational decisions are occasionally human nature.") (citing Richard H. Thaler, *From

11   Homo Economicus to Homo Sapiens*, 14 J. Econ. Perspectives 133 (2000)). "Thus, even if some of [the]

12   survey responses were irrational, that is to be expected even in an accurate survey." *Id.*

13        Apple also fails to credit Dr. Singer for keeping these responses in his analysis rather than

14   excluding them. While some CBC practitioners have chosen to exclude seemingly irrational responses,

15   doing so here would result in higher damages. Ex. 4 (Singer Reply Rpt., ¶ 59). Dr. Singer followed

16   guidance in the CBC literature, which cautions "against disregarding seemingly irrational responses

17   from CBC" because this "may result in the removal of valid preferences; induce sample selection bias;

18   and reduce the statistical efficiency and power of the estimated choice models." *Id.* ¶ 57.

19        Apple's own authority "underscore[s] that [Dr. Singer's] survey results are relatively reliable."

20   *Williams*, 2021 WL 2186223, at *23 (rejecting similar "irrational results" argument raised by Apple and

21   distinguishing *MacDougal* and *In re Volkswagen*). In *MacDougall*, 2020 WL 5583534, at *8, the court

22   found that the conjoint survey results were not merely "economically irrational" but absurd. That survey,

23   for example, found that a respondent would pay "*three million* dollars more for a vehicle *with* a defect."

24   *Id.* (emphasis added). In *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500

25   F. Supp. 3d 940, 950 (N.D. Cal. 2020), the survey "results suggest[ed] that certain consumers value a

26   $2,000 navigation system in a $16,000 vehicle at $9,000, and that VW is a premium brand compared to

27   Audi." The expert also found an unreasonably wide array of overpayment values ranging from 8.5% to

28   60.5%. *See id.* at 943, 950.

1   In this case Apple points to no absurd results, e.g., consumers agreeing to pay millions for a

2   MacBook with a defect or damages ranging "between almost nothing and almost everything." *Id.* at 950.

3   At most, Dr. Singer's "results present certain idiosyncrasies or irrationalities that track some economic

4   theories." *Williams*, 2021 WL 2186223, at *23. Apple will have the opportunity to cross-examine Dr.

5   Singer about the survey responses[7] and Dr. Song can present her competing views. *See Apple v.*

6   *Samsung*, 2014 WL 794328, at *16 (declining to exclude CBC analysis where experts disputed whether

7   conjoint survey produced "irrational" results and concluding "this battle of the experts is best resolved

8   by the jury.").

9   In addition, Apple misleadingly argues that Dr. Singer's estimate for the change in willingness to

10   pay for a MacBook with a latent keyboard defect is too high. Mot. at 18. Apple's critique in this regard

11   ignores two key steps in Dr. Singer's analysis, where he multiplies his damages estimate by the

12   likelihood of manifestation and reduces it further in relation to Apple's supply-side behavior.

13   Corroborating his results, his per-MacBook damages estimate generally aligns with the price of an

14   external Apple keyboard. Apple's critique further ignores that the discounts presented in Dr. Singer's

15   survey are based upon his findings from the prior conjoint surveys he ran, which revealed that "75

16   percent of respondents required a higher discount than the highest discount offered in [his] survey at the

17   time, $800." Ex. 4 (Singer Reply Rpt., ¶ 22).

18   Finally, Apple faults Dr. Singer because an alternative damages scenario he presented in a

19   generic drug antitrust lawsuit was excluded. *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 237 (E.D.

20   Pa. 2017). Yet that case had nothing to do with conjoint analysis or calculating damages for a class of

21   consumers who purchased a product with an allegedly undisclosed defect. *Id.* at 223-24. Apple also does

22   not acknowledge that the court in that case accepted one of Dr. Singer's damages scenarios. *Id.* at 237.

23   While the court rejected the alternative damages scenario, it did so because it rejected the legal theory of

24   harm presented (which was dictated by Dr. Singer's client), without commenting on his ability to

25   construct a reliable damages model. *Id.* at 235-36.

26   **C.    Dr. Singer's Repair-Rate Calculations Are Methodologically Sound.**

27   Apple continues to overstate the impact of its repair-rate data on the reliability of Dr. Singer's

28

---

[7] It has already deposed Dr. Singer twice, for over 10 hours on the record.

20

damages analysis. The CBC analysis works just as reliably with *any* repair rate, including more updated data produced closer to trial, or multiple repair rates. *See* Ex. 1 (Singer Rpt., ¶ 51); Singer Class Cert. Reply Rpt., Dkt. No. 259-54, ¶ 91. Apple mischaracterizes Dr. Singer's work by claiming that he discards available data and his projections are "contrary to accepted statistical principles." Mot. at 19-20. Apple also falsely claims that Dr. Singer admitted he is not a statistician. Mot. at 19. Quite the contrary: Dr. Singer testified, "[S]tatistics is just the basic building block of what -- what applied microeconomists do. So if I -- if I haven't conveyed that I believe I'm an expert in statistics, then shame on me. I think I do." Ex. 8 (Singer Dep. at 22:22-23:1); *see also id*. at 23:15-17; 25:4-5.

Dr. Singer tailors his CBC damages estimate to the facts of this case by adjusting his damages estimate downward in proportion to the probability that a Class member's MacBook will experience keyboard failure. The best available data for approximating this probability are Apple's own records of customers who returned their MacBooks to Apple for a sticky key, no-make, or double-make failure. But these records are incomplete, because while repair rates are cumulative across time, not all models have been in the field for the same amount of time. *See* Ex. 1 (Singer Rpt., Table 3). Dr. Singer therefore used average repair rates that either (1) are limited to models with complete repair-rate data or (2) rely on projections. Dr. Singer calculated the first weighted average repair rate using only the MacBooks with at least four full years of data. *Id.* ¶ 30. These models are the five oldest because they have been in the field the longest. While some of these models have repair rates that exceed those for later models (*e.g.*, ██ and ██ ), others have repair rates that are lower than those for later models (*e.g.*, ██ and ██ ). In addition to this approach, which relies on historically verifiable data, Dr. Singer developed two regression models that "conservatively extrapolate what the repair rate for newer models of MacBooks would be if they had four complete years of data." *Id.* ¶ 52.

Dr. Singer used standard regression techniques to project cumulative fifth-year repair-rate values for models with incomplete data. Under one approach, he distilled the relationship between the fifth-year and the first- and second-year values for models with complete data and then uses that relationship to predict fifth-year values for every other model with only two years of data. *Id.* ¶ 54. The predictive value

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD

of this method is robust, with an exceptionally high 99.9% R-squared.[8] *Id.* Because the 2019 models

████████████████████████████, they cannot be included in this model. *Id.* Dr. Singer's second

approach to projecting ███████████████ extends to all of the models. Under this approach, he

predicts ████████████████████████████████████████████ *Id.* ¶ 55. The

model uses all available data points and includes ███████████. *Id.* The projection is highly reliable,

with a 90% R-squared. *Id.* Contrary to Apple's overstated claim that these predictive models produce

"wildly varying" estimates (Mot. at 20), the projected weighted averages deviate by only one-tenth of a

percent (██% and ██%). Dr. Singer also noted at deposition that he conducted a fourth projection,

which yielded a ███ weighted average, confirming that his other projections are accurate. Ex. 9 (Singer

Dep. at 189:25-190:5; 344:11-15). The results are also intuitive. Models with ████████████

████████████████████████████████████. Ex. 1 (Singer Rpt., Tables A7

and A8). And his projections are *considerably lower than* █████████████████████.

*See* Ex. 14 (APL-MBKeyboard_01150617).

Apple cites two cases for the proposition that Dr. Singer's repair-rate methodology is flawed.

Both are distinguishable. In *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d

1021, 1025 (C.D. Cal. 2013), the plaintiffs "proposed the use of a statistical sampling" to prove

allegations of securities violations arising out of mortgage-backed securities. One of their experts

proposed a methodology to randomly select certain loans that would be relevant and representative of

the plaintiffs' claims. *Id.* at 1029. Among other deficiencies, the court found that the proposed sampling

methodology suffered from selection bias that affected the capability of the sample to "represent a

population that includes many loans that have not been selected for litigation" *Id.* at 1039. Here, Apple

cannot credibly point to any such "selection bias" because Dr. Singer did not sample data; he instead

used *all* of ████████████████████████████████████████████████████

████. Also unlike the situation in *Countrywide*, the reliability of Dr. Singer's underlying damages

methodology does not depend on his use of Apple's repair-rate data—the CBC analysis could employ

---

[8] A 99.9% R-squared means that the independent variables used in his regression explain over 99% of
variation in the dependent variables, which are the predicted fifth-year repair rates. Ex.1 (Singer Rpt., ¶
69).

any sampling of repair rates. Similarly, in *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007), the expert focused on studies to support his conclusion while "ignoring the great weight of evidence that contradicted it." Dr. Singer did not ignore any of the available repair-rate data. In addition, the court in *Bextra* found the expert unqualified but Apple does not challenge Dr. Singer's credentials. *Id.*

Apple's citation to Dr. Singer's work in an antitrust "no poach" case that had nothing to do with repair-rate projections does not support its argument, either. *See Conrad v. Jimmy John's Franchise, LLC*, Case No. 18-CV-00133-NJR, Dkt. No. 223 (S.D. Ill. Feb. 16, 2021). The parties there disputed how to handle a measurement error in a large set of employee payment data. *Id.* at 1-2. The dispute arose from a small percentage of Jimmy John's employees recording their time on a per-shift instead of an hourly basis. *Id.* at 11. In this case, however, Apple points to no unreasonably included data points.

### D. Dr. Singer's CBC Analysis Is Consistent with Plaintiffs' Theory of Liability and Measures the Damages They Seek Under Their Claims

Despite its discussion (Mot. at 3-4), Apple still "misunderstands Plaintiffs' theory of the case." Class Cert. Order, 2021 WL 1250378, at *14. As the Court explained, "Plaintiffs allege that Apple failed to disclose the existence of the defect not the risk that the defect would manifest. Based on that alleged omission, they contend that every Class member was damaged at the point of sale." *Id.* Apple loses sight of the doctrinal basis for Plaintiffs' claim to damages—that they did not get the benefit of their bargain. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (where a consumer was deceived into making a purchase, he or she suffered harm by "purchas[ing] a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately.") (quoting *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 316 (2011)). Hence under settled law, Dr. Singer's CBC analysis properly measures the harm attributable to Plaintiffs' alleged point-of-sale injury. *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019) ("Plaintiff's theory of liability—that Nissan's manufacture and concealment of a defective clutch system injured class members at the time of sale—is consistent with his proposed recovery based on the benefit of the bargain.").

Apple's new twist on its *Comcast* or "fit" argument is that Dr. Singer failed to account for the fact that MacBook customers would actually expect some baseline level of keyboard failures. Apple provides

no support for the claim, instead erroneously characterizing the argument as testimony Dr. Singer gave in this case. Mot. at 24. The passage Apple cites is actually its own counsel reading from a report Dr. Singer submitted in a different case. *See* Ex. 9 (Singer Dep. at 128:25-129:8). As Dr. Singer explained, in that case he was discussing a brand-new product that had never been on the market. *Id.* at 129:13-15. Apple laptops are not a new product for which consumers might expect some flaws in the initial rollout. Accordingly, "what's relevant here . . . is one of the expectations of Apple consumers . . . for an old, established product they've come to enjoy and love over the years." *Id.* at 131:17-21. Dr. Singer cites evidence that Apple consumers are highly demanding and expect perfection or near-perfection from Apple's products. *See* Singer Class Cert. Rpt., Dkt. No. 224-10, ¶ 13. Apple's own employees testified that no failure rate is acceptable at Apple. *See* Ex. 15 (Ternus Dep. at 175:17-20 ("I don't consider any failure rate to be acceptable, which is why we're always working to try to make the products better.")); Ex. 16 (Williams Dep. at 161:14-15 ("Acceptable at Apple would be everything is at zero percent.")). To the extent Apple believes Dr. Singer's survey unreasonably inflates damages, it can cross-examine him on this point at trial. *In re Arris*, 327 F.R.D. at 370 ("To the extent that Defendant asserts that the conjoint survey overstates the magnitude or frequency of the performance issues, that is a merits argument about the proper amount of damages, not a mismatch between Plaintiffs' damages model and theory of liability.").

Apple's remaining authorities lend no support to its exclusion request. In *In re General Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 235 (S.D.N.Y. Aug. 6, 2019), the court rejected a conjoint analysis that focused "only on changes to the demand side of the equation" without adequately accounting for supply-side factors. In contrast, Dr. Singer developed robust modeling that fully accounts for Apple's supply-side behavior. In *In re Volkswagen*, 500 F. Supp. 3d at 951, the expert admitted that he "did not attempt to calculate" the form of damages approved by the court. Dr. Singer makes no such admission and the Court already upheld his conjoint damages methodology.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Apple's motion to strike Dr. Singer's expert opinions.

24

Dated: August 12, 2021

Respectfully submitted,

**GIRARD SHARP LLP**

/s/ *Simon S. Grille*

Daniel C. Girard (SBN 114826)
Jordan Elias (SBN 228731)
Adam E. Polk (SBN 273000)
Simon S. Grille (SBN 294914)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Fax: (415) 981-4846
*dgirard@girardsharp.com*
*jelias@girardsharp.com*
*apolk@girardsharp.com*
*sgrille@girardsharp.com*

Steven A. Schwartz *(pro hac vice)*
Benjamin F. Johns *(pro hac vice)*
Beena M. McDonald *(pro hac vice)*
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
One Haverford Centre
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
*sas@chimicles.com*
*bfj@chimicles.com*
*bmm@chimicles.com*

*Class Counsel*

Robert C. Schubert
Willem F. Jonckheer
Noah M. Schubert
**SCHUBERT JONCKHEER
& KOLBE LLP**
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
*rschubert@sjk.law*
*wjonckheer@sjk.com*
*nschubert@sjk.law*

25

1

2       E. Michelle Drake
        Joseph C. Hashmall
3       **BERGER & MONTAGUE, P.C.**
        43 SE Main Street
4       Suite 505
        Minneapolis, MN 55414
5       Telephone: (612) 594-5999
        Facsimile: (215) 875-4604
6       *emdrake@bm.net*
        *jhashmall@bm.net*
7

8       Esfand Nafisi
9       **MIGLIACCIO & RATHOD LLP**
        388 Market Street
10      Suite 1300
        San Francisco, CA 94111
11      Telephone: (415) 489-7004
        Facsimile: (202) 800-2730
12      *enafisi@classlawdc.com*

13

14      *Plaintiffs' Executive Committee*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO APPLE'S MOTION TO STRIKE EXPERT OPINIONS OF DR. SINGER
CASE NO. 5:18-CV-02813-EJD-VKD